UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>)<br>CENTER FOR BIOLOGICAL DIVERSITY )<br>1333 North Oracle Road )<br>Tucson, AZ 85705 ) Civ. No.<br>)<br> Plaintiff, )<br>)<br>vs. )<br>)<br>STEPHEN L. JOHNSON )<br>Administrator )<br>United States Environmental Protection Agency )<br>Ariel Ross Building )<br>1200 Pennsylvania Avenue, N.W. )<br>Washington, DC 20460 )<br>)<br> Defendant. )<br>_____) | |

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

I. INTRODUCTION

1.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY challenges the failure of Defendant

STEPHEN L. JOHNSON, Administrator of the United States Environmental Protection Agency

to perform mandatory duties required by the Clean Air Act, 42 U.S.C. §§ 7401-7671q.

Specifically, the Clean Air Act establishes a mandatory deadline for Defendant to complete a

thorough review of the air quality criteria  for Nitrogen Oxides (NOx) and National Ambient Air

Quality Standards ("NAAQS") for Nitrogen Dioxide ("$NO_2$"), make such revisions to these air

quality criteria and NAAQS as may be appropriate, promulgate such new NAAQS as may be

appropriate, and publish notice of such actions in the Federal Register.  Administrator Johnson

has failed to meet this deadline, and the Center for Biological Diversity thus brings this action to

ensure that its members and others who breathe harmful air pollution in communities around the

nation and appreciate ecosystems damaged by harmful air pollution will enjoy the up-to-date

scientific analysis and air quality standards that Congress intended them to have.


## II. JURISDICTION, VENUE, and NOTICE


2.      This is a Clean Air Act citizen suit.  Thus, the Court has jurisdiction over this action

pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 7604(a)(2) (citizen

suits for failure to perform a non-discretionary duty required by the Clean Air Act).

3.      This Court has authority to award the relief sought pursuant to 42 U.S.C. § 7604(a), 28

U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief), and 5 U.S.C. §§ 705, 706.

4.      The acts and omissions allegedly giving rise to the claims in this case occurred in the

District of Columbia.  Furthermore, Defendant Stephen L. Johnson officially resides in the

District of Columbia.  Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) and

(2).

5.      As required by the Clean Air Act, 42 U.S.C. § 7604(b)(2), on June 1, 2005, Plaintiff

mailed to Defendant written notice of intent to sue regarding the violations alleged in this

Complaint.  More than sixty days have passed since Defendant received Plaintiff's notice of

intent to sue letter.  Defendant has not acted to remedy the violations alleged in this complaint.

Therefore, a present and actual controversy exists between the parties.

III. PARTIES

6.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit corporation with its headquarters in Tucson, Arizona.  Striving to secure a healthy environment for the physical and spiritual welfare of generations to come, CBD is actively involved in environmental protection advocacy throughout the United States.

7.      Members and staff of CBD live, work, and travel throughout all fifty states and the District of Columbia during all seasons of the year and will continue to do so on a regular basis.  As a result, CBD's members and staff breathe air containing Nitrogen Dioxide ("$NO_2$") in all fifty states and the District of Columbia.

8.      Scientific evidence has linked $NO_2$ to a wide variety of adverse effects on human health and welfare.  Indeed, recent scientific evidence indicates that those adverse effects are occurring at $NO_2$ concentrations meeting the previously promulgated National Ambient Air Quality Standards ("NAAQS") for $NO_2$.  Plaintiff's members and staff are exposed to this pollution by breathing it, as well as by experiencing its adverse impacts on visibility, aquatic and terrestrial life, human-made materials, and other aspects of public welfare.  Plaintiff's members and staff also rely on scientific information, and compilations and evaluations of scientific information about $NO_2$ impacts to plants, animals and other parts of ecosystems to conduct their biodiversity advocacy work.  Defendant's violations deny Plaintiff's members and staff this scientific information and compilations and evaluations of this scientific information.

9.      The agency actions sought herein include completion of agency review of air quality criteria for NOx and NAAQS for $NO_2$, the making of revisions in those criteria and NAAQS, and the promulgation of new NAAQS as appropriate.  These review, revision, and promulgation

processes offer Plaintiff and its members and staff an opportunity to advocate for more accurate and protective criteria and NAAQS. Plaintiff and its members and staff have repeatedly availed themselves of such advocacy opportunities and will continue to do so in the future. Failure to complete the review and promulgation process deprives Plaintiff's members and staff of these advocacy opportunities.

10.     Failure to complete the review and promulgation processes also deprives Plaintiff and its members and staff of the agency actions resulting from those processes -- including decisions concerning the revision of air quality criteria and NAAQS and promulgation of new NAAQS, as well as the resulting revised criteria and NAAQS and new NAAQS. Those actions will offer crucial information concerning the health and welfare effects of NOx. That information will assist Plaintiff's members and staff in making informed choices concerning their own and their families' exposure to NOx, and in urging federal, state, local, and private decision-makers to take steps to abate NOx. Likewise, more protective NAAQS for $NO_2$ or other NOx will set in motion statutory requirements for abatement of $NO_2$ or NOx levels violating such NAAQS. In particular, such NAAQS would trigger requirements for states -- or EPA, if the states fail to respond or if they respond inadequately -- to design pollution control plans sufficient to attain revised or new NAAQS as expeditiously as practicable, but no later than statutorily specified deadlines. Clean Air Act §§ 107, 110 and 171 et seq., 42 U.S.C. §§ 7407, 7410, and 7501 et seq. Failure to complete the statutorily mandated review, revision, and promulgation addressed herein deprives Plaintiff and its members and staff of these benefits.

11.     For the foregoing reasons, the failures of Defendant challenged in this case have caused, are causing, and unless this Court grants the requested relief, will continue to cause Plaintiff's members and staff injuries for which it has no adequate remedy at law.

12.    Defendant STEPHEN L. JOHNSON is the Administrator of the United States
Environmental Protection Agency ("EPA").  In that role Administrator Johnson has been
charged by Congress with the duty to administer the Clean Air Act, including the duty to review
and revise air quality criteria and NAAQS, and to promulgate new NAAQS as necessary.

## IV. CLEAN AIR ACT REQUIREMENTS

13.    The Clean Air Act ("CAA") aims "to protect and enhance the quality of the Nation's air
resources."  42 U.S.C. § 7401(b)(1).  To help meet this goal, the Clean Air Act requires EPA to
establish and update air quality criteria and National Ambient Air Quality Standards
("NAAQS").

14.    Section 108 of the CAA requires EPA to identify pollutants that "may reasonably be
anticipated to endanger public health and welfare" and to issue air quality criteria for those
pollutants.  42 U.S.C. § 7408.  Section 109 requires EPA to promulgate primary and secondary
NAAQS for the pollutants identified under section 108.  42 U.S.C. § 7409.  Primary standards
must be sufficient to protect the public health, while secondary standards must safeguard the
public welfare.  42 U.S.C. § 7409(b).   The CAA defines effects on welfare to include, among
others, effects on soils, water, vegetation, animals, wildlife, and visibility.  42 U.S.C. § 7602(h).

15.    Section 109(d)(1) further requires that "at five year intervals" EPA "shall complete a
thorough review of the criteria published under [section 108] and the national ambient air quality
standards promulgated under this section and shall make such revisions in such criteria and
standards and promulgate such new standards as may be appropriate."  42 U.S.C. § 7409(d)(1).
Each time it goes through this review process, EPA must publish in the Federal Register its

revision decision concerning the air quality criteria and NAAQS for the pollutant at issue

(including any new or revised NAAQS resulting from that review), as well as notice of the

issuance of any revised air quality criteria for that pollutant.  See 42 U.S.C. §§ 7408(d), 7607(d).

16.    Courts have held that the duties prescribed by § 109(d)(1) are nondiscretionary. For

example, the Second Circuit rejected an argument that § 109(d)(1) merely imposed a duty to

avoid unreasonable delay, finding that the provision instead established a nondiscretionary duty:

"when, as here, a statute sets forth a bright-line rule for agency action, . . . there is no room for

debate -- Congress has prescribed a categorical mandate that deprives EPA of all discretion over

the timing of its work." American Lung Association v. Reilly, 962 F.2d 258, 263 (2d Cir. 1992)

(emphasis added).  The D.C. Circuit subsequently "agree[d]" with this Second Circuit ruling.

American Trucking Assns. v. United States EPA, 175 F.3d 1027, 1047 (D.C. Cir. 1999),

rehearing granted in part on other grounds, denied in part, 195 F.3d 4 (D.C. Cir. 1999), rev'd in

part on other grounds, aff'd in part sub nom. Whitman v. American Trucking Assns., 531 U.S.

457 (2001).

17.    Moreover, EPA's own interpretation of § 109(d)(1) acknowledges the nondiscretionary

nature of the deadline.  With respect to the NAAQS for $NO_2$, EPA long ago recognized that

section 109(d)(1) "requires EPA to review the scientific basis of existing National Ambient Air

Quality Standards (NAAQS) every 5 years."  45 Fed. Reg. 77,768 (Nov. 24, 1980).  More

recently, EPA reaffirmed this straightforward reading with respect to the NAAQS for ozone:

"Under section 109(d)(1) of the Act, EPA is required to perform a review of the ozone NAAQS

every five years." 61 Fed. Reg. 19,195 (May 1, 1996).  Thus, EPA has interpreted 42 U.S.C. §

7409(d)(1) to impose a mandatory duty.

18.     Consistent with this interpretation, EPA has recently implemented a program to reduce unnecessary delays in the NAAQS review process.  To better adhere to the statutory mandate, EPA's senior professional staff have made the entire process more collaborative, and shifted the focus of air quality criteria documents from description to evaluation.


V.  NITROGEN OXIDES


19.     Nitrogen oxides ("$NO_x$") such as $NO_2$ are highly reactive gases emitted primarily through the combustion of fossil fuels in mobile and stationary sources.

20.     $NO_x$ emissions contribute to a variety of public health and public welfare problems.  $NO_x$ emissions are a precursor of ground-level ozone and particulate matter pollution. $NO_x$ emissions also play a role in the accumulation of excess nitrates in drinking water, the eutrophication of aquatic ecosystems and nitrification of soils, global climate change, increases in toxic pollutant levels, and the depletion of the ozone layer.  70 Fed. Reg. 8888-89 (Feb. 23, 2005).

21.     EPA claims that $NO_2$ accounts for the vast majority of $NO_x$ in the atmosphere, and has used this claim as a justification to use $NO_2$ as a surrogate for $NO_x$ since first promulgating the NAAQS for $NO_2$ in 1971.  See 36 Fed. Reg. 8186.

22.     Despite the clear statutory language requiring EPA to review and update the air quality criteria and NAAQS for all regulated pollutants every five years, it has been nearly ten years since EPA last completed such a review to update the air quality criteria for NOx and NAAQS for $NO_2$.  See 61 Fed. Reg. 52,852 (Oct. 8, 1996) (the last such update).  During this time, no review of the NOx criteria or $NO_2$ NAAQS has been completed, nor has there been any decision on revision of such criteria or NAAQS or promulgation of new NAAQS pursuant to such a

review.

23.    The 1996 review culminated in EPA's decision to retain the then-existing primary and

secondary $NO_2$ NAAQS, each an annual arithmetic mean of 0.053 parts per million (ppm).  61

Fed. Reg. 52,852.  This review relied extensively on a 1993 air quality criteria document for $NO_x$

and a 1995 EPA staff paper which reviewed and integrated the research findings compiled in the

earlier document. 61 Fed. Reg. 52,853.

24.    Since the last such review, extensive scientific evidence has emerged concerning the

health and welfare effects of NOx.  This recent evidence indicates that $NO_2$ is causing adverse

effects to human health and welfare at levels allowed by the current $NO_2$ NAAQS.

25.    For example, citing two studies completed after the 1993 air quality criteria document,

the American Academy of Pediatrics reports that "controlled-exposure studies of people with

asthma have found that short-term exposures (30 minutes) to nitrogen dioxide at concentrations

as low as 0.26 ppm can enhance the allergic response after subsequent challenge with allergens."

Committee on Environmental Health, American Academy of Pediatrics, "Ambient Air Pollution:

Health Hazards to Children," Pediatrics 2004: 114: 1699-1707, at 1701.  These findings are

important because some urban communities that are in compliance with the $NO_2$ NAAQS

nonetheless may experience short-term $NO_2$ levels in excess of 0.25 ppm. Id.  For example, in

2004, Miami, Florida recorded a one-hour peak $NO_2$ concentration of 0.417 ppm, while Sublette

County, Wyoming reached 0.267 ppm during a similar span.[1]  Despite these high readings, both

areas meet the current $NO_2$ NAAQS.

---

[1] This data is available at:
http://oaspub.epa.gov/airsdata/adaqs.monvals?geotype=st&geocode=FL+WY&geoinfo=%3Fst%7EFL+WY%7EFlo
rida%2C+Wyoming&pol=NO2&year=2004&fld=monid&fld=siteid&fld=address&fld=city&fld=county&fld=stabb
r&fld=regn&rpp=25

26.    Research completed since the last $NO_2$ NAAQS update has also established that there is a correlation between elevated levels of $NO_2$ and incidence of Sudden Infant Death Syndrome ("SIDS").  See Dales, Robert, et al., "Air Pollution and Sudden Infant Death Syndrome," Pediatrics, 2004: 113: 628-31, at 629.

27.    Meanwhile, other recent studies have expanded the base of knowledge on the links between $NO_2$ and asthma attacks, respiratory tract symptoms, bronchitis, and decreased lung function.  Committee on Environmental Health at 1701.

28.    Moreover, since the last review of the air quality criteria for NOx and NAAQS for $NO_2$, research into the public welfare impacts of $NO_2$ emissions has solidified the link between $NO_2$ emissions and the harmful effects of nitrogen deposition. For example, one 2003 study found a linear relationship between $NO_x$ emissions and nitrogen deposition. 70 Fed. Reg. 8892 (Feb. 23, 2005). Meanwhile, a 2001 report linked elevated soil nitrogen levels caused by deposition with the accelerated acidification of soils through the leaching of minerals which neutralize acid deposition.  Id. at 8893. Soil acidification is known to inhibit tree growth and can also result in the dissolution of harmful levels of aluminum into aquatic ecosystems.  Id. at 8892-93. Recent studies have also raised awareness of the role of nitrogen deposition in the eutrophication of water bodies. Thus, a 1998 survey estimated the percentage of the total nitrate load in the Chesapeake Bay attributable to nitrogen deposition to be between 10% and 45%. Id. at 8894.

29.    The increasing evidence regarding the adverse effects of $NO_2$ pollution has prompted the state of California to enact ambient $NO_2$ limitations which are stricter than the federal NAAQS. In addition to the annual arithmetic mean concentration limit imposed by the NAAQS, California regulations provide for a one-hour $NO_2$ concentration limit of 0.25 ppm.  Cal. Code. Regs. tit. 17, § 70200.  Moreover, due to the increasing evidence that even this more restrictive standard

may be inadequate to protect the health of California residents, the state has recently begun a review of its own $NO_2$ standards. See http://www.arb.ca.gov/research/aaqs/caaqs/no2-1/no2-1.htm (last updated Apr. 7, 2004).

30.    However, despite the growing evidence that existing NAAQS for $NO_2$ is inadequate to protect public health and public welfare, EPA has not fulfilled its mandatory duty to review thoroughly and update as necessary the air quality criteria for NOx and the NAAQS for $NO_2$, to promulgate such new NAAQS for $NO_2$ or any other oxides of nitrogen as may be requisite, and to publish notice of such actions in the Federal Register. According to the clear statutory deadlines, such a review should have been completed in 2001. Yet, as EPA's own website indicates, EPA has yet to even commence such a review. See http://www.epa.gov/ttn/naaqs/standards/nox/s_nox_index.html (last visited Aug. 2, 2005) (indicating that EPA is not currently reviewing any documents in preparation for a review of the $NO_2$ NAAQS).

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(CAA Sections 304(a)(2); 108; 109(d)(1); & 307(d))

31.    Each allegation set forth in the complaint is incorporated herein by reference.

32.    The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $NO_2$ and NOx expired several years ago. Nonetheless, Defendant has failed to perform those actions. Specifically, Defendant has failed to complete a thorough review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$. Furthermore, Defendant has failed to make such revisions in the foregoing

criteria for NOx and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b). Moreover, Defendant has failed to publish in the Federal Register (1) a revision decision concerning the review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (2) notice of the issuance of any revised air quality criteria for NOx.  See 42 U.S.C. §§ 7408(d), 7607(d).

33.     Defendant's failure to perform each of the above actions constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).


### (ALTERNATIVE) SECOND CLAIM FOR RELIEF
(Administrative Procedure Act Section 706(1))

34.     Each allegation set forth in the complaint is incorporated herein by reference.

35.     The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $NO_2$ and NOx expired several years ago. Nonetheless, Defendant has failed to perform those actions. Specifically, Defendant has failed to complete a thorough review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$. Furthermore, Defendant has failed to make such revisions in the foregoing criteria and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b). Moreover, Defendant has failed to publish in the Federal Register (1) a revision decision concerning the review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (2) notice of the issuance of any revised air quality criteria for NOx.  See 42 U.S.C. §§ 7408(d), 7607(d).

36.     Defendant's failure to perform each of the above actions constitutes agency action unreasonably delayed or unlawfully withheld within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(1).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

A.     Declare that Defendant's failure (a) to complete a thorough review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$, and (b) to make such revisions in the foregoing criteria for NOx and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b), each constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2), or in the alternative that each constitutes agency action unreasonably delayed within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1).

B.     Order Defendant (a) to complete a thorough review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$, (b) to make such revisions in the foregoing criteria for NOx and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b), and (c) to publish in the Federal Register (i) a revision decision concerning the review of the air quality criteria for NOx and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (ii) notice of the issuance of any revised air quality

criteria for NOx -- all in accordance with expeditious deadlines prescribed by the Court,

including deadlines for notices of proposed and final rulemaking and other interim milestones.

C.      Retain jurisdiction of this action to ensure compliance with the Court's Order.

D.      Award plaintiffs the costs of litigation in this action, including attorney's fees. <u>See</u> 42

U.S.C. § 7604(d).

E.      Grant such other relief as the Court deems just and proper.


                                Respectfully submitted,


                                _____/s_____
                                Robert Ukeiley (MD14062)
                                Law Office of Robert Ukeiley
                                433 Chestnut Street
                                Berea, KY 40403
                                Tel: (859) 986-5402
                                Fax: (859) 986-1299
                                E-mail: rukeiley@igc.org


                                Counsel for Plaintiff

Dated: September 12, 2005