# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ) | |
| ) | |
| CENTER FOR BIOLOGICAL DIVERSITY ) | |
| 1333 North Oracle Road ) | |
| Tucson, AZ 85705, ) | Civ. No. 05-1814 (JGP) |
| ) | |
| VALLEY WATCH, INC. ) | |
| 800 Adams Avenue ) | |
| Evansville, IN 47713, ) | |
| ) | |
| PRESTON FORSYTHE ) | |
| 2309 Hwy 431 South ) | |
| Browder, KY 42326, ) | |
| ) | |
| TINA JOHNSON ) | |
| 433 Chestnut Street ) | |
| Berea, KY 40403, ) | |
| ) | |
| and ) | |
| ) | |
| JEREMY NICHOLS ) | |
| 42-A Fox Street ) | |
| Denver, CO 80223 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| STEPHEN L. JOHNSON ) | |
| Administrator ) | |
| United States Environmental Protection Agency ) | |
| Ariel Ross Building ) | |
| 1200 Pennsylvania Avenue, N.W. ) | |
| Washington, DC 20460 ) | |
| ) | |
| Defendant. ) | |

_____)


**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY
RELIEF**

# I. INTRODUCTION

1.     Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY, VALLEY WATCH, INC., PRESTON FORSYTHE, TINA JOHNSON, and JEREMY NICHOLS challenge the failure of Defendant STEPHEN L. JOHNSON, Administrator of the United States Environmental Protection Agency to perform mandatory duties required by the Clean Air Act, 42 U.S.C. §§ 7401-7671q.  Specifically, the Clean Air Act establishes mandatory deadlines for Defendant to complete a thorough review of the air quality criteria for Nitrogen Oxides ($NO_x$) and Sulfur Oxides ($SO_x$) and the National Ambient Air Quality Standards (NAAQS) for Nitrogen Dioxide ($NO_2$) and Sulfur Dioxide ($SO_2$), to make such revisions to these air quality criteria and NAAQS as may be appropriate, to promulgate such new NAAQS as may be appropriate, and to publish notice of such actions in the Federal Register.  Administrator Johnson has failed to meet these deadlines.  Thus, Plaintiffs bring this action to ensure that they and their families, their members and others who breathe harmful air pollution in communities around the nation and appreciate ecosystems damaged by harmful air pollution will enjoy the up-to-date scientific analysis and air quality standards that Congress intended them to have.

# II. JURISDICTION, VENUE, and NOTICE

2.     This is a Clean Air Act citizen suit.  Thus, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. §

7604(a)(2) (citizen suits for failure to perform a non-discretionary duty required by the Clean Air Act).

3.      This Court has authority to award the relief sought pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief), and 5 U.S.C. §§ 705, 706.

4.      The acts and omissions allegedly giving rise to the claims in this case occurred in the District of Columbia.  Furthermore, Defendant Stephen L. Johnson officially resides in the District of Columbia.  Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) and (2).

5.      As required by the Clean Air Act, 42 U.S.C. § 7604(b)(2), on June 1, 2005, Plaintiff Center for Biological Diversity mailed to Defendant written notice of intent to sue regarding the violations alleged in this Complaint with respect to the air quality criteria for $NO_x$ and the NAAQS for $NO_2$, and on November 15, 2005, Plaintiffs Center for Biological Diversity, Valley Watch, Inc., Preston Forsythe, Tina Johnson, and Jeremy Nichols mailed to Defendant written notice of intent to sue regarding the violations alleged in this Complaint with respect to the air quality criteria for $SO_x$ and the NAAQS for $SO_2$.  More than sixty days have passed since Defendant received each of Plaintiffs' notice of intent to sue letters.  Defendant has not remedied the violations alleged in this Complaint.  Therefore, a present and actual controversy exists between the parties.

## III. PARTIES

6.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit corporation with its headquarters in Tucson, Arizona.  Striving to secure a healthy environment for the physical and spiritual welfare of generations to come, CBD is actively involved in environmental protection advocacy throughout the United States.

7.     Members and staff of CBD live, work, and travel throughout all fifty states and the District of Columbia during all seasons of the year and will continue to do so on a regular basis.  As a result, CBD's members and staff breathe air containing Nitrogen Dioxide ("$NO_x$") and Sulfur Dioxide ("$SO_x$") in all fifty states and the District of Columbia.

8.     Scientific evidence has linked both $NO_x$ and $SO_x$ to a wide variety of adverse effects on human health and "welfare" as "welfare" is defined in the Clean Air Act.  <u>See</u> 42 U.S.C. § 7602(h).  Indeed, recent scientific evidence indicates that such adverse effects are occurring at $NO_2$ and $SO_2$ concentrations below the existing National Ambient Air Quality Standards ("NAAQS") for $NO_2$ and $SO_2$.  CBD's members and staff are exposed to this pollution by breathing it, as well as by experiencing its adverse impacts on visibility, aquatic and terrestrial life, human-made materials, and other aspects of public welfare.  CBD's members and staff also rely on scientific information and compilations and evaluations of scientific information about $NO_x$ and $SO_x$ impacts to plants, animals and other parts of ecosystems to conduct their biodiversity advocacy work.  Defendant's violations deny CBD's members and staff this scientific information and compilations and evaluations of this scientific information.

8.    Plaintiff VALLEY WATCH, INC.'s primary mission is to protect the public health and environment of the Lower Ohio Valley.  President and member John Blair is an adjunct faculty member of the University of Southern Indiana and a freelance photographer, as well as president of Valley Watch, Inc.  His work as a freelance photographer includes a considerable amount of aerial photography.  Air pollution, including $SO_x$, adversely affects Mr. Blair's work because poor air quality obscures the view to such a degree that it prevents him from taking commercial quality photographs. The Lower Ohio Valley is a region already saturated with air pollution from its many large sources of $SO_x$, and where there are already health problems due to air quality issues, including asthma, premature death, respiratory problems and, in colloquial terms, something Evansville residents refer to as "the Evansville crud," from which Mr. Blair suffers.  Mr. Blair has also suffered from numerous upper respiratory infections over the last several years.  In that they contribute to the persistence of elevated levels of $SO_x$ pollution, Defendant's violations of the Clean Air Act constitute both an economic and physical injury to Valley Watch, Inc.'s members.

9.    Plaintiff PRESTON FORSYTHE is a resident of Muhlenberg County, Kentucky who lives, recreates, and obtains spiritual and aesthetic pleasure from locations that are, and will continue to be adversely affected by $SO_x$ air pollution.  The air in Muhlenberg County only recently came into compliance with the existing $SO_2$ NAAQS and the area would likely again fail to meet the NAAQS if the United States Environmental Protection Agency (EPA) revised the $SO_2$ NAAQS to comply with current science and law.  This failure to meet the NAAQS would bring about stricter emission limits and other control

5

measurers that could have a variety of benefits for Mr. Forsythe including reducing his risk of his premature death.

10.    Plaintiff TINA JOHNSON works, in both a professional and volunteer capacity, on forest issues including ensuring that small scale forestry is conducted in an economically and environmentally sustainable manner.  $SO_x$ impacts on trees adversely affect Ms. Johnson's ability to foster economic and environmental viable forestry by injuring trees which can cause a variety of problems including slower growth and death. EPA's failure to complete the required review of the $SO_x$ air quality criteria and the related NAAQS exacerbates this problem by contributing to the persistence of high ambient concentrations of $SO_x$ pollution.

11.    Plaintiff JEREMY NICHOLS is a resident of Denver, Colorado, an avid bicycle rider, outdoor enthusiast, and father of a three year old son, who is deeply concerned about air quality in the Rocky Mountain Region of the western United States and its effects to the health and welfare of people, plants, and animals.  Mr. Nichols is adversely affected by $SO_x$ emissions, especially in the Denver metropolitan area of Colorado. Emissions of $SO_x$ lead to the formation of haze in the Denver metropolitan area, which takes the form of an ugly, ominous, brown cloud that covers the metro area. Emissions of $SO_x$ also increase the risk that Mr. Nichols and his young son will suffer respiratory ailments. The above described interests are adversely affected by the EPA's failure to complete the required review of the $SO_x$ air quality criteria and the related NAAQS.

9.    The agency actions sought herein include completion of agency review of air quality criteria for $NO_x$ and $SO_x$ and NAAQS for $NO_2$ and $SO_2$, the making of revisions in those criteria and NAAQS, and the promulgation of new NAAQS as appropriate.

These review, revision, and promulgation processes offer Plaintiffs and their members and staff an opportunity to advocate for more accurate and protective criteria and NAAQS. Plaintiffs and their members and staff have repeatedly availed themselves of such advocacy opportunities and will continue to do so in the future. Failure to complete the review and promulgation process deprives Plaintiffs and their members and staff of these advocacy opportunities.

10.     Failure to complete the review and promulgation processes also deprives Plaintiffs and their members and staff of the agency actions resulting from those processes -- including decisions concerning the revision of air quality criteria and NAAQS and promulgation of new NAAQS, as well as the resulting revised criteria and NAAQS and new NAAQS. Those actions will offer crucial information concerning the health and welfare effects of $NO_x$ and $SO_x$. That information will assist Plaintiffs and their members and staff in making informed choices concerning their own and their families' exposure to $NO_x$ and $SO_x$, and in urging federal, state, local, and private decision-makers to take steps to abate $NO_x$ and $SO_x$ emissions. Likewise, more protective NAAQS for $NO_2$ or other $NO_x$ and for $SO_2$ or other $SO_x$ will set in motion statutory requirements for the abatement of pollutant levels violating such NAAQS. In particular, such NAAQS would trigger requirements for states -- or EPA, if the states fail to respond or if they respond inadequately -- to design pollution control plans sufficient to attain revised or new NAAQS as expeditiously as practicable, but no later than statutorily specified deadlines. See e.g. 42 U.S.C. §§ 7407, 7410, and 7501 et seq. Failure to complete the statutorily mandated review, revision, and promulgation addressed herein deprives Plaintiffs and their members and staff of these benefits.

11.    For the foregoing reasons, the failures of Defendant challenged in this case have caused, are causing, and unless this Court grants the requested relief, will continue to cause Plaintiffs and their members and staff injuries for which they have no adequate remedy at law.

12.    Defendant STEPHEN L. JOHNSON is the Administrator of the United States Environmental Protection Agency ("EPA").  In that role Administrator Johnson has been charged by Congress with the duty to administer the Clean Air Act, including the duty to review and revise air quality criteria and NAAQS, and to promulgate new NAAQS as necessary.


## IV. CLEAN AIR ACT REQUIREMENTS


13.    The Clean Air Act ("CAA") aims "to protect and enhance the quality of the Nation's air resources."  42 U.S.C. § 7401(b)(1).  To help meet this goal, the Clean Air Act requires EPA to establish and update air quality criteria and National Ambient Air Quality Standards ("NAAQS").

14.    Section 108 of the CAA requires EPA to identify pollutants that "may reasonably be anticipated to endanger public health and welfare" and to issue air quality criteria for those pollutants.  42 U.S.C. § 7408.  Air quality criteria, commonly referred to as the "criteria document," is a document that "reflects the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health and welfare which may be expected from the presence of such pollutants in the ambient air, in varying quantities."  42 U.S.C. § 7408(a)(2).  Section 109 requires EPA to promulgate

primary and secondary NAAQS for the pollutants identified under section 108. 42

U.S.C. § 7409. Primary standards must be sufficient to protect the public health, while

secondary standards must safeguard the public welfare. 42 U.S.C. § 7409(b). The CAA

defines effects on welfare to include, among others, effects on soils, water, vegetation,

animals, wildlife, and visibility. 42 U.S.C. § 7602(h).

15.     Section 109(d)(1) further requires that "at five year intervals" EPA "shall

complete a thorough review of the criteria published under [section 108] and the national

ambient air quality standards promulgated under this section and shall make such

revisions in such criteria and standards and promulgate such new standards as may be

appropriate." 42 U.S.C. § 7409(d)(1). Each time it goes through this review process,

EPA must publish in the Federal Register its revision decision concerning the air quality

criteria and NAAQS for the pollutant at issue (including any new or revised NAAQS

resulting from that review), as well as notice of the issuance of any revised air quality

criteria for that pollutant. See 42 U.S.C. §§ 7408(d), 7607(d).

16.     Courts have held that the duties prescribed by § 109(d)(1) are nondiscretionary.

For example, the Second Circuit rejected an argument that § 109(d)(1) merely imposed a

duty to avoid unreasonable delay, finding that the provision instead established a

nondiscretionary duty: "when, as here, a statute sets forth a bright-line rule for agency

action, . . . there is no room for debate -- Congress has prescribed a categorical mandate

that deprives EPA of all discretion over the timing of its work." American Lung

Association v. Reilly, 962 F.2d 258, 263 (2d Cir. 1992) (emphasis added). The D.C.

Circuit subsequently "agree[d]" with this Second Circuit ruling. American Trucking

Assns. v. United States EPA, 175 F.3d 1027, 1047 (D.C. Cir. 1999), rehearing granted in

part on other grounds, denied in part, 195 F.3d 4 (D.C. Cir. 1999), rev'd in part on other

grounds, aff'd in part sub nom. Whitman v. American Trucking Assns., 531 U.S. 457

(2001).

17.     Moreover, EPA's own interpretation of § 109(d)(1) acknowledges the

nondiscretionary nature of the deadline.  For example, with respect to the NAAQS for

$NO_2$, EPA long ago recognized that section 109(d)(1) "requires EPA to review the

scientific basis of existing National Ambient Air Quality Standards (NAAQS) every 5

years."  45 Fed. Reg. 77,768 (Nov. 24, 1980).  More recently, EPA reaffirmed this

straightforward reading with respect to the NAAQS for ozone:  "Under section 109(d)(1)

of the Act, EPA is required to perform a review of the ozone NAAQS every five years."

61 Fed. Reg. 19,195 (May 1, 1996).  Thus, EPA has interpreted 42 U.S.C. § 7409(d)(1) to

impose a mandatory duty.

18.     Consistent with this interpretation, EPA has recently implemented a program to

reduce unnecessary delays in the NAAQS review process.  To better adhere to the

statutory mandate, EPA's senior professional staff have made the entire process more

collaborative, and shifted the focus of air quality criteria documents from description to

evaluation.


### V. NITROGEN OXIDES


19.     Nitrogen oxides ("$NO_x$") such as $NO_2$ are highly reactive gases emitted primarily

through the combustion of fossil fuels in mobile and stationary sources.

20.    $NO_x$ emissions contribute to a variety of public health and public welfare problems.  $NO_x$ emissions are a precursor of ground-level ozone and particulate matter pollution.  $NO_x$ emissions also play a role in the accumulation of excess nitrates in drinking water, the eutrophication of aquatic ecosystems and nitrification of soils, global climate change, increases in toxic pollutant levels, and the depletion of the ozone layer. 70 Fed. Reg. 8888-89 (Feb. 23, 2005).

21.    EPA claims that $NO_2$ accounts for the vast majority of $NO_x$ in the atmosphere, and has used this claim as a justification to use $NO_2$ as a surrogate for $NO_x$ since first promulgating the NAAQS for $NO_2$ in 1971.  See 36 Fed. Reg. 8186.

22.    Despite the clear statutory language requiring EPA to review and update the air quality criteria and NAAQS for all regulated pollutants every five years, it has been nearly ten years since EPA last completed such a review to update the air quality criteria for $NO_x$ and NAAQS for $NO_2$.  See 61 Fed. Reg. 52,852 (Oct. 8, 1996) (the last such update).  During this time, no review of the $NO_x$ criteria or $NO_2$ NAAQS has been completed, nor has there been any decision on revision of such criteria or NAAQS or promulgation of new NAAQS pursuant to such a review.

23.    The 1996 review culminated in EPA's decision to retain the then-existing primary and secondary $NO_2$ NAAQS, each an annual arithmetic mean of 0.053 parts per million (ppm).  61 Fed. Reg. 52,852.  This review relied extensively on a 1993 air quality criteria document for $NO_x$ and a 1995 EPA staff paper which reviewed and integrated the research findings compiled in the earlier document.  61 Fed. Reg. 52,853.

24.    Since the last such review, extensive scientific evidence has emerged concerning the health and welfare effects of $NO_x$.  This recent evidence indicates that $NO_2$ is causing

11

adverse effects to human health and welfare at levels allowed by the current $NO_2$ NAAQS.

25.     For example, citing two studies completed after the 1993 air quality criteria document, the American Academy of Pediatrics reports that "controlled-exposure studies of people with asthma have found that short-term exposures (30 minutes) to nitrogen dioxide at concentrations as low as 0.26 ppm can enhance the allergic response after subsequent challenge with allergens."  Committee on Environmental Health, American Academy of Pediatrics, "Ambient Air Pollution: Health Hazards to Children," Pediatrics 2004: 114: 1699-1707, at 1701.  These findings are important because some urban communities that are in compliance with the $NO_2$ NAAQS nonetheless may experience short-term $NO_2$ levels in excess of 0.25 ppm.  Id.  For example, in 2004, Miami, Florida recorded a one-hour peak $NO_2$ concentration of 0.417 ppm, while Sublette County, Wyoming reached 0.267 ppm during a similar span.[1]  Despite these high readings, both areas meet the current $NO_2$ NAAQS.

26.     Research completed since the last $NO_2$ NAAQS update has also established that there is a correlation between elevated levels of $NO_2$ and incidence of Sudden Infant Death Syndrome ("SIDS").  See Dales, Robert, et al., "Air Pollution and Sudden Infant Death Syndrome," Pediatrics, 2004: 113: 628-31, at 629.

27.     Meanwhile, other recent studies have expanded the base of knowledge on the links between $NO_2$ and asthma attacks, respiratory tract symptoms, bronchitis, and decreased lung function.  Committee on Environmental Health at 1701.

---

[1] This data is available at:
http://oaspub.epa.gov/airsdata/adaqs.monvals?geotype=st&geocode=FL+WY&geoinfo=%3Fst%7EFL+WY%7EFlorida%2C+Wyoming&pol=NO2&year=2004&fld=monid&fld=siteid&fld=address&fld=city&fld=county&fld=stabbr&fld=regn&rpp=25

28.     Moreover, since the last review of the air quality criteria for $NO_x$ and NAAQS for $NO_2$, research into the public welfare impacts of $NO_2$ emissions has solidified the link between $NO_2$ emissions and the harmful effects of nitrogen deposition.  For example, one 2003 study found a linear relationship between $NO_x$ emissions and nitrogen deposition. 70 Fed. Reg. 8892 (Feb. 23, 2005).  Meanwhile, a 2001 report linked elevated soil nitrogen levels caused by deposition with the accelerated acidification of soils through the leaching of minerals which neutralize acid deposition.  Id. at 8893.  Soil acidification is known to inhibit tree growth and can also result in the dissolution of harmful levels of aluminum into aquatic ecosystems.  Id. at 8892-93.  Recent studies have also raised awareness of the role of nitrogen deposition in the eutrophication of water bodies.  Thus, a 1998 survey estimated the percentage of the total nitrate load in the Chesapeake Bay attributable to nitrogen deposition to be between 10% and 45%.  Id. at 8894.

29.     The increasing evidence regarding the adverse effects of $NO_2$ pollution has prompted the state of California to enact ambient $NO_2$ limitations which are stricter than the federal NAAQS.  In addition to the annual arithmetic mean concentration limit imposed by the NAAQS, California regulations provide for a one-hour $NO_2$ concentration limit of 0.25 ppm.  Cal. Code. Regs. tit. 17, § 70200.  Moreover, due to the increasing evidence that even this more restrictive standard may be inadequate to protect the human health, California has recently begun a review of its own $NO_2$ standards.  See http://www.arb.ca.gov/research/aaqs/caaqs/no2-1/no2-1.htm (last updated Apr. 7, 2004).

30.     However, despite the growing evidence that the existing NAAQS for $NO_2$ are inadequate to protect public health and public welfare, EPA has not fulfilled its mandatory duty to review thoroughly and update as necessary the air quality criteria for

$NO_x$ and the NAAQS for $NO_2$, to promulgate such new NAAQS for $NO_2$ or any other

oxides of nitrogen as may be requisite, and to publish notice of such actions in the

Federal Register.  According to the clear statutory deadlines, such a review should have

been completed in 2001.  Yet, EPA did not even initiate its review of the air quality

criteria for $NO_x$, the first step in the NAAQS review process, until after the

commencement of this lawsuit.  See 70 Fed. Reg. 73,236 (Dec. 9, 2005) (announcing that

EPA is undertaking a review of the $NO_x$ air quality criteria).

## VI. SULFUR OXIDES

31.     Sulfur Oxides ("$SO_x$") such as $SO_2$ are a group of gases formed primarily from

the combustion of fuel containing sulfur, such as coal.  $SO_x$ are also released during the

manufacture of metals and in some oil refining processes.

32.     $SO_x$ emissions have a variety of negative effects on both human health and the

environment.  $SO_x$ pollution contributes to respiratory problems, particularly for children

and the elderly, and aggravates existing heart and lung diseases.  High levels of $SO_x$

emitted over a short period can be harmful to asthmatics.  $SO_x$ also contribute to the

formation of acid rain, which damages trees, crops, historic buildings, and monuments

and alters the acidity of both soils and water bodies.  In addition, because $SO_x$ emissions

may be transmitted long distances, they contribute to visibility impairment problems in

many national parks.  See EPA, Office of Air Quality Planning and Standards, "$SO_2$ –

How Sulfur Dioxide Affects the Way We Live & Breathe" (Nov. 2000), available at

http://www.epa.gov/air/urbanair/so2/index.html.

33.     $SO_2$ is the Sulfur Oxide that EPA has used as a surrogate parameter for regulation of all $SO_x$ emissions since first promulgating NAAQS for $SO_2$ in 1971.  See 36 Fed. Reg. 8186.

34.     The current NAAQS for $SO_2$ have remained unchanged since 1971.  The primary NAAQS for $SO_2$ limit ambient concentrations to an annual arithmetic mean of 0.03 parts per million (ppm) and also impose a 24-hour limit of 0.14 ppm.  40 C.F.R. § 50.4.  Meanwhile, the secondary NAAQS limits $SO_2$ levels to 0.5 ppm over a three-hour averaging period.  40 C.F.R. § 50.5.

35.     Despite the clear statutory language requiring EPA to review and update the air quality criteria and NAAQS for all regulated pollutants every five years, it has been nearly ten years since EPA last completed such a review to update the air quality criteria for $SO_x$ and NAAQS for $SO_2$.  During this time, no review of the $SO_x$ criteria or $SO_2$ NAAQS has been completed, nor has there been any decision on revision of such criteria or NAAQS or promulgation of new NAAQS pursuant to such a review.

36.     EPA's last review of the air quality criteria document for $SO_x$ was combined with a review of the air quality criteria document for particulate matter, a process which concluded with the issuance of the new criteria document for both pollutants in 1984.  58 Fed. Reg. 21,351, 21,353 (Apr. 21, 1993).  Although EPA has supplemented this criteria document over the years as new studies on the effects of $SO_x$ pollution have been published, it does not appear that EPA has done so since issuing a supplement to the second addendum to the document in 1994.

36.     EPA's most recent consideration of the efficacy of the existing NAAQS for $SO_2$ proceeded in two stages.  In 1993, EPA elected to retain the existing secondary $SO_2$

NAAQS, and in 1996 EPA came to the same conclusion regarding the existing primary

NAAQS.  See 58 Fed. Reg. 21,351 (Apr. 21, 1993) (retaining existing secondary $SO_2$

NAAQS); 61 Fed. Reg. 25,566 (May 22, 1996) (retaining existing primary $SO_2$

NAAQS).

37.    EPA's 1996 decision to retain the existing primary NAAQS for $SO_2$ provoked a

lawsuit challenging that decision, and upon concluding that EPA had not adequately

explained its rationale for retaining the existing primary $SO_2$ NAAQS the District of

Columbia Circuit remanded the case to EPA for further elucidation.  American Lung

Assn. v. EPA, 134 F.3d 388 (D.C. Cir. 1998).  Although it has now been over seven years

since this remand, EPA still has neither provided a new justification for its 1996 decision

to retain the existing primary $SO_2$ NAAQS nor completed a new cycle of review of those

standards.

38.    Similarly, EPA's inaction with respect to the secondary $SO_2$ NAAQS has incited a

multistate effort to prod the agency into commencing a review of those NAAQS. Because

of the persistent problem of acid rain in the northeastern United States, in 1999, seven

states submitted a joint petition for rulemaking to EPA requesting that the agency review,

pursuant to 42 U.S.C. § 7409(d)(1), the secondary NAAQS for both $SO_2$ and the other

regulated pollutants associated with acid rain. 65 Fed. Reg. 48,699, 48,700-01 (Aug. 9,

2000).  However, EPA still has not yet even announced in the Federal Register that it has

begun a review of the $SO_2$ secondary NAAQS.

39.    Much of the controversy surrounding the current $SO_2$ NAAQS stems from

increasing scientific understanding of the problems posed by elevated short-term $SO_2$

concentrations, especially among sensitive populations.  Thus, for example, California's

air quality standards for $SO_2$ impose a more stringent short-term concentration limit than the NAAQS.  California regulations limit the hourly concentration of $SO_2$ to 0.25 ppm (half the amount that the existing NAAQS allow to persist for three hours).  Cal. Code. Regs. tit. 17, § 70200.  Yet, a survey of recent research on the adverse health effects of $SO_2$ conducted for the California Air Resources Board concluded that even this 0.25 ppm hourly standard was not sufficient to protect all California residents.  See Jane Q Koenig & Therese F Mar, Sulfur Dioxide: Evaluation of Current California Air Quality Standards with Respect to Protection of Children at 22-23 (2000), available at http://www.oehha.ca.gov/air/pdf/oehhaso2.pdf.

50.     As to the secondary $SO_2$ NAAQS, research has shown for decades that $SO_2$ has adverse impacts on vegetation, including important agricultural crops at levels below the current $SO_2$ NAAQS.  For example, a 1974 study by the Tennessee Valley Authority (TVA) found that $SO_2$ impacts from one of TVA's coal-fired power plants which created $SO_2$ levels of between 0.21 – 0.30 ppm over a 3-hour average damaged trees.  S.B. McLaughlin and N.T. Lee, "Botanical Studies in the Vicinity of Widows Creek Steam Plant; Review of Air Pollution Effects Studies, 1952-1972 and Results of 1973 Surveys," (1974) at F-1.  EPA itself has admitted that sensitive vegetation suffers adverse effects from $SO_2$ at 0.30 ppm over a 3-hour average and all levels of vegetation suffers adverse effects from $SO_2$ at 0.007 ppm over an annual average.  EPA, "A Screening Procedure for the Impacts of Air Pollution Sources on Plants, Soils and Animals: Final Report," EPA 450/2-81-078 (Dec. 12, 1980) at page 11, Table 3.1.  Moreover, EPA admits that these levels are below the current NAAQS.  Id. at 14, Table 3.2.  Unfortunately, EPA has never even set a secondary $SO_2$ NAAQS based on an annual averaging time, despite the fact

that the difference between the current secondary $SO_2$ NAAQS and the level at which vegetation experiences adverse impacts based on an annual averaging time is four orders of magnitude.

40.    However, despite the increasing evidence that the existing NAAQS for $SO_2$ are inadequate to protect public health and public welfare, EPA has not fulfilled its mandatory duty to review thoroughly and update as necessary the air quality criteria for $SO_x$ and the NAAQS for $SO_2$, to promulgate such new NAAQS for $SO_2$ or any other sulfur oxides as may be requisite, and to publish notice of such actions in the Federal Register.  According to the clear statutory deadlines, such a review should have been completed in 2001.  Yet, as EPA's own website indicates, EPA has yet to even commence such a review.  See http://www.epa.gov/ttn/naaqs/standards/so2/s_so2_index.html (last visited Feb. 3, 2006) (indicating that EPA is not currently reviewing any documents in preparation for a review of the $SO_2$ NAAQS).

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (CAA Sections 304(a)(2); 108; 109(d)(1); & 307(d)

31.    Each allegation set forth in the complaint is incorporated herein by reference.

32.    The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $NO_2$ and $NO_x$ expired several

years ago.  Nonetheless, Defendant has failed to perform those actions.  Specifically, Defendant has failed to complete a thorough review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$.  Furthermore, Defendant has failed to make such revisions in the foregoing criteria for $NO_x$ and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS as may be appropriate in accordance with §§ 108 and 109(b).  Moreover, Defendant has failed to publish in the Federal Register (1) a revision decision concerning the review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (2) notice of the issuance of any revised air quality criteria for $NO_x$.  See 42 U.S.C. §§ 7408(d), 7607(d).

33.     Defendant's failure to perform each of the above actions constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).

## (ALTERNATIVE) SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act Section 706(1))

34.     Each allegation set forth in the complaint is incorporated herein by reference.

35.     The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $NO_2$ and $NO_x$ expired several years ago.  Nonetheless, Defendant has failed to perform those actions.  Specifically, Defendant has failed to complete a thorough review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$.  Furthermore, Defendant has failed to make

such revisions in the foregoing criteria and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b).  Moreover, Defendant has failed to publish in the Federal Register (1) a revision decision concerning the review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (2) notice of the issuance of any revised air quality criteria for $NO_x$.  See 42 U.S.C. §§ 7408(d), 7607(d).

36.     Defendant's failure to perform each of the above actions constitutes agency action unreasonably delayed or unlawfully withheld within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(1).


### THIRD CLAIM FOR RELIEF

### (CAA Sections 304(a)(2); 108; 109(d)(1); & 307(d)


31.     Each allegation set forth in the complaint is incorporated herein by reference.

32.     The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $SO_2$ and $SO_x$ expired several years ago.  Nonetheless, Defendant has failed to perform those actions.  Specifically, Defendant has failed to complete a thorough review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$.  Furthermore, Defendant has failed to make such revisions in the foregoing criteria for $SO_x$ and primary and secondary NAAQS for $SO_2$, and to promulgate such new primary and secondary NAAQS as may be appropriate in accordance with §§ 108 and 109(b).  Moreover, Defendant has failed to publish in the

Federal Register (1) a revision decision concerning the review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$ (including any revised and/or new NAAQS resulting from that review), and (2) notice of the issuance of any revised air quality criteria for $SO_x$.  See 42 U.S.C. §§ 7408(d), 7607(d).

33.    Defendant's failure to perform each of the above actions constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).


## (ALTERNATIVE) FOURTH CLAIM FOR RELIEF

## (Administrative Procedure Act Section 706(1))


34.    Each allegation set forth in the complaint is incorporated herein by reference.

35.    The deadline under § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $SO_2$ and $SO_x$ expired several years ago.  Nonetheless, Defendant has failed to perform those actions.  Specifically, Defendant has failed to complete a thorough review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$.  Furthermore, Defendant has failed to make such revisions in the foregoing criteria and primary and secondary NAAQS for $SO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b).  Moreover, Defendant has failed to publish in the Federal Register (1) a revision decision concerning the review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$ (including any revised and/or

new NAAQS resulting from that review), and (2) notice of the issuance of any revised air

quality criteria for $SO_x$.  See 42 U.S.C. §§ 7408(d), 7607(d).

36.    Defendant's failure to perform each of the above actions constitutes agency action

unreasonably delayed or unlawfully withheld within the meaning of the Administrative

Procedure Act.  5 U.S.C. § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing

the following relief:

A.    Declare that Defendant's failure (a) to complete a thorough review of the air

quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$, and (b) to make

such revisions in the foregoing criteria for $NO_x$ and primary and secondary NAAQS for

$NO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate

in accordance with §§ 108 and 109(b), each constitutes a failure to perform an act or duty

(or acts or duties) that are not discretionary with Defendant within the meaning of Clean

Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2), or in the alternative that each constitutes

agency action unreasonably delayed or unlawfully withheld within the meaning of the

Administrative Procedure Act, 5 U.S.C. § 706(1).

B.    Declare that Defendant's failure (a) to complete a thorough review of the air

quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$, and (b) to make

such revisions in the foregoing criteria for $SO_x$ and primary and secondary NAAQS for

$SO_2$, and to promulgate such new primary and secondary NAAQS, as may be appropriate in accordance with §§ 108 and 109(b), each constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2), or in the alternative that each constitutes agency action unreasonably delayed or unlawfully within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1).

C.      Order Defendant (a) to complete a thorough review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$, (b) to make such revisions in the foregoing criteria for $NO_x$ and primary and secondary NAAQS for $NO_2$, and to promulgate such new primary and secondary NAAQS as may be appropriate in accordance with §§ 108 and 109(b), and (c) to publish in the Federal Register (i) a revision decision concerning the review of the air quality criteria for $NO_x$ and the primary and secondary NAAQS for $NO_2$ (including any revised and/or new NAAQS resulting from that review), and (ii) notice of the issuance of any revised air quality criteria for $NO_x$ -- all in accordance with expeditious deadlines prescribed by the Court, including deadlines for notices of proposed and final rulemaking and other interim milestones.

D.      Order Defendant (a) to complete a thorough review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$, (b) to make such revisions in the foregoing criteria for $SO_x$ and primary and secondary NAAQS for $SO_2$, and to promulgate such new primary and secondary NAAQS as may be appropriate in accordance with §§ 108 and 109(b), and (c) to publish in the Federal Register (i) a revision decision concerning the review of the air quality criteria for $SO_x$ and the primary and secondary NAAQS for $SO_2$ (including any revised and/or new NAAQS resulting

from that review), and (ii) notice of the issuance of any revised air quality criteria for $SO_x$

-- all in accordance with expeditious deadlines prescribed by the Court, including

deadlines for notices of proposed and final rulemaking and other interim milestones.

E.      Retain jurisdiction of this action to ensure compliance with the Court's Order.

F.      Award plaintiffs the costs of litigation in this action, including attorney's fees.

See 42 U.S.C. § 7604(d).

G.      Grant such other relief as the Court deems just and proper.

                                        Respectfully submitted,


                                        ____/s_____
                                        Robert Ukeiley (MD14062)
                                        Law Office of Robert Ukeiley
                                        433 Chestnut Street
                                        Berea, KY 40403
                                        Tel: (859) 986-5402
                                        Fax: (859) 986-1299
                                        E-mail: rukeiley@igc.org


                                        Counsel for Plaintiffs

Dated: February 3, 2006