# EXHIBIT 1

Declaration of Stephen D. Page, Director of the Office of Air Quality Planning and Standards, Office of Air and Radiation, EPA (May 31, 2006)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL<br>DIVERSITY, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>STEPHEN L. JOHNSON, Administrator,<br>United States Environmental<br>Protection Agency,<br><br>        Defendant. | ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 05-1814 (JGP) |

## DECLARATION OF STEPHEN D. PAGE

I, Stephen D. Page, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge or on information contained in the records of the United States Environmental Protection Agency (EPA) or supplied to me by EPA employees under my supervision.

1.  I am the Director of the Office of Air Quality Planning and Standards (OAQPS) within the Office of Air and Radiation at EPA, a position I have held since September 2002. Prior to that time, I served as Director of the Office of Radiation and Indoor Air and in various other positions at EPA.

2.  In my current capacity as Director of OAQPS, I am responsible for overseeing EPA's implementation of major portions of the Clean Air Act (CAA or Act), including the

promulgation of many very significant regulations pursuant to the CAA.  In this capacity, I am familiar with the processes and time periods required for major EPA actions under the CAA, including periodic review and, as appropriate, revision of air quality criteria and national ambient air quality standards (NAAQS) under section 109(d) of the Act, 42 U.S.C. § 7409(d).

3.  This declaration is filed in support of EPA's Memorandum in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment. Its purpose is to explain the amount of time EPA needs to complete its current reviews of the air quality criteria for nitrogen oxides ($NO_x$) and for sulfur oxides ($SO_x$) and the NAAQS for nitrogen dioxide ($NO_2$) and sulfur dioxide ($SO_2$), and, if appropriate, to revise these NAAQS.[1]

## BACKGROUND

**Air Quality Criteria and NAAQS**

4.  Air quality criteria and NAAQS issued under CAA sections 108 and 109 of the Act are central to the nation's programs to control air pollution.  Section 108 requires EPA to identify certain ubiquitous air pollutants that may reasonably be anticipated to endanger public health and welfare and to issue comprehensive assessments of scientific information bearing on their effects.   As described in section 108, these comprehensive assessments, referred to as "air quality criteria," must "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air."   Section 109, in turn, requires EPA to promulgate NAAQS based on the air quality criteria for each such pollutant.  Section 109(d)(1)

---

[1]  For convenience, this document generally uses the terminology "review of the $NO_2$ NAAQS" and "review of the $SO_2$ NAAQS" to describe the reviews of the air quality criteria for NOx and the NAAQS for $NO_2$ and the air quality criteria for SOx and the NAAQS $SO_2$.

requires EPA to periodically review and, as appropriate, revise existing air quality criteria and NAAQS. Section 109(d)(2) requires that EPA appoint an independent scientific review committee to advise EPA on its review of the air quality criteria and on appropriate revisions to the NAAQS. The Clean Air Scientific Advisory Committee (CASAC) of EPA's Science Advisory Board was accordingly established pursuant to section 109(d) to provide independent scientific advice on NAAQS matters.

5. In substance, NAAQS define levels of ambient air quality that in EPA's judgment are requisite to protect the nation's health and welfare from effects ranging from premature mortality and aggravation of respiratory diseases, for example, to crop damage and adverse effects on the environment, including disruption of ecosystems. Currently there are NAAQS for six common air pollutants: particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead.

6. Under CAA section 110 and related provisions, the NAAQS are the principal basis for control of air pollution by federal, state and local governments. As such, the NAAQS collectively affect every major industry in the country and cost many billions of dollars to attain. Because of the significance of the NAAQS for protecting public health and welfare and the economic impact of the standards, the Administrator's decisions on the NAAQS are closely scrutinized and typically subject to litigation. *See e.g. Whitman v. EPA*, 531 U.S. 457 (2001) (challenge to revised NAAQS for particulate matter and ozone); *NRDC v. Adm'r, EPA*, 902 F.2d 962 (D.C. Cir. 1990)(challenge to revised NAAQS for particulate matter); *American Petroleum Institute v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981)(challenge to revised NAAQS for ozone).

**Review and Revision of Air Quality Criteria and NAAQS**

7. In view of the extraordinary importance of the NAAQS, stemming from their public health, environmental, social, and economic impact, it is critical that EPA make sound, well-

reasoned decisions when establishing or revising them.  Almost by definition, however, the key

data on which EPA must rely in such decisions are essentially reports from the "frontiers" of

scientific research, where both the methodologies and the results of key studies are often

controversial, and scientists of impeccable credentials often reach markedly different

conclusions in assessing their significance.  In view of the uncertainties in these data, as well as

the enormous volume of scientific research currently focused on major air pollutants, sound

decisions on retention or revision of existing NAAQS must be made through a highly rigorous

process designed to address what are often very complex issues of science, law, and policy.

     8.  The following paragraphs describe the NAAQS review process in generic terms, as

well as recent actions by EPA to review and strengthen this process, including its timeliness.  A

more detailed description of the activities involved in each phase is provided in connection with

EPA's proposed schedule for completing its reviews of the NAAQS for $NO_2$ and $SO_2$ and the

related air quality criteria. See paragraphs 63-67 below.

**Overview of NAAQS review process**

     9.  Every NAAQS review is different in nature and scope from every other, depending

not only on the characteristics of the air pollutant in question but also on the state of the science

at the time of the review.   As discussed below, however, the NAAQS review process necessarily

includes (1) a science, exposure/risk, and policy assessment phase, and related planning, which

involves a highly rigorous assessment of scientific and technical data and provides a number of

opportunities for public and expert review of relevant staff and Agency  documents; and (2) a

regulatory development phase, in which any proposed decisions on a NAAQS are governed by

special rulemaking procedures under the CAA.   A number of EPA offices are involved in the

process, including the Office of Air and Radiation, the Office of Research and Development, the

Office of General Counsel, the Office of Policy, Economics, and Innovation, and other offices

with related responsibilities (*e.g.*, drinking water, toxic substances, cleanup of Superfund sites) as appropriate for any particular review.

10.  It is important to note that implementation of the decisions made during a NAAQS review is a separate and distinct process from the NAAQS review itself.   Under the Clean Air Act, implementing a revised NAAQS is integrally tied to the obligation on States to develop plans and control strategies that will attain the NAAQS.  When a NAAQS is revised, section 110 of the Act requires States to submit plans containing measures necessary to attain and maintain the NAAQS.   EPA also may conduct rulemakings after the NAAQS review process is completed to further clarify the responsibilities of States under section 110 of the Act.  The actions taken by States and EPA to implement a NAAQS normally stretch over a many year time frame, starting from when a NAAQS review is completed.

11.  These implementation actions  will clearly be impacted by the decisions made during a NAAQS review, but they are not part of the NAAQS review process itself.   Implementation of a NAAQS is not under sections 108 and 109 of the Act, but instead is structured around the requirements set out in section 110.

12.  Science, exposure/risk, and policy assessment phase, and related planning.  A major element of this phase is review and appropriate revision of the air quality criteria for the pollutant in question.  In general, air quality criteria take the form of documents prepared by EPA that review and critically assess pertinent scientific studies and related information.   As scientific research on the effects of the major air pollutants has intensified, the *science assessment* has become a comprehensive, multi-volume assessment of the relevant medical, scientific, and technical information, referred to as a "criteria document".  The most recent

criteria document for ozone, for example, occupies three volumes and an estimated 2000 pages.[2] The criteria document is typically a comprehensive analyses of the relevant science, including the chemistry of the pollutant, sources of ambient levels, and information from toxicology, epidemiology, and other scientific studies on the impact of the pollutant on public health and welfare, and in recent criteria documents provides an integrated synthesis of this scientific information.

13.   In addition to the science assessment, this phase includes *assessment of exposure and risks* to  public health and to the environment, as appropriate, from various ambient levels of the pollutant.  This assessment uses the science from the criteria document along with information about exposure of sensitive human population groups and/or sensitive species of vegetation to different ambient levels of the pollutant, to provide a quantified assessment of risks to public health and welfare at various levels of ambient air quality.

14.   This phase also includes a *policy assessment.*  The policy assessment uses the information from the science assessment and exposure/risk assessment and weighs the strengths and limitations of the scientific and technical information, as well as the quantitative estimates of exposure and risks.  It frames this information in a manner that informs policy judgments to be made by  the agency  concerning the adequacy of the current standards and identifies various options, as appropriate, in terms of possible alternative standards for consideration.

15.   Given the magnitude and complexity of the scientific and technical information typically involved in NAAQS reviews, detailed  *planning*  for each of these assessments is a key element for ensuring that  the assessments are both timely and scientifically sound and are focused on key issues that are relevant to the ultimate policy decisions that need to be made.

---

[2]     Air Quality Criteria for Ozone and Related Photochemical Oxidants (USEPA, 2006).

16.   A critical part of this assessment phase is the receipt of *advice from CASAC* on the scientific issues involved in each of these assessments. This seven-member committee is supplemented by expert consultants selected for their particular expertise in fields pertinent to the specific pollutant under review, forming a CASAC Review Panel that includes generally about 20 members.  Composed of physicians, research scientists, and other experts from medical faculties, research institutions, and the private sector, this CASAC Panel provides its advice and recommendations directly to the Administrator.  As discussed below, CASAC's recommendations and comments play a significant role throughout the entire review process.

17.   EPA prepares drafts of the various assessment documents that address the issues described above, and provides them for CASAC and public review.  CASAC provides critical advice to the agency on the scientific adequacy of the assessments and the current standards and on possible alternative standards that may be supported by the underlying scientific and technical information.  This fulfills CASAC's statutory role as an advisor on the air quality criteria and standards under section 109 and provides valuable input from CASAC for the Administrator in making decisions on the NAAQS.

**Efforts to Strengthen the NAAQS Review Process, Including Timeliness**

18.   Historically, the functional elements described above have been accomplished through development of three or more documents, a criteria document, a staff paper, and one or more exposure/risk assessment reports issued in conjunction with the staff paper.  The assessment of the science has been primarily presented in the criteria document, and historically the bulk of the science assessment activities have been undertaken by the National Center for Environmental Assessment (NCEA) of EPA's Office and Research and Development.  The criteria document has generally been written for a scientific audience rather than being oriented

toward policy makers and the decisions confronting them.  In the past the criteria document has often presented a large volume of material in a somewhat encyclopedic fashion.

19.  The staff paper, prepared by the Office of Air Quality, Planning, and Standards (OAQPS) of EPA's Office of Air and Radiation, was designed to bridge the gap between the science assessment and the policy judgements required in making decisions on the NAAQS. Historically it has provided an integration of the most policy-relevant scientific information, in a manner intended to be more understandable and meaningful for policy makers and a broad public audience.  The staff paper would winnow down the large volume of comprehensive information in the criteria document to address the critical needs of decision-makers in addressing the issues central to promulgating, retaining, or revising a NAAQS, such as decisions on the indicator, level, form, and averaging time of a standard.

20.  In addition to performing this focused integrative function of bringing forward the most policy-relevant scientific information, the staff paper has also served two other functions - presenting and interpreting the major findings of any exposure/risk assessment(s) that was performed in conjunction with the staff paper, and integrating the scientific evidence and the quantitative risk-based information into a policy assessment.  The policy assessment would include staff-identified ranges of policy options and alternative standards for the Administrator to consider.

21.  Historically, this process has relied upon two separate planning stages, one for the criteria document and one for the staff paper and any related exposure risk assessment report. This process resulted in some overlap in the information considered and evaluated in the criteria document and the staff paper.  In addition, an explicit focus on the policy relevant issues central to decisions on promulgating or revising a NAAQS occurred well into the process rather than at the outset.

22.  Given the importance of the NAAQS, the magnitude of the resources and time expended in reviewing them, and the rapid pace of scientific research on criteria pollutants, over the years EPA Administrators and senior managers have repeatedly sought ways to strengthen and expedite the review process.  After an intensive review of the process in the 1990's, for example, EPA built on previous improvements by adopting a number of additional measures that were designed to accelerate it significantly, including both internal changes in the process and strict limits on the time allowed for public comment at various stages.  *See* 59 Fed. Reg. 5,164 (l994).

23.  Since then, EPA has continued to seek further ways to streamline or otherwise improve the NAAQS process.  In connection with its current review of the NAAQS for ozone, for example, EPA's senior staff recently developed an approach involving a broader, more collaborative process for planning and developing the important documents issued in the NAAQS review process, as well as a significant restructuring of the criteria document itself.

24.  More recently, the Deputy Administrator of the EPA directed that an intra-agency workgroup be formed to conduct a "top-to-bottom" review of the NAAQS process.  Although, as noted above, previous reviews of the NAAQS process had led to significant changes and improvements, the workgroup was charged with examining whether and, if so, how the process could be further strengthened, and with identifying ways of further streamlining the process so EPA can achieve more timely NAAQS reviews.  EPA accordingly established a NAAQS Process Review Workgroup (hereafter "NAAQS Workgroup" or "Workgroup") composed of highly knowledgeable representatives, including senior management, from each of the offices involved in NAAQS reviews.  In performing the review over the last several months, the Workgroup focused on the basic functional elements of the NAAQS review process – planning, science assessment, exposure/risk assessment, policy assessment, and rulemaking – and on the

- 9 -

nature and linkages between the contents of the documents that are currently part of a NAAQS

review.

25.  After a rigorous review of the process, the NAAQS Workgroup prepared a

comprehensive  report with specific recommendations for strengthening it further.[3]  The Acting

Assistant Administrator for the Office of Air and Radiation, William Wehrum, and the Assistant

Administrator for the Office of Research and Development, George Gray, endorsed the general

recommendations of the Workgroup in April 2006, offered two additional recommendations for

consideration, and recognized that some components of the recommendations would benefit

from further consultation with CASAC and the public.[4]  The recommendations of the

Workgroup, as well as the accelerated approach adopted in the 1990's and the improvements

adopted for the current ozone review, form the basis for the development of EPA's schedule for

the $NO_2$ and $SO_2$ reviews at issue here.

26.  As discussed in the following paragraphs, based on the recommendations of the

NAAQS Workgroup,  EPA plans to restructure the timing and approach of the various elements

of the assessment phase described above, covering *planning, science assessment, risk and*

*exposure assessment, and policy assessment*, which is linked to the rulemaking phase.  All of

these key functional elements will be focused and coordinated in a way that will strengthen the

NAAQS review process, including review by CASAC, and will promote the overall timeliness of

---

[3]     "Review of the Process for Setting National Ambient Air Quality Standards," prepared by the NAAQS Process Review Workgroup, March, 2006.

[4]     "Review of Process for Setting National Ambient Air Quality Standards," Memorandum from George Gray, Assistant Administrator, Office of Research and Development, and William Wehrum, Acting Assistant Administrator, Office of Air and Radiation, to Marcus Peacock, Deputy Administrator, April 3, 2006.  Throughout the review of the process, the Workgroup has solicited input from CASAC and various stakeholders.  EPA has scheduled two public meetings for June 27th and 29th, 2006, to obtain further input on various components of the NAAQS review process from members of the public and CASAC respectively.

the review by avoiding redundancy and inefficiency in the document preparation and review process. For example, EPA plans to use a more integrated planning process, to refocus the process so that the policy-relevant issues that the Administrator must decide are a framework for all of the documents, to perform the exposure/risk assessment earlier in the process and in a manner that is more closely integrated with the science assessment, and to avoid duplication of effort by having the policy-relevant integration of the science occur in the science assessment document.

27. Based on the recommendations of the NAAQS Workgroup, EPA plans to substantially restructure and refocus the traditional criteria document in a number of ways. To emphasize these changes, EPA will rename the document as a "science assessment." As compared to the criteria document, the science assessment document will provide a much more concise evaluation, integration, and synthesis of the most policy-relevant science: namely, that related to the appropriate indicator to use for the pollutant at issue, the averaging time for the standard, the form of the standard, and the level of the standard. The science assessment will also include key science judgments that are integral to the exposure/risk assessments. The foundation for this integrative assessment will still be a comprehensive review of the underlying science. This restructuring is designed to make the central document more directly focused on answering the questions (to be identified in the planning process, as noted below) that are most relevant in making decisions on whether and, if so, how to revise a NAAQS. This will allow for more focused and timely review by CASAC, and make it more likely that a well-grounded science assessment can be completed in a timely manner.

28. As with criteria documents, the process for developing a science assessment will begin with an extensive search of the scientific literature bearing on the health and welfare effects of the air pollutant in question. Because the establishment of NAAQS for a pollutant

tends to focus research attention on that pollutant, the number of scientific studies that have emerged since the last revision of a criteria document may be very large. The most recently revised criteria document, for example, cites more than 1,000 studies related to ozone. Based on the recommendations of the NAAQS Workgroup, the planning process that precedes preparation of the science assessment itself will identify the key questions that are most relevant to the outcome of the overall review, allowing both the literature search and the preparation of the science assessment to be focused on the most highly relevant studies.

29. As pertinent studies are identified and evaluated, NCEA will prepare initial drafts of key sections of the science assessment and/or discussions of key policy-relevant scientific issues to facilitate consultation with experts in the relevant fields at a series of public workshops. These workshops are necessary to assure that all relevant research and key policy-relevant issues have been identified and appropriately characterized, and that the likely broad range of views among the experts on interpreting the scientific information in a policy-relevant context is elicited and discussed. The workshop materials will be authored by teams of experts in the field, both inside and outside EPA; the draft criteria document for ozone referred to above, for example, was prepared by some 50 authors. The workshop draft materials will then form the basis for a draft science assessment document and will be made available for peer review by CASAC and accompanying public review and comment.

30. Similar to the process historically followed with the criteria documents, drafts of the science assessment will be reviewed by the CASAC Panel. In reviewing drafts of the science assessment, the CASAC Panel will examine in detail the appropriateness and completeness of the scientific information included in the draft, the accuracy of the characterization of that information and the related uncertainties, the validity and balance of the interpretation and integration of the information, and the scientific soundness of the conclusions drawn from the

information.  To allow for thorough discussion of the views of the Panel members, as well as

time for public comments, CASAC meetings typically last two days.  They are attended by

representatives of major industries, national environmental groups, and other interested parties

and are transcribed by a court reporter. Because the science being evaluated is generally on the

frontiers of scientific research, and thus often controversial, these meetings often elicit sharply

contrasting points of view. Given such differing views, as well as the sheer volume and

complexity of the materials addressed,  it has almost always been necessary in the past for EPA

to prepare and seek CASAC review of at least two drafts of a criteria document in order to

resolve key scientific issues.   Similarly, EPA believes that it will be necessary for CASAC to

have the opportunity to review  two drafts of a science assessment – EPA expects that the

changes to the review process discussed above will obviate the need for any additional reviews.

31.    Based on the NAAQS Workgroup report, EPA intends to separate the functional

elements previously combined in a staff paper and the related report(s) on exposure and risk

assessment - i.e.,  an assessment of exposure to a pollutant and resulting risks, and an assessment

of relevant policy issues based on the most relevant scientific and risk information.  The first

element, a rigorous assessment of exposure and risk, will be performed earlier in the process to

facilitate its closer coordination with the science assessment and its completion closer in time to

the completion of the science assessment.  This will enhance both its scientific strength as well

as its timeliness.  The risk assessment will be similar to the exposure/risk report and related

chapters(s) that were formerly included in the staff paper, such that it will be a more concise

document than had previously been prepared and will avoid any repetition of information in two

different documents.  As discussed in the NAAQS Process Workgroup Report and reflected in

Attachment A, these reviews will allocate a larger proportion of the overall schedule than in

previous reviews to the science and exposure/risk assessments; will more closely link these

assessments through a more coordinated, consultative process, and will minimize the time

between the completion of these assessments and reaching proposed decisions on the NAAQS.

32.  As an integral part of this exposure and risk assessment, OAQPS will conduct a

variety of technical analyses that would previously have been incorporated into a staff paper and

related reports, including analyses of air quality patterns and distributions, human exposure to

the pollutant under review, and associated risks to public health, and when appropriate, analyses

of the distribution of the pollutant through the environment and resulting impacts on public

welfare.

33.  Based on the science assessment and the risk assessment, OAQPS will also prepare a

policy assessment document that will include policy-relevant air quality analyses and

assessments of policy issues formerly included in a staff paper.  The policy assessment will

include discussion of approaches for making policy choices and will identify for the

Administrator's consideration ranges of alternative NAAQS, as appropriate, that reflect

alternative policy judgments consistent with the science as reflected in the science assessment

and exposure/risk assessment documents.  The ranges of alternative standards and the underlying

analyses will also provide a framework for CASAC advice and recommendations on the

NAAQS and for public comment.

34.  Regulatory development phase.  Based on the science, exposure/risk, and policy

assessment documents, the advice of CASAC, and public comments, the Administrator will

decide whether it is appropriate to propose a revision to the NAAQS in question.  Any such

proposal is governed by special rulemaking procedures set forth in section 307(d) of the Act, 42

U.S.C. § 7607(d).  EPA's notice of proposed decision, for example, must be accompanied by a

detailed statement of its basis and purpose, including the factual data on which the proposal is

based and the methodology used in obtaining and analyzing the data.  42 U.S.C. § 7607(d)(3).  In

the case of NAAQS, section 307(d)(3) specifically requires that the proposal "set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments" made by CASAC and explain any important departures from CASAC's advice.

35.  As in other proceedings under section 307(d), EPA must provide at least 30 days for public comment on the proposal.  42 U.S.C. § 7607(h).   EPA must also provide an opportunity for oral presentation of comments on NAAQS proposals, keep a transcript of any such proceeding, and hold the record of the proceeding open for an additional 30 days to provide an opportunity for submission of rebuttal and supplementary information.  42 U.S.C. § 7607(d)(5). EPA often holds more than one public hearing, in different parts of the country, because of the broad interest in NAAQS proposals.  In the past, a total period of 90 or more days has often been allowed for public comment on NAAQS proposals, given their importance, the complexity of the issues, the large number of scientific publications underlying the proposed standards, and the intense public interest typically generated by the proposals.  Where shorter periods have been provided, interested parties have frequently requested extensions on the ground that additional time is necessary to allow an adequate opportunity for comment in light of these factors.

36.  After evaluating all written and oral comments on the proposal, EPA must determine whether any revisions are warranted and draft the final rulemaking decision and supporting technical documents.  The final decision must be accompanied by a detailed statement of basis and purpose, an explanation of the reasons for any major changes from the proposal, and a response to each of the significant comments submitted in written or oral presentations during the comment period.  42 U.S.C. § 7607(d)(6).

37.   Historically, NAAQS rulemakings have often involved additional steps beyond those described above, reflecting the  unusual complexity and importance of the issues involved. These have included, for example, preparation of supplements to criteria documents and staff

papers that incorporate important advances in scientific research, additional CASAC meetings to review such developments, the extension or reopening of comment periods, reproposals, and petitions for reconsideration.

## BACKGROUND OF CURRENT REVIEWS

**Background of Review of NAAQS for NO$_2$**

38.  A variety of NOx compounds, including NO$_2$, occur naturally in the environment and also result from human activities.  In past reviews of the NO$_2$ NAAQS, the air quality criteria necessarily addressed NOx compounds in general, while focusing on the public health and welfare effects reported to be associated with exposure to NO$_2$ in particular.  NO$_2$ at elevated concentrations can adversely affect human health, vegetation, materials, and visibility.   For example, long-term, repeated exposure to NO$_2$ at elevated concentrations may lead to increased susceptibility to respiratory infection and may cause irreversible alterations in lung structure. Deposition of nitrogen from atmospheric NOx also contributes to a wide range of environmental effects.  Deposition of nitrogen can lead to fertilization, eutrophication, or acidification of terrestrial, wetland, and aquatic (*e.g.*, fresh water bodies, estuaries, and coastal water) systems. These effects can alter competition between existing species, leading to changes in the number and type of species (composition) within a community.

39.  In 1971,  EPA promulgated primary and secondary NAAQS for NO$_2$, each set at 0.053 parts per million averaged annually.  36 Fed. Reg. 8,186 (April 30, 1971).  In 1978 EPA commenced a review of the air quality criteria, which covered both adverse health effects of acute exposures as well as a broader assessment of health and ecological effects associated with both short-term and long-term exposures to NO$_2$ and other NOx compounds.  These reviews

were reflected in a revised criteria document issued in 1982.  In 1985 EPA issued a final

decision, based on the revised air quality criteria, to retain the NAAQS for $NO_2$.  50 Fed. Reg.

25,532 (June 19, 1985).   During the 1990's, EPA conducted an extensive review of the $NO_2$

NAAQS and the related air quality under section 109(d)(1) of the Act.  With full involvement of

CASAC and the public, this review led to publication of a revised criteria document (1993) and a

staff paper (1995).  After consideration of these documents, EPA determined in 1996 that

revisions to the primary and secondary NAAQS for $NO_2$ were not appropriate.  61 Fed. Reg.

52,852 (Oct. 8, 1996).  In this final determination in 1996,  EPA noted that all areas of the

United States were in attainment of the existing standards for $NO_2$.

40.  Since EPA's last review of the $NO_2$ NAAQS in 1996, there has been a substantial

decline in the amount of NOx emitted into the air and a concomitant reduction in concentrations

of $NO_2$ in the air.  For example, from 1995 to 2005, total NOx emissions into the air decreased

from 24.7 million tons per year to 19 million tons per year,[5] and concentrations of $NO_2$ have

decreased by approximately 21 percent for the period 1996 to 2005 on average in the United

States.[6]

41.  The substantial decline in NOx emissions from 1996 to the 2005 is mainly

attributable to regulatory efforts to reduce NOx emissions from stationary and mobile sources.

As State and federal regulatory programs are fully implemented, EPA expects to see significant

additional reductions in NOx emissions and air quality concentrations of $NO_2$ in future years.

42.  Many of EPA's regulatory efforts to reduce NOx emissions stem from an increasing

awareness that the national pollution problem consists of both regional as well as local emission

---

[5]  *See* http://www.epa.gov/airtrends/2006/econ-emissions.html.

[6]  *See* http://www.epa.gov/airtrends/nitrogen.htm.

problems.  Because NOx plays a major role in the formation of ground-level ozone and fine

particle pollution, both of which also adversely affect human health and welfare, EPA has taken

a number of steps requiring States to reduce NOx emissions to help States attain the NAAQS for

ozone and fine particulates.  For example, in 1998, EPA promulgated a rule commonly referred

to as "the NOx SIP Call," 63 Fed. Reg. 57,356 (October 27, 1998), that when fully implemented,

will reduce summertime NOx emissions by approximately 23 percent (900,000 tons) in the

eastern United States, as compared to 1996 emission levels.  More recently, in the Clean Air

Interstate Rule ("CAIR") EPA found that 28 States and the District of Columbia were

contributing significantly to the nonattainment of the NAAQS for fine particles and/or ozone in

downwind States  and is requiring these upwind States to reduce emissions of $SO_2$ and/or NOx.

70 Fed. Reg.  25,162 (May 12, 2005).   When fully implemented, the CAIR will reduce NOx

emissions in 28 eastern States and the District of Columbia by more than 60 percent from 2003

levels.

     43.  In the last several years, EPA has also issued rules that will lead to dramatic

reductions in the emissions of NOx from gasoline and diesel powered cars, trucks, buses and off-

road equipment (*e.g* construction equipment, farm machinery, and mining equipment).  These

regulations combine the use of advanced emissions control technology for the engines with large

reductions in the sulfur content of the fuel.  65 Fed. Reg. 6,698 (Feb. 10, 2000)(Tier 2 vehicles

and gasoline sulfur program), 66 Fed. Reg. 5,002 (Jan. 18, 2001) (standards for truck and bus

diesel engines and diesel fuel sulfur program), 69 Fed. Reg. 38,958 (June 29,2004)(standards for

off-road diesel engines and off-road diesel fuel sulfur program).

**Background of Review of the NAAQS for SO$_2$**

44.  SO$_x$ compounds other than SO$_2$ are not commonly found in the atmosphere;

therefore, EPA's reviews of the air quality criteria for SO$_x$ have largely focused on the health and

welfare effects of SO$_2$.  In these reviews, EPA has found that high concentrations of SO$_2$ can

result in temporary breathing impairment for asthmatic children and adults who are active

outdoors. Short-term exposures of asthmatic individuals to elevated SO$_2$ levels during moderate

activity may result in breathing difficulties that can be accompanied by symptoms such as

wheezing, chest tightness, or shortness of breath. Other effects that have been associated with

longer-term exposures to high concentrations of SO$_2$, in conjunction with high levels of PM,

include aggravation of existing cardiovascular disease, respiratory illness, and alterations in the

lung's defenses.  The subgroups of the population that may be affected under these conditions

include individuals with heart or lung disease, as well as the elderly and children.  In addition to

such health effects, SO$_2$ also contributes to adverse welfare effects.  Together, SO$_2$ and NOx are

the major precursors to acidic deposition (acid rain), which is associated with the acidification of

soils, lakes, and streams and accelerated corrosion of buildings and monuments.

45.  In 1971,  EPA promulgated primary and secondary NAAQS for SO$_2$.  The primary

standards were set at 365 micrograms per cubic meter ($\mu g/m^3$) (0.14 parts per million (ppm)),

averaged over a 24-hour period and not to be exceeded more than once per year, and 80 $\mu g/m^3$

(0.030 ppm) annual arithmetic mean.  The secondary standard was set at 1300 $\mu g/m^3$ (0.5 ppm)

averaged over a period of 3 hours and not to be exceeded more than once per year.

46.  During the 1980's and 1990's, EPA conducted an extensive review of the air quality

criteria and NAAQS for SO$_2$ under section 109 (d)(1) of the Act.  With full involvement of

CASAC and the public, this review led to publication of a revised criteria document (1982), a

staff paper (1982), a criteria document addendum (1986), a staff paper addendum (1986), a criteria document supplement (1994), and a staff paper supplement (1994).  After consideration of these documents, EPA determined that revisions to the primary and secondary NAAQS for $SO_2$ were not appropriate in 1996, aside from several minor technical changes.  58 Fed. Reg. 21,351 (April 21, 1993) (secondary NAAQS); 61 Fed. Reg. 25,566 (May 22, 1996)(primary NAAQS).  That decision with respect to the primary standard was subsequently remanded.

47.  As of 1996, it was apparent that $SO_2$ emissions into the atmosphere had decreased substantially and were continuing to decrease. Since 1996, there has been a substantial further decline in the amount of $SO_2$ emitted into the air and a concomitant decline in concentrations of $SO_2$ in the air.  From 1995 to 2005, estimated $SO_2$ emissions into the air decreased from 18.6 million tons per year to 15 million tons per year[7], and national average air quality concentrations of $SO_2$ have decreased by approximately 39 percent for the period 1993-2002.[8]

48.  The downward trend in $SO_2$ emissions over this period is mainly attributable to EPA's regulatory efforts, including  implementation of the Acid Rain Program in the 1990's. Established under Title IV of the Clean Air Act,  the Acid Rain Program's principal goal was to achieve significant reductions in $SO_2$ and NOx emissions from electric utilities, a goal that the program has, in fact, achieved.  Additional reductions in $SO_2$ emissions have also occurred over time through the installation of flue-gas control equipment at coal-fired generating plants, reducing emissions from industrial manufacturing plants, reducing the average sulfur content of fuels burned, and  using cleaner burning fuels in residential and commercial burners.

---

[7]  *See* http://www.epa.gov/airtrends/2006/econ-emissions.html .

[8]  *See*  http://www.epa.gov/airtrends/sulfur.html.

49.  In addition to its other impacts, $SO_2$ also is a major precursor to fine particle pollution.  As noted in paragraph 42 in discussing the Clean Air Interstate Rule, EPA recently found that 28 States and the District of Columbia contribute significantly to the nonattainment of the NAAQS for fine particles and/or ozone in downwind States and required these jurisdictions to reduce emissions of NOx and $SO_2$.  When fully implemented, the CAIR will reduce $SO_2$ emissions in these areas by more than 70 percent from 2003 levels.


## STATUS OF CURRENT REVIEWS

50.  Since the last reviews of the NAAQS for $NO_2$ and $SO_2$, EPA has been accumulating additional information concerning the health and welfare effects of both these pollutants.   Upon receiving notice that the plaintiffs intended to initiate this lawsuit, EPA accelerated these activities to enable formal commencement of the review as rapidly as possible.  Among other things, NCEA began assessing the likely nature and scope of the  relevant scientific assessments in light of trends in research since the last reviews; identifying key scientific questions and issues that will need to be addressed in the science assessments; and identifying external experts who would be qualified to serve as authors or reviewers in the development of science assessments or as participants in peer review workshops.  NCEA and OAQPS have been coordinating efforts on planning for the reviews as a whole, including identifying key policy-relevant issues that would appropriately frame the reviews, and the related critical scientific questions, and determining the most efficient approach to organizing these reviews of the both the primary and secondary standards for both $NO_2$ and $SO_2$.

51.  More recently, EPA has prepared and published Federal Register notices for each of the pollutants, formally initiating the current reviews of the criteria and NAAQS and inviting

interested parties to help assure that all relevant information will be considered.  The call for information related to $NO_2$ was published in the Federal Register on December 9, 2005.  The call for information related to $SO_2$ was published on May 15, 2006.

52.  EPA currently intends to undertake closely coordinated reviews of the NAAQS for $NO_2$ and $SO_2$ on a schedule that accounts for the important interrelationships between these two pollutants, most importantly in terms of their interdependent atmospheric chemistry and their interrelated effects on the environment..  To most efficiently and effectively address these interrelationships, especially taking into account the complex science underlying the environmental affects of $NO_x$ and $SO_x$, EPA intends to review the public health impacts of $NO_x$ and $SO_x$ in two closely coordinated reviews, and to review the interrelated environmental effects of $NO_x$ and SOx jointly, in a separate review of the secondary NAAQS for these pollutants, somewhat offset from the two reviews of the primary NAAQS for each pollutant.

53.  EPA is accordingly planning a schedule for the review of the NAAQS for $NO_2$ and $SO_2$ that consists of a review of the primary standard for $NO_2$ that is coordinated with and followed closely in time by a review of the primary standard for $SO_2$.  EPA is further planning to undertake a single review of the secondary standards for these two pollutants together.  EPA believes by conducting a combined assessment of the scientific evidence for NOx and SOx on atmospheric chemistry and environmental effects, EPA will be able to produce a  more comprehensive and meaningful evaluation of the evidence than would separate assessments.  Conducting a closely coordinated assessment of the scientific evidence for NOx and SOx effects on public health is anticipated to result in a more efficient evaluation of the evidence than would more separate assessments.  While this approach is expected to be more efficient and timely overall, and to produce a more scientifically robust review in the long run, it will require more

time and attention in the planning phase, especially for the joint review of the environmental

effects and secondary NAAQS for both NOx and SOx.

54.  As EPA is completing the first of three planning documents – covering the review

of the primary NAAQS for $NO_2$ –  EPA is now beginning work on its assessment of the relevant

scientific literature concerning NOx-related human health effects and exposure. EPA is also now

preparing a plan for the review of primary NAAQS for $SO_2$ as well as a separate plan for the

joint assessment of atmospheric chemistry and environmental effects of NOx and SOx.   Each of

these planning documents will identify a set of policy-relevant issues to frame the science,

exposure/risk, and policy assessments; outline the projected scope of the exposure and/or risk

assessments; and provide an overview of the approach to be taken in the policy assessment (by

integrating the results of the science and exposure/risk assessments) to inform policy judgments

about the adequacy of the current standards and to identify ranges of alternative standards, as

appropriate, for the Administrator to consider.

55.  The reviews of the primary and secondary NAAQS for $NO_2$ and $SO_2$ will be

complex,  particularly with respect to the interrelationships between the pollutants.   In

particular, the atmospheric chemistry interactions between these pollutants and the

interdependent nature of the environmental effects will add substantial complexity both to the

scientific assessment of environmental effects and the policy assessment of secondary standards.

The chemical interactions involving the pollutants and between the pollutants are complex. For

example, nitrogen oxides play a role in the formation of reactive species such as peroxides or

nitrate radicals, formation of ozone, acid aerosols and fine particles, and organic nitrates like

nitro-PAH's. Nitrogen and sulfur compounds also interact. One aspect of such interaction is that

sulfate and nitrate ions are both neutralized in ammonia compounds and the aerosol acidity

fluctuates with changes in the relative proportion of emissions of nitrogen and sulfur compounds. Acidic sulfate compounds can displace nitrate ions from ammonium nitrate to form nitric acid but reduce the "strong acidity" of the atmosphere. In the atmosphere, changes in emissions for one pollutant or changes in meteorology can shift equilibrium reactions in one direction or another. Effects on terrestrial and aquatic ecosystems can also depend on the interactions between the pollutants in the complex atmospheric mixture. Visibility impairment, as well, is a result of the atmospheric interactions that result in secondary aerosols. This complexity in nature also leads to complexity in policy considerations; not only is the assessment of the science complex, but the determination of appropriate actions to reduce effects on the environment will also be complex.

Examples of some critical aspects of the science assessment that will be needed to inform the reviews of the *primary* NAAQS for $NO_2$ and $SO_2$ include:

- Evaluation and integration of relevant evidence on the health effects of $NO_2$ and $SO_2$ from scientific literature published over approximately the past 15 years on animal toxicology and controlled human exposure studies with previous findings on effects, such as decreased lung function, airway hyperresponsiveness, morphological and/or biochemical changes in the respiratory tract, allergic responses, increased susceptibility to respiratory infections and occurrence of respiratory illness or chronic lung disease.

- Evaluation of epidemiologic study findings for both $NO_2$ and $SO_2$, assessing the role played by the individual pollutant – i.e., $NO_2$ or $SO_2$ – in the context of the ambient air pollution mixture.  Evaluation of effects associated with $NO_2$, for example, will include consideration of the possibility that $NO_2$ could be serving as an indicator for the mixture of emissions from a pollution source, such as motor vehicle exhaust.  Similarly, examination of evidence regarding health associations with ambient $SO_2$ concentrations will include consideration of whether the associations are the result of $SO_2$ exposures alone, or whether $SO_2$ is acting as a marker for emissions from a source such as power plants.

- Assessment of the health evidence related to effects associated with exposures to $NO_2$ or $SO_2$ over different time periods, including chronic or cumulative exposure

periods, repeated acute exposures and acute exposures.  For $SO_2$ in particular, it will be necessary to evaluate evidence for effects related to peak exposures over very short time periods, including exposures as brief  as a few minutes.

•    Characterization of the literature on health outcomes not previously considered to be associated with $NO_2$ or $SO_2$, such as cardiovascular or genotoxic effects.

•    Identification of susceptible or vulnerable populations with potential for experiencing greater health risks with exposure to $NO_2$ or $SO_2$.

Examples of some critical aspects of the science assessment that will be needed to inform the reviews of the *secondary* NAAQS for $NO_2$ and $SO_2$ include:

•    Characterization and assessment of the role of NOx and SOx in acidification processes that occur in both terrestrial and aquatic ecosystems, potentially leading to a cascade of adverse ecological effects, such as potential reduction in diversity and abundance of aquatic organisms in lakes and streams in acid-sensitive areas of the United States.

•    Evaluation of how deposition of NOx and other nitrogenous compounds is influencing the biodiversity of terrestrial ecosystems in the U.S.

•    Assessment of the degree to which NOx, SOx, and related pollutants have contributed to other important environmental issues, such as impaired visibility, climate change, and over-fertilization of near-coastal waters.

•    Characterization of available evidence on the signs of chemical and biological recovery of terrestrial and aquatic ecosystems after reductions in NOx and SOx related pollution.

In addressing these and other significant issues, EPA will draw upon and take into account not only new research data reported in the scientific literature but also analyses of newly emerging information performed by other federal agencies, state agencies, and  by international organizations such as the World Health Organization.

56.  Decisions on potential revisions to the primary and secondary NAAQS for $NO_2$ or

- 25 -

$SO_2$ may also draw from quantified risk assessments for health and environmental effects. Such assessments would build upon the characterization of evidence linking ambient NOx or SOx to effects on health or the environment. The design of health or environmental assessments will be based on the conclusions drawn about the strength of the evidence in the science assessment. Considerations in the development of health or environmental risk assessments will include a range of highly technical issues.

57. Ultimate decisions on retention or possible revision of the primary and secondary NAAQS for $NO_2$ or $SO_2$, will necessarily be based on considerations of issues such as:

- The appropriate indicator(s) for a standard – *e.g.*, $NO_2$ in the case of nitrogen oxides.

- The appropriate averaging time(s) for standards – *e.g.*, annual, monthly, daily or hourly averages.

- The form of the standards(s) – *e.g.*, the air quality statistic to be compared against the numerical level of a standard.

- The numerical level of the standard(s).

- How to measure the pollutant – *e.g.*, criteria for selection of appropriate sampling devices.

## SCHEDULE FOR COMPLETING CURRENT REVIEWS

58. EPA is firmly committed to carrying out and completing its reviews of the primary and secondary NAAQS for $NO_2$ and $SO_2$ and the related air quality criteria as rapidly as possible, consistent with satisfying applicable legal requirements and assuring sound and scientifically supportable decisions. Accordingly, EPA has incorporated the accelerated approach adopted in the 1990's and the further improvements adopted for the current ozone review (paragraphs 22-23

above), as well as the comprehensive recommendations made in the recent NAAQS Process Workgroup Report (paragraphs 26-33 above), in developing its proposed schedules for completing these reviews.

59.  EPA has also tailored its approach to these particular reviews in a way designed to increase their overall timeliness, efficiency, and effectiveness.  The latest scientific information on the environmental effects of NOx and SOx, is expected to be appreciably more complex than the scientific information on the health effects of the two pollutants.  The scientific information on the environmental effects is intertwined in complex ways.  As a result, review of the scientific information and secondary standards for the environmental effects of the two pollutants will be more challenging and will take somewhat longer than review of the information and primary standards for the health effects of the pollutants.  It will also be more efficient to review the information and secondary standards for the environmental effects of the two pollutants together.  Accordingly, EPA plans to have closely coordinated but separate reviews of the primary and secondary standards for these pollutants.  In this approach, EPA will proceed as rapidly as possible with tasks related to review of the primary standards for $NO_2$ and $SO_2$ (with the schedules for each slightly staggered for efficiency), will allow somewhat more time for tasks related to review of the secondary standards, including preparation of a comprehensive and policy-relevant planning document, and will conduct its reviews of the $NO_2$ and $SO_2$ secondary standards concurrently.

60.  The resulting proposed schedules call for completion of  final science assessments addressing the human health effects of NOx and SOx by July 11, 2008 and September 12, 2008, respectively; and addressing the environmental effects of both NOx and SOx by December 12, 2008.  EPA will sign for publication in the Federal Register notices of proposed rulemaking

addressing the primary NAAQS for $NO_2$ and the primary NAAQS for $SO_2$ by August 28, 2009 and October 30, 2009, respectively; and  notices of final action on the primary-standard proposals  by May 21, 2010 for $NO_2$ and by July 30, 2010 for $SO_2$. EPA will sign for publication a notice of proposed rulemaking  addressing the secondary NAAQS for both $NO_2$ and $SO_2$ by February 12, 2010 and a notice of final action on the secondary-standard proposal for $NO_2$ and $SO_2$  by November 19, 2010.   As detailed below, these are very ambitious schedules and represent the minimum time reasonably necessary to complete each of the reviews, consistent with satisfying applicable legal requirements and reaching sound and scientifically supportable decisions.

61. Attachment A presents timeline charts showing the various steps in the review processes for primary and secondary $NO_2$ and $SO_2$ NAAQS in graphic form, as well as the minimum amount of time EPA reasonably will need to complete each step. The first page of the chart shows the tasks involved in the reviews of the primary standards for $NO_2$ and $SO_2$. Although the schedules for these reviews are slightly staggered, they will be closely coordinated and proceed on essentially the same track.  The second page of the chart shows the tasks involved in review of the secondary standards for the two pollutants, which as indicated above will be considered together at each step.  For each of the three timelines shown in the charts, the five functional elements of a review (planning, science assessment, exposure/risk assessment, policy assessment, and rulemaking) are listed to the left, and color-coded bars on the timelines correspond to the tasks listed under each of those elements.  As indicated at the bottom of each chart, the color-coding identifies the entity (either one of several EPA offices or CASAC) with primary responsible for performing each task.

62.  The following paragraphs briefly describe the various tasks shown in the timeline

charts, including for the sake of completeness several steps already underway or completed. As reflected in the charts, the schedules for the three reviews differ by a few months; e.g., steps in the review of the primary standards for $SO_2$ generally occur about two months after corresponding steps in the review of the primary standard for $NO_2$. However, each review involves the same basic tasks, and to avoid needless repetition each task is described only once. For convenience of reference, the paragraph headings below correspond to the functional elements listed in the charts, and the subparagraph headings in general correspond to the tasks shown for each functional element. As illustrated in the charts, virtually all of the tasks will be carried out concurrently with others.

**Process and Schedule for Completion of $NO_2$ and $SO_2$ Reviews**

63.     **Planning**

•      Calls for information.  EPA has prepared and published a Federal Register notice
       for each pollutant, formally initiating the current review of the air quality criteria
       and standards for each and inviting submission of relevant scientific and technical
       papers for consideration in the review.  The $NO_2$ notice was published on
       December 9, 2005 (70 Fed. Reg. 73,236), and the $SO_2$ notice was published on
       May 15, 2006 (71 Fed. Reg. 28,023).

•      Prepare NAAQS review plans.   For each pollutant, EPA is currently preparing an
       integrated planning document that will set forth the process and schedule for the
       review of the air quality criteria and primary NAAQS that address the health
       effects of  $NO_2$ and $SO_2$, respectively.  EPA is also preparing a third such
       document for review of the criteria and secondary NAAQS that address the
       environmental effects of both $NO_2$ and $SO_2$.  Among other things, the document
       corresponding to each review will identify a set of policy-relevant issues – i.e.,
       those related to the indicator(s), form(s), averaging time(s), and level(s) of the
       standard(s) involved -- to frame the science, exposure/risk, and policy
       assessments to be prepared in that review.   It will also outline the projected scope
       of the exposure/risk assessment for that review and provide an overview of the
       approach to be taken in the policy assessment (by integrating the results of the
       science and exposure/risk assessments) to produce policy options, possibly
       including ranges of alternative standards for the Administrator to consider.

As discussed in the NAAQS Process Workgroup Report and reflected in Attachment A, these plans will allocate a larger proportion of the overall schedule than in previous reviews to the science and exposure/risk assessments; will more closely link these assessments through a more coordinated, consultative process, and will minimize the time between the completion of these assessments and reaching proposed decisions on the NAAQS.

- <u>CASAC/public consultation on plans</u>.  A draft of each review  plan will be made available for consultation with CASAC and for public comment.  The emphasis on  planning and on CASAC and public review of plans is expected to strengthen the overall effectiveness of the review process and obviate the need for more than the planned number of reviews of draft documents.  This will be particularly true for the concurrent review of the scientific information and standards for the environmental effects of NOx and SOx, which as indicated above will be quite complex.

- <u>Prepare final plans</u>.   EPA will initiate work on  the science assessments (see paragraph 64 below) even as  final plans for each review are being completed, taking into account CASAC and public comments on the draft plans.

64.    **Science assessments**

- <u>Prepare materials for the science assessment workshops</u>.  For each of the three reviews, EPA will prepare preliminary "workshop"draft materials related to the science assessment for that review, intended to focus the  review on all relevant scientific studies and key policy-relevant issues.   In final form, each science assessment will consist of a concise evaluation, integration, and synthesis of the most policy-relevant science (with comprehensive annexes containing  descriptive information) and will include key science judgments needed to develop  the corresponding exposure/risk assessment (see paragraph 65 below).

- <u>Peer-review workshops</u>.  EPA will  hold a series of workshops for initial peer-review of the preliminary draft materials by highly knowledgeable experts in the particular subject areas covered.  The workshops are necessary to assure that all relevant research has been identified and appropriately characterized, and to elicit and discuss differing views of its interpretation among experts in the pertinent disciplines.  Such discussions are essential to ensure that EPA's evaluation and interpretation of the scientific information is scientifically sound and balanced.

- <u>Prepare first-draft science assessments</u>. Building on the peer-review workshop materials, and taking into account input received at the workshops, EPA will prepare a first draft of the science assessment for CASAC and public review.  This will involve addressing issues raised at the peer-review workshops and ensuring

that each draft assessment reflects appropriate integration and synthesis of information from the different disciplines involved.

- <u>CASAC/public review of first-draft science assessments.</u>  The first drafts of the science assessments will be made available for review by CASAC and the public approximately 90 days in advance of a public meeting on each draft.  At the meetings, CASAC members will offer their individual views and discuss key issues raised, leading to the formulation of initial written advice and recommendations  by CASAC.  As with subsequent CASAC and public reviews of draft documents, the public will also be invited to submit written comments on the draft assessments, and time will be made available at the CASAC meetings for public comments that can inform CASAC's deliberations.

- <u>Prepare second drafts of science assessments.</u>  Based on advice and recommendations from CASAC, and taking into account public comments, EPA will prepare second drafts of the science assessments for further CASAC and public review.  As discussed in paragraph 65 below, EPA will release first drafts of the corresponding exposure and risk assessment reports at approximately the same time so they can be reviewed by CASAC and the public in conjunction with the draft science assessments on which they are based.  This is an example of the early and close coordination between development of related documents, in this case the science assessment and the corresponding exposure and risk assessment, that will be provided for in the plans for each review.

- <u>CASAC/public review of second drafts.</u>  Given the scientific complexities involved in the evaluation and interpretation of available information on the effects of NOx and SOx on human health and the environment, it is essential that CASAC and the public have an opportunity to evaluate and comment on EPA's responses to important critical comments made on review of the first drafts.  Past experience amply demonstrates that omitting this step would jeopardize the soundness of EPA's scientific review.  The second drafts will be made available for review by CASAC and the public approximately 60 days in advance of a public meeting on each.

  Based on past experience and the process changes discussed above, EPA expects that all remaining key issues will be resolvable based on CASAC's deliberations and advice on the second drafts, so that CASAC will be able to conclude its deliberations on the science assessments at these meetings and subsequently provide final advice to the Administrator that the revised documents represent adequate assessments of the available scientific information and provide an adequate scientific basis for making decisions on the NAAQS.

- <u>Prepare final science assessments.</u>  Taking into account CASAC advice and public comments on the second drafts, EPA will incorporate appropriate revisions into a

final science assessment for each of the three reviews.  EPA proposes to issue these documents by July 11, 2008 for the NOx and September 12, 2008 for SOx primary standard reviews, respectively,  and by December 12, 2008 for NOx/SOx secondary standard review.

65.     **Exposure/risk assessments**

•     Prepare exposure/risk assessment methodology documents.  Following the peer-review workshops and in conjunction with preparation of the first drafts of the science assessments (paragraph 64 above), EPA will also prepare detailed "scope and methods" plans that lay out proposed methodologies for conducting quantitative assessments of (1) human population exposures and (2) if the information is judged adequate to conduct quantitative risk assessments, the associated risks of sensitive population groups for $NO_2$ and $SO_2$, respectively.   A separate "scope and methods" plan will be prepared for conducting exposure assessments and, if the information is judged adequate to conduct quantitative risk assessments, associated risks for the environmental effects of NOx and SOx.  Each of these  draft plans (hereafter "methodology plans") will include methodologies that reflect the latest advancements in exposure/risk assessment tools and approaches.

Proper planning and development of exposure/risk assessment methodologies for these reviews are critical, as they lay the foundation for the subsequent quantitative assessments of the health and environmental risks associated with varying concentrations of the pollutants.  Starting with a scientifically appropriate methodology is thus critical to timely development of this important information.

•     CASAC/public consultation on exposure/risk assessment methodologies.  The draft methodology plan for each pollutant will be made available for review by CASAC and the public 60 days in advance of a public meeting, at which CASAC members will provide advice on the appropriateness and scientific soundness of the proposed methodologies.  In each case, EPA intends to combine this meeting with the CASAC meeting on the first draft of the corresponding science assessment, which will allow concurrent peer and public review of both the relevant scientific information and the proposed use of that information in the health and environment exposure/risk assessments.

•     Prepare first-draft exposure/risk assessments.   Taking into account CASAC and public comments on the assessment methodologies, as well as CASAC and public comments on the draft science assessments, EPA will conduct and document assessments of human and environmental exposure to NOx and SOx, and, if the information is judged adequate to conduct quantitative risk assessments, of associated risks to public health and  the environment of these pollutants. The first drafts of these reports (for the health effects of NOx and SOx  and for the

environmental effects of both NOx and SOx) will be released at approximately the same time as release of the corresponding second-draft science assessments, so they can be efficiently reviewed by CASAC and the public in conjunction with the science assessments on which they are based.   The first drafts will focus on effects associated with current air quality and just meeting the current standards; as noted below, the second drafts will additionally focus, as appropriate, on air quality scenarios that reflect just meeting potential alternative standards identified for consideration.

- CASAC/public review of first-draft exposure/risk assessments.  Each draft exposure/risk assessment  will be made available for review by CASAC and the public approximately 60 days in advance of a public meeting, at which CASAC will offer advice and recommendations as to the appropriateness and scientific soundness of the assessment.  In each case, EPA intends to combine this meeting with the CASAC meeting on the second draft of the corresponding science assessment, which will again allow concurrent peer and public review of these closely related documents.

- Prepare second-draft exposure/risk assessments.  Taking into account CASAC and public comments on both the second-draft science assessments and the first-draft exposure/risk assessment reports, EPA will prepare second-draft exposure/risk assessment reports for CASAC and public review.  For each report , this step will be concurrent with preparation of a draft policy assessment for that pollutant (see paragraph 66 below), which will allow efficient, concurrent consideration of exposure/risk-assessment results and their potential use in developing policy recommendations on ranges of alternative standards for the Administrator to consider.

- CASAC/public review of second-draft exposure/risk assessments.  Each second-draft exposure/risk assessment report  will be made available for review by CASAC and the public about 60 days  in advance of the public meeting at which it will be reviewed.  In each case, EPA intends to combine this meeting with the CASAC meeting on a draft of the corresponding policy assessment (see paragraph 66 below), which will facilitate concurrent peer and public review of the risk-assessment results and their proposed use in developing policy recommendations.

- Prepare final exposure/risk assessments.  Taking into account CASAC advice and public comments on the second drafts, EPA will incorporate appropriate revisions into final exposure/risk assessment reports.

66.    **Policy assessment**s

- Prepare draft policy assessments.  Based on the information and judgments in the science assessments and the results of the first-draft exposure/risk assessments, and taking into account CASAC and public comments on those documents, EPA will prepare a draft policy assessment for each review.  These drafts will include policy-relevant air quality analyses and will present preliminary policy analyses and conclusions  as to the adequacy of the current standards and whether consideration of revisions of the NAAQS is appropriate and, if so, ranges of alternative standards for the Administrator's consideration.  EPA will begin preparation of these draft policy assessments concurrently with preparation of the second-draft exposure/risk assessments, allowing concurrent development of both the possible alternative standards for consideration and EPA's assessment of the health and environmental risks  associated with each of them.

  The draft policy assessments will provide a preliminary basis for subsequent decisions as to the adequacy of the current standards and whether the existing standards should be revised and, if so, on the appropriate elements of any revised primary (health-based) or secondary (welfare-based) standards.  These are the indicator(s) (*i.e.*, the specific definition of the pollutant to be addressed by a standard); the averaging time(s) (*e.g.*, 24-hour, monthly, quarterly averages); the form(s) (*i.e.*, the air quality statistic to be compared against the level of the standard); and the level(s) for any revised standards.

- CASAC/public review of draft policy assessments.  A draft of each policy assessment will be made available for CASAC and public review approximately 60 days in advance of a public meeting.  The focus of this review will be on whether EPA's preliminary analyses as to whether the existing standards should be revised and, if so, on whether the indicator(s), averaging time(s), form(s), and level(s) suggested for consideration by the Administrator, are each supported by the underlying scientific evidence and/or quantitative exposure/risk estimates.  Again, EPA intends to combine this meeting with the meeting on the second draft of the corresponding exposure/risk assessment report, which will allow concurrent peer and public review of the closely related issues addressed in these documents.

- Prepare final policy assessments.  Taking into account CASAC advice and public comments on the draft policy assessments and on the second-draft exposure/risk assessments, EPA will prepare final policy assessments for the $NO_2$ and $SO_2$ primary-standard reviews, and for the $NO_2$ /$SO_2$ secondary-standard review.

67.    **Rulemaking**

*Proposed rulemakings*.  This process necessarily includes the following steps:

•    <u>Prepare decision packages</u>. Based on the results of the final science assessment, risk assessment, and policy assessment  for each pollutant, EPA staff will prepare a number of regulatory decision packages for the Administrator's consideration. Each decision package will include recommendations on whether the existing standards should be revised and, if so, on the indicator(s), averaging time(s), form(s), and level(s) for revised standards, together with supporting rationale and appropriate alternatives raised during Agency, CASAC, or public review and the underlying basis for such alternatives.  These documents will be coordinated with the other EPA offices involved (*e.g.*, the Office of Research and Development, other offices with related program responsibilities or expertise, and the Office of General Counsel) to assure that their views on key issues are appropriately reflected.

•    <u>Decisions by Administrator</u>. For purposes of preparing notices of proposed rulemaking, the Administrator must reach provisional decisions on each of the key issues for the rulemaking proposal raised in the decision packages or in discussions of those packages.  If revisions of the standards appear to be appropriate, of particular importance will be determining appropriate levels for the primary and secondary NAAQS.   The Administrator's  decisions on these key questions will be particularly difficult given their significance in protecting the nations's public health and welfare and the scientific complexity of the issues involved.

•    <u>Prepare draft Federal Register proposal notices</u>.  Upon receipt of direction from the Administrator, EPA staff will prepare draft proposed notices of rulemaking for publication in the Federal Register.  As required by section 307(d)(3) of the Act, 42 U.S.C. § 7607(d)(3), the notices will set forth the basis for the proposed decisions and will provide for both a public comment period, during which the public may submit written comments, and an opportunity to present oral testimony at one or more public hearings.  If the proposal differs in any important respect from CASAC's recommendations, the notice will also explain the reasons for any such difference.

•    <u>Agency review</u>.  The draft Federal Register notices will be subjected to formal, comprehensive Agency review to assure that they accurately reflect the available scientific and technical information, conform to the Administrator's proposed decisions on each issue, and are legally defensible.  This step also includes an interagency review process.

- Issue Federal Register Notices of Proposed Rulemaking.  EPA will sign for publication in the Federal Register the notices of proposed rulemaking as follows: by August 28, 2009 for decisions on the primary standard for $NO_2$; by October 30, 2009  for decisions on the primary standards for $SO_2$; and by February 12, 2010 for decisions on the secondary standards for $NO_2$ and $SO_2$.

*Final rulemakings.*.  This process necessarily involves the following steps:

- Public comment period and public hearing.  A 60-day period will be provided for submission of written comments on each proposal notice; the public will be appraised that EPA does not intend to consider requests for extensions to this comment period.  Any public hearings to be held will be scheduled for approximately 30 days after the commencement of the comment period to allow time for the public to prepare oral testimony.  As required by section 307(d)(5) of the Act, 42 U.S.C. § 7607(d)(5), the record of any  public hearing  will be kept open for 30 days after the close of the proceeding for to provide an opportunity for submission of rebuttal and supplementary information.

- Response to public comments.  EPA staff will review the public comments on each proposal, identify key issues that must be addressed, and prepare responses to comments as appropriate.  A complete summary of significant comments and responses to them will be prepared prior to final action, as required by section 307(d)(6) of the Act.

- Decisions by the Administrator.  Taking into account the public comments and any additional advice that may be provided by CASAC, the Administrator must reach final decisions on the NAAQS.

- Prepare draft Federal Register notices of final rulemaking.  EPA staff will prepare draft  notices for publication in the Federal Register that announce and explain the basis for its  final decisions on the NAAQS.  As required by section 307(d)(6)(A) of the Act, 42 U.S.C. § 7607(d)(6)(A), the notices will include the reasons for any major changes from the proposed decisions, and if the final rule differs in any important respect from CASAC's recommendations, the notice will also explain the reasons for any such difference.

- Agency review.  The draft Federal Register notices will be subjected to formal, comprehensive review within EPA.  This step also includes an interagency review process .

- Issue notices of final rulemaking.  EPA will sign for publication in the Federal Register  the notices announcing and explaining its  final actions  by May 21, 2010

for decisions on the primary NAAQS for NO2, by July 30, 2010 for decisions on the primary NAAQS for $SO_2$, and by November 19, 2010 for decisions on the secondary NAAQS for $NO_2$ and $SO_2$.

68. As discussed above, each step in the above process has been scrutinized by EPA professional staff and senior managers knowledgeable in the NAAQS process to produce the shortest schedules consistent with completing scientifically sound and appropriate $NO_2$ and $SO_2$ NAAQS reviews. In EPA's judgment, none of the steps described can be omitted without violating applicable procedural requirements or jeopardizing the scientific soundness of the review, or both. The resulting schedules take into account the unusual complexity of the review of the environmental effects of $NO_x$ and $SO_x$ and the nature and importance of the scientific and technical issues involved. It is EPA's judgment that imposition of shorter schedules than the ones presented in this Declaration would jeopardize its ability to make sound and scientifically supportable decisions in the current reviews.

69. It would be particularly harmful to the public interest to shorten the scientific assessment portions of the schedules by reducing the amount of time provided for preparation of science assessments, or by reducing the amount of time provided for CASAC and public review. In EPA's judgment, this would be very short-sighted. NAAQS decisions can have enormous consequences for society, and their legitimacy rests on the assurance that they are based on sound science and have been carefully considered. Given the serious nature of some of the health and environmental effects associated with exposures to SOx and NOx and the concern of some members of the public with possible effects below the level of the current standards, these factors are especially important in reviewing the NAAQS for $NO_2$ and $SO_2$. To unduly restrict the CASAC's review role, or the public's, would not only jeopardize the scientific soundness of the standards, but very likely lead to strong criticism from CASAC, the Science Advisory Board, the

scientific community generally, various interest groups, and Congress.  All have strongly

expressed the need for rigorous review of the scientific basis for NAAQS decisions.

70.  Aside from the above factors, EPA's proposed schedules also take into account three

very major  NAAQS reviews (particulate matter, ozone, and lead) that are already underway and

subject to court-ordered deadlines.  Although work on the $NO_2$ and $SO_2$ NAAQS reviews will

proceed concurrently with work on those reviews, some key members of the professional team

will have responsibilities for all reviews, and many if not all members will have responsibilities

for more than one review.  The proposed schedules must also be viewed in the context of the

unusually large number of rulemakings and other significant actions for which the Office of Air

and Radiation is responsible, including many  in the same time frame as the $NO_2$ and $SO_2$

NAAQS review.  The spring 2006 issue of EPA's semi-annual "Agenda of Regulatory and

Deregulatory Actions" includes a list of rulemakings and other significant actions scheduled for

the next several years, with a focus on the next two years.  As indicated in that document,

approximately 189 rulemakings are currently scheduled to be initiated or finished during the next

several years by the Office of Air and Radiation alone.  *See* 71 Fed. Reg. 23,225, 23,249-23,317

(April 24, 2006).  As reflected in the Agenda, this office is responsible for the great majority of

rulemaking actions conducted by EPA.

71.  As a result of these competing obligations, as well as strong budgetary pressures, the

Office of Air and Radiation has unusually limited ability to shift resources from other programs to

the  $NO_2$ and $SO_2$ NAAQS review.  The Office of Research and Development, which is

responsible for science assessments, operates under comparable constraints.  Indeed, continued

careful attention and diligence will be required of EPA management to assure that competing

regulatory obligations and fiscal constraints do not impact the review schedules presented in this Declaration.

72.  Moreover, committing additional resources beyond those planned for the $NO_2$ and $SO_2$ reviews would not effectively shorten the time necessary to complete them.  Key members of the professional staff responsible for the reviews are specially qualified for the tasks they perform, not merely by virtue of their training but, more significantly, as a result of the highly relevant technical expertise and experience they have acquired in prior NAAQS reviews.  It would be unrealistic to expect that other staff members or new hires could perform the same tasks effectively without an extended period of learning, regardless of their background qualifications, training, or experience.

73.  In addition, the amount of time necessary to complete the $NO_2$ and $SO_2$ reviews is largely dependent on the time necessary to allow review and comment by CASAC and the public; to allow rigorous and thoughtful consideration of the scientific issues that are certain to arise in the  review process; and to allow full management review and consideration of the key issues and regulatory options identified in the regulatory development phase.  Given the seriousness of the health effects for those potentially at risk from exposure to these pollutants  and the scientific complexities that are involved in understanding the environmental effects from NOx and SOx and in interpreting them in a policy-relevant context, it is imperative and in the best interests of all concerned parties that the decision whether to revise the NAAQS be well-considered and based on a sound resolution of the underlying scientific issues.

74.  It is also imperative that the air quality criteria for NOx and SOx  "accurately reflect the latest scientific knowledge," 42 U.S.C. § 7408(a)(2), and that any revised NAAQS for $NO_2$ or $SO_2$ be fully defensible on judicial review.  If the air quality criteria and NAAQS do not

"accurately reflect"  the scientific knowledge, or if EPA does not comply with applicable procedures in revising them, the resulting standards would likely not withstand judicial scrutiny, leading to a remand to EPA for further consideration.  If this occurred, the States' efforts to implement any revised NAAQS and the prior NAAQS would very likely be disrupted during the period of uncertainty, possibly years, that would ensue pending new agency decisions on remand. As a result, the implementation of any additional control measures that may be necessary to reduce the health or environmental risks posed by  $NO_2$ and $SO_2$ could be substantially delayed.

75.  As previously indicated, the Administrator is firmly committed to completing the current reviews as rapidly as possible, consistent with satisfying applicable legal requirements and assuring a sound and scientifically supportable decision.  EPA has just conducted a detailed review of its process for developing and reviewing the NAAQS in order to strengthen that process and achieve more timely reviews, and intends to use the steps recommended in that Report for the $NO_2$ and $SO_2$ NAAQS reviews. The schedules presented in this Declaration are very ambitious and represent the minimum time reasonably necessary to carry out that commitment.  If EPA had to take final action on shorter schedules, it would be forced to take procedural or analytical shortcuts that would jeopardize the soundness of the ultimate decisions and their defensibility on judicial review.  It is especially important to provide CASAC and the public sufficient opportunities for review and comment, given the seriousness of the effects at issue in the decision and the degree to which its validity will depend on sound resolution of the underlying scientific issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 31 day of May, 2006 at Research Triangle Park, N.C.


STEPHEN D. PAGE
Director, Office of Air Quality Planning
and Standards
United States Environmental
Protection Agency

**Page Declaration – Attachment A**

# Plans for Reviews of the NO$_2$ and SO$_2$ NAAQS



Plans for Reviews of the NO₂ and SO₂ NAAQS

May 30, 2006

*May 30, 2006*

# Plans for Reviews of the NO$_2$ and SO$_2$ NAAQS

