IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
CENTER FOR BIOLOGICAL               )
DIVERSITY, *et al.*,                )
                                    )
        Plaintiff,                  )
                                    )
 v.                                 )        Case No.: 05-1814 (JGP)
                                    )
STEPHEN L. JOHNSON,                 )
ADMINISTRATOR, UNITED STATES        )
ENVIRONMENTAL PROTECTION            )
AGENCY,                             )
                                    )
        Defendant.                  )
_____)

**EPA'S MEMORANDUM IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

/s/ EILEEN T. MCDONOUGH
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-3126
eileen.mcdonough@usdoj.gov

Of Counsel:

John Hannon
Lea Anderson
Air and Radiation Law Office
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C.  20460

Dated: May 31, 2006

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      $NO_x$ and $NO_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      $SO_x$ and $SO_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      The Review Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        D.      Proposed Schedule for the Reviews at Issue  . . . . . . . . . . . . . . . . . . . . . . . . . 13

STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      THIS COURT HAS EQUITABLE DISCRETION TO DETERMINE A
        REASONABLE SCHEDULE FOR AGENCY ACTION . . . . . . . . . . . . . . . . . . . . . . . 16

II.     THIS COURT SHOULD ADOPT THE SCHEDULE PROPOSED BY EPA,
        BECAUSE ANY SHORTER SCHEDULE WOULD JEOPARDIZE EPA'S
        ABILITY TO PROMULGATE SCIENTIFICALLY SOUND STANDARDS  . . . . . . . 17

III.    PLAINTIFFS' PROPOSED REMEDY SHOULD BE REJECTED . . . . . . . . . . . . . . . 19

        A.      The Requested Remedy Exceeds the Scope of the Citizen Suit Provision  . . . . . 19

                1.      The CAA Does Not Establish A Mandatory Duty For EPA
                        to Take "Implementing Actions" When Promulgating a
                        New or Revised NAAQS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                2.      The Court Should Not Impose Deadlines for Document Drafts  . . . . . . . 23

        B.      Plaintiffs' Proposed Schedule Is Insufficient . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## INTRODUCTION

This action was brought by Plaintiffs, the Center for Biological Diversity, Valley Watch, Preston Forsythe, Tina Johnson, and Jeremy Nichols, pursuant to the citizen suit provision of the Clean Air Act ("CAA" or the "Act,"), 42 U.S.C. § 7604(a)(2), to compel Defendant Stephen L. Johnson, Administrator, United States Environmental Protection Agency ("EPA"), to review, and, if appropriate, revise the existing air quality criteria for nitrogen oxides ("$NO_x$") and sulfur oxides ("$SO_x$") and national ambient air quality standards ("NAAQS") for nitrogen dioxide ("$NO_2$") and sulfur dioxide ("$SO_2$")  (jointly referred to herein as the "Pollutants"), pursuant to section 109(d) of the Act, 42 U.S.C. § 7409(d).[1]  EPA acknowledges that the Agency has not reviewed the relevant air quality criteria and NAAQS since 1996 and that, pursuant to section 109(d) of the Act, EPA has a current mandatory duty to undertake that review and to make any appropriate revisions.  Accordingly, the only issue to be resolved in this suit is the question of remedy – *i.e.*, the appropriate schedule under which EPA should undertake to review and, if appropriate, revise the criteria and NAAQS for the Pollutants (generally referred to hereafter as "review of the NAAQS," or "NAAQS review" or "review").

EPA is committed to carrying out and completing such a review as rapidly as possible, consistent with satisfying applicable legal requirements and ensuring a sound and scientifically supportable decision.  For the reasons set forth below and in the Declaration of Stephen D. Page, Director of the Office of Air Quality Planning and Standards ("OAQPS"), Office of Air and Radiation, EPA (May 31, 2006) ("Page Decl.") (Exhibit 1 hereto), the minimum amount of time reasonably necessary for EPA to complete all the obligations at issue here would be

---

[1]      The nature of the Pollutants, as well as the substance of EPA's actions to analyze and control emissions of the Pollutants are set forth below.  *See supra* 5-7 .

approximately four years and six months from the date of this motion.  Therefore, the ultimate deadline should be November 19, 2010.[2]  The Page  Declaration explains the steps that EPA has taken to determine the most efficient administrative process for satisfactorily completing the complex series of tasks necessary for the Agency to sufficiently analyze the scientific and policy issues involved and take final actions that will be consistent with the standards of the CAA and likely to withstand judicial review.  The Page Declaration also presents the reasons that EPA requires the full amount of time requested in order to complete each step.

Plaintiffs suggest that the Agency's work can be completed more expeditiously and ask the Court to require EPA to complete the tasks at issue for $NO_x$ and $SO_x$ no later than April 1, 2009 and May 1, 2009, respectively -- approximately 3 years from today.  This shorter timetable would require EPA to take procedural or analytical shortcuts collecting and evaluating the pertinent scientific data, considering the recommendations of a statutorily mandated independent scientific review committee, and developing any proposed revisions to the air quality criteria and NAAQS.  *Id*. ¶ 75.  Because Plaintiffs' timetable would jeopardize EPA's ability to make scientifically sound and legally defensible decisions, their proposed remedy would not serve the public interest.

In sum, the Court must ensure that the time allowed is sufficient for the Agency to complete its obligations consistent with the standards of the CAA.  The Court should grant summary judgment to EPA and order EPA to complete the mandatory duties at issue here in accord with the schedule summarized here and supported by the Declaration.

---

[2]      As set forth below and in EPA's Proposed Order, the total time can be divided into segments for the completion of specific actions.  EPA's remedy would result in nine separate deadlines covering three separate NAAQS reviews, the last deadline of which would be November 19, 2010.

**BACKGROUND**

I.    **STATUTORY BACKGROUND**

The Clean Air Act, 42 U.S.C. §§ 7401-7671q, enacted in 1970 and extensively amended

in 1977 and 1990, is intended to "protect and enhance the quality of the Nation's air resources so

as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act sets up

a comprehensive and extraordinarily detailed program for control of air pollution through a

system of shared federal and state responsibility.

National Ambient Air Quality Standards ("NAAQS") are a central element of the Clean

Air Act's program for control of air pollution. Sections 108 and 109 of the Act, 42 U.S.C.

§§ 7408-7409, require EPA to establish NAAQS for certain air pollutants – commonly referred

to as "criteria pollutants" – that "cause or contribute to air pollution that may reasonably be

anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A). Currently there

are NAAQS for six air pollutants: particulate matter, ozone, carbon monoxide, sulfur dioxide,

nitrogen dioxide, and lead. The NAAQS establish permissible concentrations of these pollutants

in the "ambient," or outside, air. EPA must establish primary NAAQS "requisite to protect"

public health with "an adequate margin of safety," and secondary NAAQS "requisite to protect"

public welfare interests, including soils, water, crops, vegetation, visibility, climate, and property

values. 42 U.S.C. § 7409(b). States must then establish State Implementation Plans, which

impose controls on individual sources of air pollution as necessary to attain and maintain the

NAAQS within their borders. 42 U.S.C. § 7410.

Both primary and secondary NAAQS must be based on "air quality criteria" developed

by EPA. 42 U.S.C. §§ 7409(b)(1) and (d)(1). Air quality criteria must "accurately reflect" the

"latest scientific knowledge" on "all identifiable effects on public health or welfare" that may

3

result from a pollutant's presence in the ambient air. *Id.* § 7408(a)(2). Historically, EPA has set forth air quality criteria in "criteria documents" – which are comprehensive, multi-volume, assessments of relevant medical, scientific, and technical information. The most recent criteria document for ozone, for example, is approximately 2000 pages in length.[3/]

To ensure that NAAQS will keep pace with advances in scientific knowledge, section 109(d) of the Act, 42 U.S.C. § 7409(d), requires that EPA complete a review of, and make appropriate revisions to, at five year intervals, both the air quality criteria and the NAAQS for each applicable pollutant. An independent scientific review committee, the Clean Air Scientific Advisory Committee ("CASAC") of EPA's Science Advisory Board, is required by the CAA to advise the Administrator on appropriate revisions of the air quality criteria and standards. 42 U.S.C. § 7409(d)(2). A separate statute, 42 U.S.C. § 4365(e), requires EPA to make proposed criteria documents available to CASAC for its comments on their scientific and technical adequacy. CASAC's advice and recommendations then continue to play a significant role throughout the standard-setting process. When EPA proposes to establish, retain, or revise existing NAAQS, it must "set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by [CASAC]." 42 U.S.C. § 7607(d)(3)(C). If EPA proposes action that "differs in any important respect from any of these recommendations," the Agency must provide "an explanation of the reason for such differences." *Id.*

## II.  REGULATORY BACKGROUND

### A.  $NO_x$ and $NO_2$

The term $NO_x$ refers to a number of compounds of nitrogen oxides, including $NO_2$. *See*

---

[3/]    Air Quality Criteria for Ozone and Related Photochemical Oxidants (USEPA 2006).

61 Fed. Reg. 52,852, 52,853 (Oct. 8, 1996). These compounds occur naturally in the

environment and also result from human activities. *Id.* The major sources of $NO_x$ emissions

associated with human activities are mobile sources (primarily cars and trucks) and electric

utilities. *Id.*

Evidence has shown that exposure to $NO_2$, at elevated concentrations, can adversely

affect human health, vegetation, materials, and visibility. Page Decl. ¶ 38. For example,

long-term exposure to elevated concentrations of $NO_2$ may lead to increased susceptibility to

respiratory infection and may cause irreversible alterations in lung structure. $NO_x$ compounds,

including $NO_2$, also have adverse environmental effects. Deposition of nitrogen (acid rain) can

lead to fertilization, eutrophication, or acidification of terrestrial, wetland, and aquatic (*e.g.*, fresh

water bodies, estuaries, and coastal water) systems. These effects can alter competition between

existing species, leading to changes in the number and type of species (composition) within a

community. *Id.*

In 1971, EPA promulgated primary and secondary NAAQS for $NO_2$. 36 Fed. Reg. 8186

(April 30, 1971). The Agency also adopted air quality criteria for $NO_x$ compounds, including

$NO_2$, but did not promulgate NAAQS for any other $NO_x$ compounds. The Agency explained that

there was little evidence linking specific health or welfare effects to near-ambient concentrations

of other $NO_x$ compounds. EPA reviewed these NAAQS and air quality criteria in 1985 and

concluded that revisions were not appropriate. 50 Fed. Reg. 25,532 (June 19, 1985). EPA again

reviewed these NAAQS in 1996 and reached the same conclusion. 61 Fed. Reg. 52,852 (Oct. 8,

1996). In this final determination, EPA noted that all areas of the United States were in

attainment of the existing standards for NO$_2$.  *Id*. at 52,853. [4/]

The Agency has not completed a review of the NO$_x$ air quality criteria and NO$_2$ NAAQS since 1996.  On December 9, 2005, EPA published a Federal Register notice formally initiating the current review of these air quality criteria and standards and inviting the submission of relevant scientific and technical papers for consideration in the development of revised standards and air quality criteria.  70 Fed. Reg. 73,236.

**B.      SO$_x$ and SO$_2$**

The term SO$_x$ refers to a number of compounds of sulfur oxides, including SO$_2$.  Because SO$_x$ compounds other than SO$_2$ are not commonly found in the atmosphere, EPA's regulatory efforts with respect to SO$_x$ have largely focused on the health effects of SO$_2$.  Page Decl. ¶ 44. EPA has found that high concentrations of SO$_2$ can result in temporary breathing impairment for asthmatic children and adults who are active outdoors.  Other effects that have been associated with longer-term exposures to high concentrations of SO$_2$, in conjunction with high levels of particulate matter, include aggravation of existing cardiovascular disease, respiratory illness, and alterations in the lungs' defenses.  SO$_2$ also contributes to adverse effects on the environment. Together, SO$_2$ and NO$_x$ are the major precursors to acidic deposition (acid rain), which is associated with the acidification of soils, lakes, and streams and accelerated corrosion of buildings and monuments.  *Id*.

---

[4/]      As explained in the Page Declaration, EPA has taken a number of regulatory actions designed to reduce NO$_x$ emissions.  Between 1995 and 2005, NO$_x$ emissions into the air decreased from 24.7 million tons per year to19 million tons per year.  National average air quality concentrations of NO$_2$ have decreased by approximately 21 percent for the period 1996 to 2005.  The Agency expects that more reductions will be achieved in the near future due to additional regulations recently adopted.  *Id*. ¶¶ 40-43.

In 1971, EPA promulgated primary and secondary NAAQS for $SO_2$[5]. During the 1980's and 1990's, EPA conducted an extensive review of the air quality criteria and NAAQS for $SO_x$. EPA determined that revisions to the primary and secondary NAAQS for $SO_2$ were not appropriate in 1996, aside from several minor technical changes.  58 Fed. Reg. 21,351 (April 21, 1993) (secondary NAAQS); 61 Fed. Reg. 25,566 (May 22, 1996) (primary NAAQS).[6]  In 1998, the D.C. Circuit granted a petition for review of EPA decision.  *American Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998).  The court held that "the Administrator has failed adequately to explain her conclusion that no public health threat exists," and remanded the matter to EPA for further action.  *Id.* at 393.  In May, EPA published a Federal Register notice formally initiating the current review of these air quality criteria and standards and inviting the submission of relevant scientific and technical papers for consideration in the development of revised standards and air quality criteria.  71 Fed. Reg. 28,023 (May 15, 2006).

## C.    The Review Process

EPA's process for reviews pursuant to section 109 has developed over time as the Agency accumulates experience.  In the 1990's, for example, EPA adopted a number of measures that were designed to accelerate the process significantly, including strict limits on the time allowed for public comment at various stages.  *See* 59 Fed. Reg. 5,164 (Feb. 3, l994).  Since then, the Agency has maintained a continuing effort to streamline or otherwise improve the

---

[5]    The NAAQS were technically established for $SO_x$, but $SO_2$ is used as the indicator for measuring compliance.  *See* 40 C.F.R. § 50.4(c) (NAAQS for sulfur oxides (sulfur dioxide)).

[6]    Since 1996, there has been a substantial decline in the amount of $SO_2$ emitted into the air. Page Decl. ¶¶ 47-49.  National average air quality concentrations of $SO_2$ decreased by 39 percent from 1993-2002.  From 1995 to 2005, estimated $SO_2$ emissions into the air decreased from 18.6 million tons per year to 15 million tons per year.  As with $NO_x$, EPA expects further reductions from recently-adopted measures.  *Id.* ¶ 49.

7

process for these reviews.  Recently, in the course of the ongoing ozone review, EPA broadened

participation in the process for planning and developing the important documents traditionally

issued in the NAAQS review – historically criteria document, the staff paper, and one or more

exposure/risk assessment reports issued in conjunction with the staff paper – to make the process

more collaborative and also significantly restructured the criteria document.

Moreover, EPA is implementing further changes based on the recommendations of a

workgroup established at the direction of the Deputy Administrator.  The NAAQS Workgroup,

composed of highly knowledgeable representatives, including senior management, from each of

the offices involved in NAAQS reviews, was charged with conducting a "top-to-bottom" review

of the NAAQS process to examine how it could be further strengthened, and to identify further

streamlining of the process so EPA can achieve more timely NAAQS reviews.  Page Decl. ¶ 24.

The recommendations of the Workgroup, as well as the accelerated approach adopted in the

1990's and the improvements adopted for the current ozone review, form the basis for the

development of EPA's schedule for the $NO_2$ and $SO_2$ reviews at issue here.[7]

As explained in the Page Declaration, the NAAQS review process necessarily includes

two phases: (1) a science, exposure/risk, and policy assessment phase, including related

planning, and (2) a rulemaking phase.  Based on the recommendations of the NAAQS

Workgroup,  EPA plans to restructure the timing and approach of the various elements of the

assessment phase described above, covering *planning, science assessment, risk and exposure*

---

[7]    Throughout the review of the process, the Workgroup has solicited input from CASAC
and various stakeholders.  EPA has scheduled two public meetings for June 27th and 29th, 2006,
to obtain further input on various components of the NAAQS review process from members of
the  public and CASAC respectively.  Page Decl. ¶ 25 n.4.  The recommendations are attached as
Exhibit 2 hereto.

*assessment, and policy assessment*.  All of these key functional elements will be focused and coordinated in a way that will strengthen the NAAQS review process, including review by CASAC, and will promote the overall timeliness of the review by avoiding redundancy and inefficiency in the document preparation and review process.  For example, EPA plans to use a more integrated planning process, to refocus the process so that the policy-relevant issues that the Administrator must decide are a framework for all of the documents, to perform the exposure/risk assessment earlier in the process and in a manner that is more closely integrated with the science assessment, and to avoid duplication of effort by having the policy-relevant integration of the science occur in the science assessment document.[9]  The Page Declaration spells out in detail the contents of the various steps, as well as the detailed timeline for completing the assessment and rulemaking phases of the review.

The planning for a NAAQS review typically commences no later than the issuance of a Federal Register notice formally initiating the review and inviting submission of relevant scientific and technical papers.  As part of the planning process, EPA also prepares an integrated planning document for CASAC review that will, among other matters, identify a set of policy-relevant issues to frame the assessment phase of the review.  Given the magnitude and complexity of the scientific and technical information typically involved in NAAQS reviews, detailed  planning at the outset of the process  is a key element for ensuring that the assessment phase is both timely and scientifically sound.  Page Decl. ¶ 26.

---

[9]      This process is different than that previously used by the Agency.  *See* Page Decl. ¶¶ 25-33.  Plaintiffs have relied upon the Agency's former methods in presenting their arguments.

*Assessment Phase*

The assessment phase comprises the bulk of the time taken during a NAAQS review and consists of three stages that build on one another:  a science assessment; a risk/exposure assessment; and a policy assessment.

1.     Science Assessment:  The National Center for Environmental Assessment ("NCEA") of EPA's Office and Research and Development has primary responsibility for the *science assessment*.   NCEA reviews the scientific literature and prepares a draft assessment addressing issues such as chemistry of the pollutant, sources of ambient levels, and information from toxicology, epidemiology, and other scientific studies on the impact of the pollutant on public health and welfare, and providing an integrated synthesis of this scientific information. Page Decl. ¶ 29.  The draft science assessment and/or discussion of key policy-relevant scientific issues is subject to a peer review process by experts from outside EPA through public workshops and, after revisions have been made, the draft is distributed to CASAC and the public for review. *Id*.  Based on past experience with CASAC during NAAQS reviews, two rounds of review and revision will be necessary to address all of the issues raised by CASAC.  *Id*. ¶ 30.  The final science assessment document will present an integrated assessment of the scientific information relevant to the necessary policy decisions, as well as the key science judgments necessary to perform the risk/exposure assessments.  *Id*. ¶ 27.  The document will also provide comprehensive and critical review of the underlying science, reflected in extensive and detailed annexes with generally descriptive information.  *Id*.

Preparation of a science assessment will entail surveying a large body of available information, as has been the case for preparing the criteria document under EPA's previous

procedure. *Id.* ¶ 28. However EPA will restructure and refocus the document more directly on the scientific information that is most relevant in making decisions on whether and, if so, how to revise a NAAQS. This refocusing will require an initial preliminary review of the broader body of literature, followed by a rigorous and critical evaluation of the subset of scientific evidence that is found to be most pertinent to the review of the NAAQS. *Id.* ¶¶ 28-30. EPA anticipates that the restructured process will allow for more focused and timely review by CASAC, and make it more likely that a comprehensive and well grounded science assessment can be completed in a timely manner. *Id.* ¶ 27. To emphasize the change in approach, the document will be renamed as a "science assessment,' instead of a criteria document. *Id.*; *see id.* ¶ 64 (detailed discussion of tasks necessary for science assessment).

2.    Risk and Exposure Assessment:  In these reviews, EPA plans to separate the functional elements previously addressed in the staff paper and its related report(s) on exposure and risk assessment, *i.e.*, a quantitative assessment of exposure to a pollutant and resulting risks; and a policy assessment of issues based on the most relevant scientific and risk information. *Id.* ¶ 31. OAQPS will conduct an *assessment of exposure and risk* from various ambient levels of the pollutant. This risk assessment uses the science from the science assessment, along with information about exposure at different ambient levels, to provide a quantified assessment of the risk to public health and welfare at various levels of ambient air quality. *Id.* ¶ 32. In comparison to past NAAQS reviews, this rigorous assessment of risk and exposure will be performed earlier in the review process and coordinated more closely with the science assessment, enhancing its scientific strength and timeliness. *Id.* ¶ 31. The risk assessment  will be similar to the risk and exposure report and related chapters(s) that were formerly included in the staff paper but will be provided in a separate risk assessment document, such that it will be a more concise document

than had previously been prepared and will avoid any repetition of information in two different documents. *Id.* A draft risk and exposure assessment will be distributed to CASAC and the public for review and comment. Based on past experience with CASAC during NAAQS reviews, two rounds of review and revision will be necessary to address all of CASAC's issues and prepare an integrated assessment. *See id.* ¶ 65 (detailed discussion of tasks necessary for risk and exposure assessment).

3.    Policy Assessment: Once the first draft of the risk/exposure assessment has been completed and reviewed by CASAC, OAQPS will prepare *a policy assessment* document presenting the policy-relevant air quality analyses and policy assessments, including a discussion of approaches for making the policy judgments required under the Clean Air Act, and the identification of ranges of alternative NAAQS that reflect alternative policy judgments. *Id.* ¶¶ 33, 66. The ranges of alternative standards and the underlying analyses will provide a framework for CASAC review, facilitating fulfillment of CASAC's statutory responsibility to advise the Administrator on appropriate revisions to the NAAQS, as well as providing opportunity for public comment. Based on past experience with CASAC during NAAQS reviews, and the restructuring of the science assessment and exposure/risk assessment, we anticipate only one round of review and revision will be necessary to address all of CASAC's issues and prepare an integrated assessment. CASAC's review of the draft policy assessment document will be coordinated with CASAC's review of the second draft risk assessment document. *Id.* ¶ 33; *see id.* ¶ 66 (detailed discussion of tasks necessary for policy assessment).

*Rulemaking Phase*

The results of the assessment phase, including the advice of CASAC, provide the basis for EPA's Administrator to decide whether it is appropriate to propose a revision to the NAAQS in question and, if so, to decide the specific revisions to be proposed.  EPA must then undertake the specific rulemaking procedures set forth in section 307(d) of the Act, 42 U.S.C. § 7607(d), to take final action to either (1) determine that no revision is appropriate or (2) promulgate the appropriate revision.  Page Decl. ¶¶ 34-36; *see id*. ¶ 67 (detailed discussion of tasks necessary for rulemaking).

### D.    Proposed Schedule for the Reviews at Issue

In developing its plan for the particular reviews at issue,  EPA has looked closely at the specific nature and circumstances of the reviews for these Pollutants to identify the most efficient and scientifically defensible way to conduct the reviews.  *Id*. ¶¶ 52-55, 59.  There are important interrelationships between these two pollutants, both in their atmospheric chemistry and their effects on the environment.  There are also differences in the nature and complexity of the science and other issues between the public health issues relevant for a review of primary NAAQS, and the environmental and welfare effects relevant for a review of the secondary NAAQS.  *Id*. ¶¶ 52, 59.  The most effective and timely way to address these interrelationships, and especially the appreciably more complex science underlying the environmental and welfare effects of  $NO_x$ and $SO_x$, is to separate the review of their environmental and welfare effects from the review of their health impacts.  *Id*. ¶¶ 53, 59.  EPA also believes these differences mean it can complete the health effects review more quickly than the welfare effects review, and that there will be a significant benefit both scientifically and in terms of time to conduct a joint

13

review of their welfare effects. *Id.*

EPA's review of the primary public health based standards for $NO_2$ will be carefully coordinated with the review of the primary standards for $SO_2$, which will follow closely in time with the $NO_2$ review. *Id.* EPA will also conduct a single, combined review of the secondary standards for these Pollutants, which would take a short period of additional time given its increased scientific complexity.[9] Planning for a review of the scientific information and standards for the environmental effects of the two pollutants will be more challenging and will take longer than review of the information and standards for the health effects of the pollutants, as will establishing the range of reasonable policy choices.[10] For these reasons, EPA has concluded that it will be more efficient and appropriate to review the air quality criteria and standards for the environmental effects of the two pollutants together in a single review. *Id.*

Accordingly, EPA plans to separate the reviews of the primary and secondary standards for these pollutants. In this approach, EPA will proceed as rapidly as possible with tasks related to review of the primary standards for the Pollutants (with the schedules for each slightly staggered for efficiency). EPA will allow more time for tasks related to review of the secondary

---

[9] Primary NAAQS address public health and secondary NAAQS protect public welfare interests. 42 U.S.C. § 7409(b). *See supra* 3-4.

[10] Not only is the scientific information on their environmental effects intertwined, but the issues relating to secondary standards for $NO_2$ and $SO_2$ also present increased legal complexity. These legal complications are due in part to the interconnection of their effects, but also to the fact that the secondary NAAQS are not the sole means of addressing many of the key welfare effects of the pollutants, acid deposition (so-called acid rain) in particular. As part of the 1990 Amendments to the Act, Congress enacted Title IV, which established a new legislative program to address acidic deposition effects by requiring mandated reductions of $SO_2$ and $NO_x$ emissions (primarily from electric utility steam generating units). CAA sections 401-416, 42 U.S.C. §§ 7651-7651o. The interplay between Title IV requirements and potential secondary standards for SO2 and NO2 requires careful consideration.

standards, and will conduct its reviews of the secondary standards for the Pollutants

concurrently. EPA requests the Court to allow the following schedule:

| | $NO_2$ (primary/ public health) | $SO_2$ (primary/ public health) | $NO_2$ and $SO_2$ (secondary, public welfare) |
|---|---|---|---|
| Final Science Assessment | July 11, 2008 | September 12, 2008 | December 12, 2008 |
| Notice of Proposed Rulemaking [11] | August 28, 2009 | October 30, 2009 | February 12, 2010 |
| Final Rule[12] | May 21, 2010 | July 30, 2010 | November 19, 2010 |

*See* Page Decl. ¶ 60.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"shall be rendered forthwith if the pleadings, . . . together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n.4 (1986) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

---

[11]    Dates are for signature of a notice of proposed rulemaking for publication in the Federal Register.

[12]    Dates are for signature of a notice of final rulemaking for publication in the Federal Register.

**ARGUMENT**

**I.     THIS COURT HAS EQUITABLE DISCRETION TO DETERMINE A
        REASONABLE SCHEDULE FOR AGENCY ACTION**

A district court has broad discretion to fashion equitable remedies. *Weinberger v. Carlos Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *American Lung Ass'n v. Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1984).  In a suit alleging violation of a Congressionally mandated duty,  "[t]he sound discretion of [a] . . . court does not embrace enforcement . . . of a party's duty to comply with an order that calls [on] him to do an impossibility."  *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975) ("*Train*").  Thus, a statutory deadline should not be enforced to the extent that it is impossible or infeasible to comply with such a deadline.  *American Lung Ass'n v. Browner*, 884 F. Supp at 347.

In *Train*, the leading case on the subject of an agency's failure to meet statutory deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily delay agency action and make it infeasible to comply with a particular deadline:  (1) budgetary and manpower constraints, and (2) the need for an agency to have more time to sufficiently evaluate complex technical issues.  510 F.2d at 712-13.  With respect to the latter, "[t]he public has a significant interest in ensuring that the government does not promulgate rules via a process that emphasizes expediency over quality and accuracy."  *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000).

The public interest in sound regulations that will survive judicial review "is of paramount importance."  *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987).  Accordingly, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency."  *Id*. "Indeed, by decreasing the risk of later judicial invalidation and remand to the agency, additional

time spent reviewing a rulemaking proposal before it is adopted may well ensure earlier, not later, implementation of any eventual regulatory scheme." *Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987). *See also United Steelworkers v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding judicial imposition of overly hasty timetable on agency would ill serve the public interest); *Maine Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear and effective regulations capable of withstanding the scrutiny of challenges following enactment.").

In short, when an agency has missed a statutory deadline, a court should examine the relevant facts and circumstances and evaluate the time frame needed by the agency to make well-reasoned, scientifically supportable, and defensible decisions.

## II. THIS COURT SHOULD ADOPT THE SCHEDULE PROPOSED BY EPA, BECAUSE ANY SHORTER SCHEDULE WOULD JEOPARDIZE EPA'S ABILITY TO PROMULGATE SCIENTIFICALLY SOUND STANDARDS

EPA acknowledges that more than five years have elapsed since EPA last concluded a review of the air quality criteria and related NAAQS for the Pollutants. Accordingly, pursuant to section 109(d)(1) of the Act, 42 U.S.C. § 7409(d)(1), EPA has a present nondiscretionary duty to perform the following tasks: (1) complete a "thorough review" of the air quality criteria and NAAQS for the Pollutants, and (2) make such revisions in the criteria and NAAQS as may be appropriate. The task of establishing deadlines for EPA's completion of these actions falls within the discretion of the Court. *See Train*, 510 F.2d at 713. In exercising that discretion, this Court should consider the five-year time frame Congress envisioned for NAAQS review, the critical importance of ensuring that any revised standards ultimately adopted can withstand challenge, and put simply, what is possible. *Id*.

To aid the Court, EPA has made a rigorous assessment of each task necessary to conclude a review and the minimum amount of time needed to accomplish each of these tasks. These tasks are identified and discussed in the Page Declaration, ¶¶ 63-67. Each step identified has been scrutinized by EPA professional staff and senior managers knowledgeable in the NAAQS process to produce the shortest possible schedule for completing the reviews of the Pollutants. None of the steps described can be omitted without violating applicable procedural requirements or jeopardizing the scientific soundness of the review or both. *Id.* ¶ 68. EPA's proposed schedule is based on both the Agency's past experience and the NAAQS Workgroup recommendations.

This Court should adopt EPA's schedule. It reflects the Agency's expert judgment, based on a rigorous examination of each step in the process, of the minimum amount of time reasonably necessary to produce a scientifically sound and legally defensible decision given the complexity of the issues confronting it. *See* 42 U.S.C. § 7408(a)(2) (directing EPA to set air quality criteria that "*accurately* reflect the latest scientific knowledge" (emphasis added)); *Train*, 510 F.2d at 712-13 (identifying the need to sufficiently evaluate complex technical issues as a circumstance that might necessarily delay agency action and make it infeasible to comply with a particular statutory deadline). As explained below, the most significant differences between EPA's proposed schedule and that proposed by Plaintiffs is the time provided for EPA to complete its review and analysis of the science, including appropriate review by CASAC and public participation. EPA's schedule is also consistent with the five-year review period for EPA reviews of NAAQS provided for in 42 U.S.C. § 7409(d); under EPA's proposed schedule, each review will be completed from start to finish in less than a five-year period.

Given the important public health and welfare and other societal interests at stake, the

18

public interest here is overwhelmingly on the side of allowing EPA sufficient time to produce a

scientifically sound and legally defensible decision on revision of the NAAQS.  The public

interest would not be served by adopting a schedule that would attempt to "punish" the Agency

for having missed a statutory deadline while forcing the Agency to perform the impossible.  If

EPA were compelled to issue air quality criteria that did not "accurately reflect the latest

scientific knowledge," 42 U.S.C. § 7408(a)(2), and were compelled to promulgate NAAQS

based on less than a complete and accurate review of the science, the public health and welfare

benefits Plaintiffs hope to realize through completion of the NAAQS review would not be

realized.

## III.    PLAINTIFFS' PROPOSED REMEDY SHOULD BE REJECTED

### A.     The Requested Remedy Exceeds the Scope of the Citizen Suit Provision

The CAA citizen suit provision limits the scope of the Court's equitable authority in

developing a remedy.[13]  The statute authorizes claims "against [EPA] where there is alleged a

failure of [EPA] to perform any act or duty under this chapter which is not discretionary."  42

U.S.C. § 7604(a)(2).  The statute further provides that "[t]he district courts shall have

jurisdiction . . .  to order the Administrator to perform such act or duty."  *Id.*  Accordingly, any

judicial remedy must be limited to requiring actions expressly mandated by Congress.  The Court

cannot impose a schedule that will compel EPA to take actions that have been left to the

_____

[13]    It is well-established that Congress can limit the scope of the Court's equitable authority
in particular disputes.  *See United States v. Philip Morris USA, Inc*., 396 F.3d 1190, 1198 D.C.
Cir. 2005) (where language of Racketeer Influenced and Corrupt Organizations Act only gives
the district courts jurisdiction for forward-looking remedies that prevent future violations of the
Act, the district court may not order disgorgement, a remedy aimed at past violations) (citing
*Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 488 (1996)).

Agency's discretion.

### 1. The CAA Does Not Establish A Mandatory Duty For EPA to Take "Implementing Actions" When Promulgating a New or Revised NAAQS

Plaintiffs ask the Court to require that EPA complete all "all tasks necessary for the implementation" of any revisions to the NAAQS by the deadline for issuance of the final rule. Pltf. Memo at 12-13, Pltf. Proposed Order at 2-3. Plaintiffs rely on *Missouri Coalition for the Environment v. EPA*, 2005 WL 2234579 (E.D. Mo. Sept. 14, 2005) ("*MCE*"), where the court, pursuant to the CAA citizen suit provision, issued an order requiring EPA to review, and, if appropriate, revise the existing air quality criteria for lead. The court required that EPA complete the implementation phase, described as "collateral statutory requirements" by the same date as the final NAAQS rule. *Id.* *3. The Court identified only one additional statutory task: CAA section 312(a)(1) requires EPA, in consultation with the Secretaries of Labor and Commerce and the Advisory Council on Clean Air Compliance Analysis, to analyze the impact of a new or revised NAAQS "on the public health, economy, and environment of the United States." 42 U.S.C. § 7612(a)(1).[14]

The statute, however, does not impose a deadline for the completion of such a report or specify that it must be completed before promulgation of the NAAQS. Because Congress gave EPA the discretion to decide *when* to issue the analysis, there is no mandatory duty that EPA has failed to perform. Accordingly, the citizen suit provision does not provide any authority for the Court to order EPA to complete the section 312 analysis prior to taking final action on the NAAQS rulemakings.

---

[14] The Advisory Council consists of nine experts appointed by the Administrator after consultation with the Secretaries of Labor and Commerce. 42 U.S.C. § 7612(f).

In the past, EPA generally has issued guidance or even additional final rules to facilitate implementation of the NAAQS by the States, generally pursuant to authority under section 110 of the Clean Air Act, 42 U.S.C. § 7410. Again, however, there is no mandatory duty to take such action by a set date. There may be issues that arise that the Agency can address contemporaneously with the NAAQS, but EPA may determine that some issues may be better addressed after the NAAQS have been issued. Moreover, new issues may arise as implementation begins. Accordingly, the statute does not support the claim that the Court should order EPA to complete all these activities by a set date. *See* Page Decl. ¶¶ 10-11.

In sections 108 and 109, Congress expressly established the Agency's duty to review the air quality criteria and the NAAQS, and, if appropriate, revise the NAAQS. Congress also established a very specific set of mandatory duties triggered by the promulgation of a new or revised NAAQS so that the benefits from the new standard would be realized in an appropriate time frame. As explained by the D.C. Circuit,

> Once EPA establishes NAAQS for a particular pollutant, the standards become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration. EPA and the States must first designate areas of the country that fail to meet the standards-that is, areas in which atmospheric concentrations of the pollutant exceed allowable levels. 42 U.S.C. § 7407(d)(1)-(2). Each State must then adopt a plan that " provides for implementation, maintenance, and enforcement of [the] primary"NAAQS, *id*. § 7410(a)(1), through, for example, regulation of wood fires or automobile or power plant emissions. States must submit their plans to EPA for approval, and may have to make revisions if the Agency finds the plans inadequate. States that fail to develop adequate plans are subject to sanctions, *id*. § 7509, or to imposition of a federal implementation plan, *id*. § 7410(c)(1).

*American Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 358-59 (D.C. Cir. 2002). Each statute cited by the D.C. Circuit in this explanation includes a specific schedule and deadline for EPA action that begins to run after promulgation of a NAAQS.

21

Congress chose not to establish any additional mandatory duties for EPA to perform in order to facilitate the States' SIP preparation.  In suggesting that the Court establish a deadline for the completion of implementation activities, Plaintiffs are expanding, rather than enforcing the statutory requirements.  Accordingly, their request that the Court compel EPA to complete these activities when promulgating the final NAAQS rules should be rejected.

### 2.    The Court Should Not Impose Deadlines for Document Drafts

Plaintiffs seek deadlines for EPA to complete (for each Pollutant) the initial draft of a criteria document; the final criteria document; a draft staff paper on whether to revise the NAAQS; a final staff paper; a notice of proposed rulemaking on revising the NAAQS; and a final rule on NAAQS revisions.  Pltf. Memo at 12.  As set forth above, EPA has revised its process to eliminate the criteria document and staff paper.  EPA's proposed schedule includes dates for the final science assessments, which, under EPA's revised process, would replace the criteria document and its review of the air quality criteria.  The Agency's schedule, however, does not include dates for the completion of draft documents, or for the other documents used to prepare for the NAAQS rulemaking.

The Court should not impose deadlines for drafts or for these other documents.  The statute does not require EPA to prepare drafts or to take any specific procedural steps in order to complete the review.  Thus, these deadlines are not within the scope of the remedy authorized in the citizen suit provision:  an order requiring EPA to complete the duty mandated by the statute. The Court should not seek to manage the details of the process by which the Agency achieves that goal, but should leave EPA discretion to determine how to best meet the deadlines to be established by the Court.

Plaintiffs suggest that these interim deadlines will serve only to make sure that the Agency does not fall behind the schedule and become unable to meet the final deadline. Pltf. Memo at 12. In *MCE*, the court did establish deadlines for EPA to complete these same tasks in completing its review of the air quality criteria and NAAQS for lead. The court relied on the following statement in *NRDC v. Train*: "[t]he authority to set enforceable deadlines both of an ultimate and an intermediate nature is an appropriate procedure for exercise of the court's equity powers to vindicate the public interest." 510 F.2d at 705. At issue in *Train* was a mandatory duty for EPA to establish effluent limitation guidelines for a number of source categories. Instead of setting a single date for the completion of all guidelines, the district court had divided the categories into two groups and required EPA to act on the first group within six months and the remainder within a year.

Thus, *Train* did not establish deadlines for EPA to complete interim stages of a single Agency action, but instead established a schedule for EPA to take several discrete final actions. The court did not become entangled with the details of the Agency's internal processes. There have been many cases where the courts have ordered federal agencies to complete administrative duties by a set time frame. These cases focus on the imposition of deadlines for actions mandated by a specific substantive or procedural statute (such as 307(d) or the Administrative Procedure Act). Plaintiffs do not cite any decisions other than *MCE* and *American Lung Association v. Browner*, 884 F. Supp. at 348-49, where deadlines for draft documents have been imposed. These decisions also address EPA's obligations under section 109(d). Plaintiffs present no reason why deadlines are appropriate in these cases, while not deemed necessary in citizen suits addressing EPA's obligations under other CAA provisions.

EPA has proposed a schedule that would establish mandatory deadlines for nine actions

in connection with three planned reviews and rulemakings to be completed over a four year

process. *See supra* 15.  Plaintiffs have failed to show that additional deadlines are necessary.

### B.        Plaintiffs' Proposed Schedule Is Insufficient

Plaintiffs' schedule would require that EPA complete all actions with respect to the two

NAAQS reviews at issue here by May 1, 2009, approximately three years from the filing of

Plaintiffs' motion.  Plaintiffs' claim that such a time frame is consistent with the deadlines

imposed by courts in similar cases is simply wrong.  For example, Plaintiffs argue that this is the

same amount of time as that allowed by *MCE* for completion of the lead NAAQS review,

pointing to the time period between issuance of the Court's order and the deadline for issuance

of the final rule.  Pltf. Memo at 14.  Plaintiffs base their argument on  an overly simplified and

inaccurate reading of  that case.  Although the court's order was issued on September 14, 2005,

and requires that EPA take final action by September 10, 2008, EPA had completed a substantial

amount of work on the review of the air quality criteria for lead *before* the schedule was issued.[15]

The schedule imposed by the *MCE* court thus in fact gave EPA close to four years to complete

its review of the lead NAAQS, as measured from the date EPA formally initiated  review.  *See*

69 Fed. Reg. 64,926 (Nov. 9, 2004).

Plaintiffs' reliance on *American Lung Association v. Browner*, where the court ordered

EPA to complete the review of the air quality standards and NAAQS for particulate matter about

two years and four months after the date of the order, is similarly misplaced.  That schedule

proved to be inadequate and was extended several times, either by agreement with the plaintiffs

---

[15]     The deadline set by the court for the initial draft of the criteria document was December
1, 2005 – about ten weeks after the order was issued.  Even Plaintiffs are not suggesting that a
draft could be prepared from the start in that limited a time frame.

or on EPA's motion.  As noted in the opinion,  EPA had started the review of the particulate

matter NAAQS in October, 1993, one year before the court issued its order.  884 F. Supp. at 348-

49.  The court ultimately modified its order, giving EPA additional time to complete its review.

*See* 62 Fed. Reg. 38,652, 38,654 n.3 (July 18, 1997).  Thus, the full process for EPA to review

the particulate matter NAAQS required almost four years.[16]

The insufficiency of Plaintiffs' roughly three-year schedule is most readily illustrated by

the fact that Plaintiffs would allow only until August and September 2007 for completion of the

science assessments for $NO_x$ and $SO_x$, a total of about 19 and about 14 months respectively,

measured from the call for information.  This schedule clearly underestimates the amount of time

needed to perform the comprehensive scientific analysis and integration that is the underpinning

of the entire NAAQS review process.  This is a key difference between Plaintiffs' and EPA's

proposed schedules, with Plaintiffs' schedule inappropriately downplaying the importance and

complexity of the science assessments that must be performed, and the importance of review by

CASAC and the public.

In addition, Plaintiffs' schedule would provide only six months between the proposed

and final rules.  Because section 307(d) mandates a 60-day period for notice and comment and

an opportunity for a public hearing, and also requires that the comment period stay open for 30

days after the conclusion of any such public hearing, the schedule effectively allows EPA

approximately four months to review and respond to the comments, make a final decision, and

complete the necessary notice.   NAAQS rulemakings often draw very large numbers of

comments, and those from principal stakeholders such as the industry, states, and public health

---

[16]      While EPA has met the schedule issued in *MCE* to date, EPA cannot know at this time
whether future circumstances will require an extension, as in *American Lung Ass'n*.

and environmental groups are often very detailed and extensive.  Whatever EPA's proposed

decision on the $NO_2$ and $SO_2$ NAAQS, it is likely to generate significant comment and

controversy.  To even review and carefully consider the comments, make final decisions, and

prepare the final rule, as well as to provide a written response to each of the significant

comments as required by section 307(d)(6)(B), will take longer than the four months Plaintiffs

would allow. [17]

    The analysis of how much time will be required to complete the reviews at issue is, in

part, dependent on the competing demands of all the rulemaking actions before the Agency, but

especially those faced by the Agency offices and staff responsible for the review of the $NO_2$ and

$SO_2$ NAAQS.  Page Decl. ¶ 70.  These demands of multiple NAAQS reviews are different than

when either of the two court orders cited by the Plaintiffs were issued.  In addition to the review

of the lead NAAQS, which will be ongoing during the next two and a quarter years pursuant to

the *MCE* court's order, and the completion of the current particulate matter and ozone NAAQS

reviews over the remainder of this year and through all of 2007, EPA will be conducting the

reviews of the $NO_2$ and $SO_2$ NAAQS in tandem.  Although Plaintiffs attempt to downplay  the

burden that these multiple reviews will place on EPA, claiming that the range of deadlines before

the Agency staff dealing with the NAAQS minimizes any "bottlenecks" at the Agency, and that

"different personnel carry out the review process for different pollutants . . . except at the highest

levels of Agency management," Pltf Memo at 15, Plaintiffs'  view of how NAAQS reviews are

---

[17]     While not identical, Plaintiffs' and EPA's proposed schedules are generally similar on the time periods between completion of the science assessment and issuance of the Notice of Proposed Rulemaking.  This similarity highlights the basic problem with Plaintiffs' schedule:  it inappropriately allots too little time for either the science assessment or the public rulemaking process.

carried out is inaccurate. Separate personnel do *not* carry out the review process for different pollutants. Over the next five years, very few, if any of the highly skilled professional staff and managers working on the review of the NAAQS will work on only one standard. Page Decl. ¶ 70; Declaration of Dr. Lester Grant, Director of the National Center for Environmental Assessment, RTP Division, Office of Research and Development, EPA, ¶ 2 (May 30, 2006) (Exhibit 3) ("Grant Decl."). EPA agrees with Plaintiffs that Congress envisioned that EPA would need to conduct more than one and perhaps several NAAQS reviews at the same time. That is one reason, however, Congress provided up to five years time to complete a review. Contrary to this, Plaintiffs seek a schedule that is much shorter than the five years Congress specified and much shorter than the time period EPA has shown is needed.

EPA is committed to carrying out and completing reviews and making appropriate revisions of the air quality criteria and NAAQS for these Pollutants as rapidly as possible, consistent with satisfying applicable legal requirements and a sound and scientifically supportable decision. Despite Plaintiffs' assertions to the contrary, however, the Agency is limited in its ability to shift resources from other programs to the NAAQS review over the next few years. EPA cannot simply transfer the scientists, engineers, or policy analysts working on other matters to work on the NAAQS reviews; NAAQS reviews require the work of highly trained specialists in toxicology, epidemiology, and ecology. Thus, although Plaintiffs suggest that EPA staff working on other regulatory matters could be devoted to review of the NAAQS, *see* Pltf. Memo at 16-17, this simply is not the case.

Finally, Plaintiffs claim that it is necessary to accelerate these reviews is based on unfounded allegations regarding the ongoing "severe and widespread harm that these pollutants inflict." Although EPA does not dispute that elevated concentrations of these Pollutants can

27

cause adverse health and environmental effects, Plaintiffs consistently oversimplify the scientific evidence regarding these Pollutants. Grant Decl. ¶ 11. Similarly, Plaintiffs' argument ignores the fact that although EPA has failed to conduct the required reviews for these Pollutants, there has been a substantial decline in the concentration of these pollutants in the ambient air since 1996, largely as a result of EPA's regulatory efforts, and that EPA has recently issued new regulations that will result in yet further reductions in emissions of these Pollutants.[18] Page Decl. ¶¶ 40-43, 47-49. Thus, although EPA has failed to meet its obligation to review the NAAQS for these pollutants since 1996, EPA has taken a number of steps that will have the effect of significantly reducing exposures to $NO_2$ and $SO_2$.

## CONCLUSION

The Court should grant summary judgment to EPA and order that the reviews at issue be completed in accord with EPA's proposed schedule.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

Environment and Natural Resources Division

---

[18]    EPA's most recent regulatory efforts to reduce emissions of these pollutants were taken to help States attain the NAAQS for fine particle pollution and ozone. $NO_x$ plays a major role in the formation of ground-level ozone and fine particle pollution, both of which also adversely affect human health and welfare; $SO_2$ also is a major precursor to fine particle pollution. Page Decl. ¶¶ 42 and 49.

/s/ EILEEN T. MCDONOUGH

Environmental Defense Section

U.S. Department of Justice

P.O. Box 23986

Washington, D.C. 20026-3986

(202) 514-3126

eileen.mcdonough@usdoj.gov

Of Counsel:

John Hannon

Lea Anderson

Air and Radiation Law Office

Office of General Counsel

U.S. Environmental Protection Agency

1200 Pennsylvania Ave., N.W.

Washington, D.C.  20460

Dated: May 31, 2006