# EXHIBIT 3

Declaration of Dr. Lester Grant, Director of the National Center for Environmental Assessment, RTP Division, Office of Research and Development, EPA, (May 30, 2006)

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN L. JOHNSON<br>Administrator,<br>United States Environmental<br>Protection Agency<br><br>Defendant. | )<br>)<br>)<br>)<br>)  Civil Action No. 05-1814 (JGP)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **DECLARATION OF DR. LESTER D. GRANT**

I, Lester D. Grant, Ph.D., under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge or on information contained in the records of the United States Environmental Protection Agency (EPA) or supplied to me by EPA employees under my supervision.

1. I have been the Director of the National Center for Environmental Assessment, RTP Division (NCEA-RTP), within EPA's Office of Research and Development (ORD) and EPA. I have served in that capacity since the creation of NCEA-RTP in a 1995 reorganization of ORD. Before that, I served from 1978 to 1995 as Director of EPA's Environmental Criteria and Assessment Office in Research Triangle Park, NC (ECAO-RTP), the predecessor organizational unit to NCEA-RTP. Chief among my responsibilities in these positions has been overseeing the

assessment of health and ecological effects of lead and other environmental agents in support of Federal standards and guidance, including national ambient air quality standards (NAAQS) established under section 109(d) of the Clean Air Act, 42 U.S.C. § 7409.

2. In this capacity, I am responsible for overseeing (a) the assessment of health and ecological effects of various environmental agents, especially air pollutants, in support of the development of Federal standards and guidance aimed at protecting human health and the environment from the effects of such agents; (b) the provision of scientific consultation and technical assistance to other U.S. Federal, State and local government agencies and internationally as well; and (c) the coordination and limited conduct of targeted research focused on highly important aspects of controversial issues related to assessments of substances by NCEA-RTP. I have been involved in planning, managing, and taking an active personal role in the scientific aspects of EPA's periodic review and, as appropriate, revision of air quality criteria and NAAQS for many years, including virtually every such review since establishment of the original Lead NAAQS in 1978. In addition to my supervisory role as Director of NCEA-RTP, NCEA-RTP has a number of professional staff working on each NAAQS review, including epidemiologists, toxicologists, and ecology specialists. Personnel from other divisions in OAR or ORD provide support in technical areas such air quality data analysis and modeling. As EPA will be conducting multiple NAAQS reviews concurrently over the next few years, the professional staff in NCEA-RTP will have responsibility for the science assessment of a number of NAAQS during this time. Both myself and NCEA-RTP professional staff also remain involved in the NAAQS process even after completion of the science assessment, providing scientific support and working closely with OAQPS during the policy assessment and regulatory

phases of each NAAQS review. I expect that very few, if any, of the NCEA-RTP professional staff will work on the review of only one NAAQS over the next five years.

3. I have also been involved for many years in scientific assessment efforts and other activities related to the health effects of nitrogen oxides ($NO_x$) and sulfur oxides ($SO_x$), and/or related particulate pollutants. These activities have included, for example, direction of the preparation of air quality criteria documents and/or coauthorship of criteria document materials evaluating the effects of such pollutants, and related consultative work in a variety of international contexts, including development of World Health Organization (WHO) Air Quality Guidelines for $NO_2$ and $SO_2$.

4. I have reviewed Plaintiffs' Statement of Material Facts Not In Genuine Dispute and make the following comments.

5. Plaintiffs observe that "$NO_x$ emissions are a precursor of ground-level ozone and particulate matter pollution." Plaintiffs' Opp. at 1. This is indeed true and is one of the complex issues underlying the assessment of effects related to exposure to ambient $NO_x$. One key consideration in evaluating epidemiologic study findings for both $NO_x$ and $SO_x$ will be assessing the role played by the individual pollutant – i.e., $NO_2$ or $SO_2$ – in the context of the ambient air pollution mixture. This issue is one that we have been grappling with in the reviews of the particulate matter and ozone standards. Since $NO_x$ are a precursor in the formation of both ozone and fine particles, concentrations of $NO_x$ can be highly correlated with concentrations of the other pollutants. The interpretation of study results is thus complicated by the relationship between $NO_x$ and the other pollutants. Similarly, $SO_2$ emissions contribute to the formation of ambient fine particles, and examination of evidence regarding health effects linked with ambient

3

$SO_2$ concentrations will include consideration of the impact of $SO_2$ exposures alone, or $SO_2$ as a marker for air pollution mixtures that include fine particle sulfates. Thus, as has been true for other criteria pollutants, in evaluating any epidemiologic associations reported between various health outcomes and $NO_2$ or $SO_2$, we will need to assess the extent to which the health outcomes are linked with those specific pollutants, or more closely linked with other covarying pollutants.

6. The plaintiffs repeatedly cite general statements from EPA documents, such as fact sheets or other public information materials, on the health effects linked with $NO_x$ and $SO_x$ as if these statements applied to any level of air pollution. For example, the plaintiffs quote from an EPA brochure on the potential health and environmental effects of $SO_2$. Plaintiff Opp. pp. 2-3. EPA has prepared a number of education materials to provide information to the public about the potential effects of exposure to air pollutants, including $NO_2$ and $SO_2$. However, the materials do not infer that such effects occur at all exposure levels, including very low exposure levels. These materials were prepared following the last review of the NAAQS and are intended to alert the U.S. public to potential effects of the pollutant, especially those individuals who might be particularly sensitive, not to imply that these effects are expected to occur at concentrations below the NAAQS levels. A fundamental component of the reviews of the standards for $NO_2$ and $SO_2$ will be assessment of whether effects may be occurring at low ambient (or near ambient) concentrations of those pollutants or their secondary atmospheric transformation products (such as nitrates or sulfates).

7. Plaintiffs use two references to support their statement that "This recent evidence indicates that $NO_2$ is causing adverse effects to human health . . . at levels allowed by the current $NO_2$ NAAQS." Plaintiff Opp. p. 2. One reference is a study reporting associations between

4

deaths due to Sudden Infant Death Syndrome (SIDS) and both $NO_2$ and $SO_2$ in Canadian cities with low levels of both pollutants. See Dales et al. Pediatrics 2004: 113: 628-631. For each criteria pollutant, there have often been hundreds to thousands of studies that have assessed health or ecological effects. No single study provides the basis for a determination of causality for a given effect. In the discussion of their results, Dales and colleagues observe that other studies have reported associations between SIDS and airborne particulate matter ($PM_{10}$) but not the gaseous pollutants (p. 630). The second reference is a policy statement by the Committee on Environmental Health of the American Academy of Pediatrics. See Pediatrics 2004: 113:1699-1707. In discussing the results of health recent studies, the committee cites two new controlled human exposure studies that suggest that $NO_2$ exposure at levels below the NAAQS can result allergic effects, but conclude that "[c]onfirmation of these studies is needed" (p. 1701). The committee also cites the results of several epidemiologic studies that suggest effects on the respiratory system, though the $NO_2$ levels in those studies are not mentioned, thus it is not clear whether these studies would suggest that effect are occurring at levels below the NAAQS. I note that the committee concludes their discussion of nitrogen dioxide with the following paragraph:

> The epidemiologic studies of health effects associated with nitrogen dioxide should be interpreted with caution. Increased levels of ambient nitrogen dioxide may be a marker for exposure to traffic emissions or other combustion-related pollution. An independent role of nitrogen dioxide cannot be clearly established because of the high covariation between ambient nitrogen dioxide and other pollutants. Nonetheless, these studies illustrate that adverse respiratory tract effects are seen in urban areas where traffic is a dominant source of pollution. (P. 1701)

This is indeed one of the major challenges that EPA will face in assessing the new health evidence regarding exposure to ambient $NO_2$ and other $NO_x$ compounds. In a preliminary review of the literature, EPA has indentified several hundred new studies that have assessed

5

relationships between health effects and exposure to ambient $NO_x$, including the study by Dales and colleagues that is cited by the Plaintiffs. In its assessment of the science, EPA will summarize and integrate the evidence from all relevant studies. While an individual study may suggest that effects occur at low levels, the science assessment will evaluate the evidence from the full body of studies, and take into consideration key issues such as the degree to which effects are attributable to $NO_x$ exposure *per se*, or to other pollutants that covary with $NO_x$.

8. Plaintiffs use an EPA rulemaking notice as the sole reference in alleging that "This recent evidence indicates that $NO_2$ is causing adverse effects to . . . welfare effects at levels allowed by the current $NO_2$ NAAQS. " Plaintiff Opp. p. 2. This particular *Federal Register* notice is proposing options for $NO_2$ increments for the program to prevent significant deterioration (PSD) of air quality. See 70 FR 8880. This notice does not represent an evaluation of whether the existing NAAQS for $NO_2$ is adequately protecting against environmental effects, but instead is generally discussing health and welfare effects to support the continued need for regulation of $NO_2$ in the PSD program. In the section highlighted by the plaintiffs, the FR notice discusses environmental effects associated with airborne $NO_x$, primarily citing the conclusions of the 1993 Criteria Document and 1995 Staff Paper from the previous review of the $NO_x$ NAAQS, but also using as references a few more recent studies. From its preliminary assessment of the new literature, EPA recognizes that hundreds of new studies, perhaps as many as a thousand, have been published since the previous Criteria Document that have some bearing on environmental effects of $NO_x$ and $SO_x$. As is the case in evaluation of the health evidence, it is not appropriate to conclude that "$NO_2$ is causing adverse effects" on the basis of results from an individual study.

9. Plaintiffs allege that "recent evidence indicates that $SO_2$ is causing adverse effects to human health at levels allowed by the current $SO_2$ NAAQS," citing a report that was prepared for California's Office of Environmental Health Hazard Assessment. Plaintiffs Opp p. 3. In reviewing this report, I note that the authors cite results from a few controlled human exposure studies that used exposure levels generally higher than the NAAQS for $SO_2$, and one recent study that reported "very diverse" responses with 10-minute exposures to 0.5 ppm $SO_x$ in adult asthmatics. See Trenga et al. 1999. Occup Environ Med 56:544-547. A number of epidemiologic studies are reviewed, but as observed by the authors: "However, the effects of $SO_2$ are very difficult to determine because $SO_2$ is often associated with PM and other pollutants." See Koenig J and Mar T 2000. Sulfur Dioxide: Evaluation of Current California Air Quality Standards with Respect to Children, p. 3 (http://www.oehha.ca.gov/air/pdf/oehhaso2.pdf). The studies included in this review will almost certainly be included in EPA's science assessment for $SO_x$; while this report may provide suggestive evidence, I believe that it is far too limited to allow conclusions to be drawn regarding effects of $SO_2$ exposure at low levels.

10. Plaintiffs state "Moreover, EPA has known for years that $SO_2$ pollution causes adverse impacts to sensitive plants at levels that are below the current $SO_2$ NAAQS." Plaintiff Opp. pp. 3-4. The reference for this statement is a report prepared for the EPA in 1980 to support determination of *de minimus* limits for the PSD program; it includes data and figures from the 1973 Criteria Document for $SO_x$ that served as a basis for an early review of the NAAQS. While it may refer to results of a screening tool that indicate that there are effects on certain plants at levels below the secondary NAAQS, this is clearly not a comprehensive review of the literature or a decision on whether or not to revise the secondary standard for $SO_x$. EPA

7

has certainly recognized that both $SO_x$ and $NO_x$ contribute to effects on the environment; the more difficult task is integrating and evaluating the body of evidence on the effects reported at various pollution levels, and the extent to which those effects constitute adverse impacts on the environment.

11. Thus, I believe that the plaintiff's statements regarding the health and environmental effects of both $NO_x$ and $SO_x$ have consistently oversimplified the scientific evidence regarding these pollutants. EPA has clearly recognized that both $NO_2$ and $SO_2$ are associated with health effects and has set primary NAAQS as a result. However, the likelihood that such effects occur at ambient or near-ambient air concentrations and the medical or public health significance of the effects, if they do occur, are among the complex issues that the current review will need to address and resolve. Similarly, EPA has recognized that $NO_x$ and $SO_x$ pollution can result in ecological and welfare effects, and set secondary NAAQS for both pollutants. However, the assessment of the evidence on effects that may occur at concentrations below the current NAAQS levels, and the ecological significance of any such effects, will be complex, as described in the Declaration by Steven D. Page.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 30th day of May, 2006, at Research Triangle Park, N.C.

*Lester D. Grant*
LESTER D. GRANT, PH.D.
Director, National Center for Environmental
Assessment, RTP Division
Office of Research and Development
United States Environmental
    Protection Agency