# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., | ) ) ) | Civ. No. 05-1814 (JGP) |
| Plaintiffs, | ) ) | DECLARATION OF DAVID HOWEKAMP OF JULY 7, 2006 |
| v. | ) ) | |
| STEPHEN L. JOHNSON Administrator United States Environmental Protection Agency | ) ) ) ) | |
| Defendant. | ) ) ) | |

I, David Howekamp, declare that the following statements are true and correct to the best of my knowledge, information and belief, and are based on my personal knowledge.

1. I am an environmental consultant specializing in air quality management. I practice as both an independent consultant as well as an affiliate of LECG, LLC, a firm specializing in providing expert witness testimony. In my practice I have provided expert advice to companies, governmental agencies, nongovernmental organizations and citizen groups. Much of my practice involves complex issues regarding the impact and control of nitrogen oxides and sulfur oxides pollution. I have also provided expert advice to organizations regarding appropriate rulemaking schedules for Clean Air Act requirements contested in Federal District Court. I have a Master's Degree in Business Administration and a Bachelor's Degree in Mechanical Engineering from the University of California at Berkeley. My CV is attached hereto as Attachment A.

2. Prior to becoming an environmental consultant in April 2000, I was a career employee at the U.S. Environmental Protection Agency for 31 years. From 1982 to 2000, I was

the Director of the Air Division for EPA's Region 9 office in San Francisco. In this position, I was the principal advisor to the Regional Administrator on policy, political and technical issues involving air quality management. I managed a budget of over $40 million and directed a staff of 120 scientists, engineers and planners in implementing the requirements of the Clean Air Act. I was responsible for communicating to the public the health and environmental effects of air pollutants, including nitrogen oxides (NOx) and sulfur oxides (SOx), so I developed a personal knowledge of the information contained in the criteria documents for the National Ambient Air Quality Standards (NAAQS). I was responsible for the approval of State Implementation Plans prepared for demonstrating attainment of the SO2 and NO2 NAAQS, so I have first-hand knowledge of the technical and policy considerations in matters concerning the SO2 and NO2 NAAQS. I was also personally responsible for the preparation of comprehensive Federal Implementation Plans for other NAAQS so I have first-hand experience with the management demands and resource requirements for producing complex Federal rulemakings. These rulemakings established national precedents requiring the involvement and approval of EPA headquarters. I also have extensive experience in establishing or negotiating rulemaking schedules since most of the rulemakings produced by my division were performed as a result of court orders or settlement agreements.

    3. I have reviewed the May 31, 2006 declaration of Mr. Stephen D. Page that proposes that EPA will complete its reviews of the primary and secondary NAAQS for NO2 and SO2 with signatures of notices of final action for the NO2 primary standard by May 21, 2010, the SO2 primary standard by July 30, 2010 and the secondary standards for both NO2 and SO2 by November 19, 2010 (Paragraph 60, Page Declaration). Detailed schedules laying out the time estimates and dates for preparation of incremental products which lead to the notices of final

action are presented as Attachment A to the Page Declaration. These schedules, as proposed by EPA, can be greatly shortened.

4. As noted in Mr. Page's declaration (Paragraph 26), EPA has recently completed an evaluation of the NAAQS review process and intends to use the results of that evaluation to comply with the requirement for the review of the NO2 and SO2 NAAQS. EPA will now divide the assessment phase into four distinct elements covering planning, science assessment, risk and exposure assessment, and policy assessment. According to Mr. Page's declaration, the science assessment will more or less equate to the preparation of the criteria document in EPA's existing process, the risk and exposure assessment and policy assessment will more or less functionally equate to the preparation of the staff paper in the existing process and the individual planning functions in the criteria document preparation and staff paper preparation phases will be pulled out and done together at the front end of the new process. The rulemaking portion in the revised process will essentially be the same as that in the existing process. In my analysis of Mr. Page's declaration, I have used these definitions provided by EPA to be able to compare the EPA proposed schedule to past schedules which used the elements of the existing process to structure schedules. Since EPA has prepared individual schedules for the NO2 primary, SO2 primary and NO2/SO2 secondary standards, my analysis and recommendations are presented in a likewise fashion.

    5. **NO2 Review: Primary Standard**

*Planning:*

    EPA has known since June 1, 2005 that the Plaintiffs intended to sue to enforce the agency's nondiscretionary duty to review and revise the air quality criteria for NOx and revise the NAAQS for NO2 as may be appropriate. Because the duty is nondiscretionary,

3

EPA should have used the past 13 months to conduct the detailed planning needed to comply with the requirement, knowing the only question to be decided by the court is the exact schedule for completion of the task. In fact, the detailed schedule proposed by EPA calls for the planning process to have begun about November 1, 2005, a draft plan is to be released by June 15, 2006 and conclude with a final plan about August 15, 2006. According to the Page Declaration (Paragraph 54) this task is nearing completion on schedule.

*Science Assessment*:

**Prepare science assessment workshop materials**: The EPA proposed schedule includes a 6-1/2 month period for preparation of workshop materials beginning about June 15, 2006. There was no need to wait for June 15 of this year to start this preparation. As with the planning process, EPA should have used the past 13 months to begin preparation of the workshop materials in parallel with preparation of the planning document. The formal "call for information" from the public required information to be submitted to EPA by no later than January 31, 2006 giving EPA the inputs needed for the initial phases of preparing the workshop materials. Furthermore, the Page Declaration (Paragraph 50) states that upon receiving notice that the plaintiffs intended to initiate this lawsuit, "…. NCEA began assessing the likely nature and scope of the relevant scientific assessments in light of trends in research since the last reviews; identifying key scientific questions and issues that will need to be addressed in the science assessment; and identifying external experts who would be qualified to serve as authors or reviewers in the development of science assessments or as participants in peer review workshops." Therefore, I believe an expeditious, but realistic, timeframe for completion of the

4

workshop materials is 3-1/2 months. In reality, depending on when a court order is issued, this would provide at least 8 to 9 months for their preparation from when information was received from the public "call" on January 31 for NOx. The 3-1/2 month period would also overlap the latter part of the nearly complete planning period, allowing that process to inform and structure the workshop materials preparation with regard to key policy-relevant issues.

*Peer review workshops*: The EPA proposed schedule includes a 3-month period for conducting the workshops (December 1, 2006 through March 1, 2007). Based on EPA's experience in its review of the Lead NAAQS in which multiple workshops were held in a 1-month period (Federal Register, March 8, 2006), the NO2 workshop timeframe could also be shortened to occur over a one-month period. Therefore, an expeditious, but realistic, schedule would be to complete the workshops 1 month after the 3-1/2 month period for preparation of the workshop materials

*Prepare two draft science assessment documents and a final science assessment:* The EPA proposed schedule provides a total of 16-1/2 months for its preparation process. EPA has chosen to include two drafts instead of one, to "enhance the soundness of EPA's scientific review" (Page Declaration, Paragraph 64). This is a sound idea if it doesn't delay the overall expeditious final action on the NAAQS review. EPA's schedule includes a 5 month preparation period for the first draft, followed by a 3 month comment period, then a 4 month preparation period for the second draft, followed by a 2-1/2 comment period. Because the next step in the critical path for the overall NAAQS review (preparation of the risk assessment document) begins with the completion of the comment period of the first draft of the science assessment, it would make sense to

5

allocate the shorter periods to the first draft and the longer periods to the second draft. In this way the overall amount of time devoted to preparing a quality science assessment remains the same, but the overall NAAQS schedule is expedited. Therefore, a critical interim date in the schedule is to require completion of the comment period on the first draft at 11 months, 6-1/2 months after completion of the peer-review workshops. Devoting 4 months of that to drafting the document and 2-1/2 months for public and CASAC review is reasonable. In this scenario, the total time period allocated for preparation of both drafts and the final science assessment (16.5 months) could remain as proposed by EPA without jeopardizing an overall expeditious schedule for the review.

*Exposure/Risk Assessment and Policy Assessment:*

**Prepare Exposure/Risk Assessment Methodology**: As in the EPA proposed schedule, this process should begin with the completion of the Science Assessment Peer Review Workshops (at 4-1/2 months) and end at the same time as the comment period on first draft science assessment (at 11 months).

**Prepare draft and Final Exposure/Risk Assessment and Policy Assessment**: As noted above, this process will begin with completion of the comment period on the first draft science assessment. The EPA proposed schedule provides a total of 16 months for this process, of which 11-1/2 months elapse between completion of the first draft of the exposure/risk assessment and completion of the final policy assessment. I believe this time should be shortened slightly to expedite the overall schedule. Based on EPA's schedule for its review of the Lead NAAQS (Federal Register, March 8, 2006), approximately 10 months elapse between completion of the first draft of the staff paper and completion of the final staff paper. As noted earlier, the combined exposure/risk

6

assessment and policy assessment in the new EPA process are functionally equivalent to the staff paper in the old process, so it would appear that the 11.5-month period for the NO2 standard could likewise be shortened by 1-1/2 months. Therefore, the final PA should be completed 14.5 months after completion of the comment period on the first draft science assessment.

*Rulemaking*:

The EPA proposed schedule provides a total of 15 months for completion of the final rulemaking action. This should be shortened substantially to reflect the timeframe of 11 months for the rulemaking process established by the U.S. District Court in ordering EPA to complete the review of the lead NAAQS (Federal Register, March 8, 2006). Based on my experience in preparing complex Federal rulemakings, I believe this is an aggressive but certainly achievable time frame. Much procedural and legal work can be done in parallel to the technical work preparing the exposure/risk assessment and policy assessment, so that the preparation of the entire rulemaking package need not wait for the final PA document.

      6.    *Recommended Schedule for NO2 Review - Primary Standard*:

Since the planning for the review has been nearly completed by EPA, my recommended schedule would allow a total of 36-1/2 months for EPA to prepare the assessments and sign the final rulemaking for the NO2 standard. Interim deadlines could also be established consistent with my above analysis.

### 7. SO2 Review: Primary Standard

In terms of elapsed time, the schedule proposed by EPA for the review of the SO2 primary standard is exactly the same as its proposal for the NO2 primary standard except for the amount of time allotted to planning.  Therefore, the above analysis for NO2 also applies to SO2.  In addition, the EPA schedule would basically stagger the start of the science assessment process for SO2 two months after the start of the NO2 science assessment process to enhance efficiency.  I concur that this offset is appropriate to efficiently schedule work, public reviews and internal policy deliberations by avoiding overlapping or conflicting schedules.  Therefore, my recommended schedule would allow a total of 38-1/2 months for EPA to prepare the science assessment, risk/exposure assessment, and policy assessment and sign the final rulemaking for the SO2 standard.  The extra two months in this schedule would provide the time necessary for EPA to complete the planning process for SO2, which parallels the EPA proposed schedule.  This schedule, as with NO2, includes an expeditious, but realistic, timeframe for completion of the workshop materials in 3-1/2 months.  It should be noted that EPA issued the formal "call for information" for SO2 five months later than its call for NO2.  Information was required to be submitted to EPA by no later than June 15, 2006. So in this case, depending on when a court order is issued, my proposed schedule would provide approximately 6 months for their preparation from when information was received from the public "call" on June 15, 2006.  Also, as with NO2, the Page Declaration clearly states that EPA initiated several steps to begin the science assessment for SO2 upon receiving the notice of intent to sue on November 15, 2005.  Again the 3-1/2 month period would also overlap the planning period, allowing that process to inform and structure the workshop materials preparation with regard to key policy-relevant issues.  In addition, EPA could choose to start to prepare the workshop materials at the same

time as the planning process, gaining another two months.

8.  *Recommended Schedule for SO2 Review - Primary Standard:*

My recommended schedule would allow a total of 38-1/2 months for EPA to prepare the assessments and sign the final rulemaking for the SO2 standard. Interim deadlines could also be established consistent with my above analysis.

9.  **NO2/SO2 Review: Secondary Standards**

In terms of elapsed time, the schedule proposed by EPA for the review of the secondary standards is about 4 months longer than that proposed for the SO2 primary standard review. This is apparently due to delaying the start of the science assessment by 2 months and then extending the completion of the three assessment documents by 2 months.  Since the planning is already underway, and the public call information has already been received, there is no obvious reason for delaying the start of the science assessment process.  The Page Declaration (Paragraph 59) makes a case for the additional two months for the assessment document completion, stating that the information on the environmental effects for both pollutants is intertwined in complex ways and the review will be more challenging than for the health effects of the primary standards.  While no specific evidence to support the claim is presented, based on my experience, I would agree that the extra two months is warranted.   Other than for these differences, my analysis for the NO2 and SO2 primary standards regarding the rest of the schedule applies here as well.

10. ***Recommended Schedule for NO2/SO2 Review: Secondary Standards:***

Based on the above, my recommended schedule would allow a total of 40-1/2 months for EPA to prepare the assessments and sign the final rulemaking for the NO2/SO2 secondary standards. Interim deadlines could also be established consistent with my above analysis.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


|     July 7, 2006     |     /s/ DAVID HOWEKAMP     |
| --- | --- |
| Dated | David Howekamp |

# ATTACHMENT A

**David P. Howekamp**
4191 Coralee Lane
Lafayette, CA 94549
925-284-8045
email: howekamp@gmail.com

**ENVIRONMENTAL CONSULTANT**
2000-present

Provide expert witness declarations for several environmental organizations regarding lawsuits against the Environmental Protection Agency.

Provide expert witness analysis of damage claims for a state attorney general in lawsuit regarding motor vehicle inspection program.

Provide expert witness analysis of Clean Air Act civil penalties for alleged violations by a major glass manufacturer and by a major wood products manufacturer.

Act as expert advisor to the Port Community Advisory Committee at the Port of Los Angeles providing advice and recommendations to the citizens regarding environmental studies and impacts and controls for port expansion projects.

Participate on consultant team that analyzed the possibility of providing shore power for berthed ships at the Port of Long Beach.

Prepare a voluntary Clean Air Plan for the cities of the Tri-Valley Area of Alameda County.

Provide expert witness analysis of Clean Air Act permitting requirements for a construction firm in a law suit against a major petroleum refiner.

Provide expert witness analysis of Clean Air Act fuel additive registration requirements in a law suit against a major petroleum refiner.

Provide policy and regulatory advice to several electric utility clients and sugar refinery regarding air quality issues affecting their industry

Provide expert witness analysis of alleged Clean Air Act criminal violations for a major petroleum refiner.

Analyze future toxic tort, groundwater/soil contamination and other environmental remediation costs for major national clients, including mineral extraction, waste disposal and airline companies.

**ENVIRONMENTAL PROTECTION AGENCY**
**REGION 9, SAN FRANCISCO, CA**

**DIRECTOR, AIR DIVISION**
1982-2000

Primary responsibility to oversee implementation of the Clean Air Act and radiation programs in California, Arizona, Nevada and Hawaii.  For seven years, also responsible for pesticides and toxic substances programs.

Principal advisor to the Regional Administrator on policy, political and technical issues involving air quality management and radiation.  As member of the senior management team, provided advice on broader, cross-media issues involving water pollution, toxic chemicals and hazardous waste.

Facilitate or negotiate settlements between agencies, industries and public interest groups.

Interpret applicable state and local laws and regulations and integrate with Federal laws.  Work closely with elected officials in state legislatures and on local air district boards to adopt needed laws, regulations and measures.

Manage a budget of over $40 million and a staff of 120 scientists, engineers and planners to accomplish the following program activities:

- initiating Federal administrative or judicial enforcement against violating sources of air pollution
- reviewing project proposals and issuing Federal air quality permits to major industrial sources
- developing and approving State Air Quality Management Plans
- developing state motor vehicle emissions testing programs and other mobile source control programs
- providing program grants to state/local air management agencies
- delegation to, support and oversight of state/local air quality programs
- collection and quality assurance of ambient and source emission air quality data for planning or compliance
- implementation of public information and outreach programs
- developing emission limiting rules and regulations for source categories
- development of emissions trading and other economic incentive programs
- negotiation and implementation of international border agreements with the Government of Mexico

**ENVIRONMENTAL PROTECTION AGENCY**
**REGION 9, SAN FRANCISCO, CA**

Prior to 1982, held progressively more responsible positions in the following areas:

- Managing development and approval of Air Quality Management Plans.

- Managing all permit programs in Region 9 including permits for air quality, wastewater discharge, dredge and fill, hazardous waste, PCB disposal and ocean dumping

- Developing emission inventories, ambient data and control strategies.

- Conducting mechanical engineering research and development of control technologies for emissions from stationary combustion sources.

**PACIFIC GAS AND ELECTRIC CO.**
**SAN FRANCISCO, CA**

   As staff engineer, measured meteorological phenomena to determine the diffusion patterns, possible temperature inversions, and other atmospheric characteristics of the future Diablo Canyon Power Plant.


**ORGANIZATIONS**

   Air and Waste Management Association
   Lafayette-Moraga Youth Association Board


**AWARDS**

   Presidential Rank Award of Meritorious Executive
      Awarded by the President of the United States
   Environmental Protection Agency Bronze, Silver and Gold Medals
   National Merit Scholar


**EDUCATION**

   Master of Business Administration
   University of California, Berkeley

   BS, Mechanical Engineering
   University of California, Berkeley