# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| | ) |
| CENTER FOR BIOLOGICAL DIVERSITY | ) |
| | ) Civ. No. 05-1814 (JGP) |
| et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STEPHEN L. JOHNSON | ) |
| Administrator | ) |
| United States Environmental Protection Agency | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## DECLARATION OF ROBERT UKEILEY IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1.

My name is Robert Ukeiley.  I am counsel for Plaintiffs in the above captioned case.

2.

I am over the age of 18 years.  I have personal knowledge of the facts stated herein and they are true and correct to the best of my knowledge, information and belief.

3.

Attached as Attachment A is an accurate copy of Dr. George T. Wolff's Comments on the NAAQS Review Process dated March 3, 2006.  The comments were attached to a March 16, 2006 memorandum entitled "Clean Air Scientific Advisory Committee Members' Comments on the Agency's Process for Establishing National Ambient Air Quality Standards," attributed to Vanessa T. Vu, Staff Director of the U.S. Environmental Protection Agency ("EPA") Science

1

Advisory Board and addressed to William Wehrum, Assistant Administrator for Air and

Radiation and George Gray, Assistant Administrator for Research and Development.  I obtained

this Memorandum from the U.S. EPA Scientific Advisory Board website.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

 July 10, 2006                           /s/ ROBERT UKEILEY
        Date                                         Robert Ukeiley

# ATTACHMENT A

# Dr. George T. Wolff

## Comments on the NAAQS Review Process

### George T. Wolff

### March 3, 2006

I welcome the opportunity to provide comments to Mr. Wehrum and Dr. Gray on the NAAQS review process. I have been an active member of the SAB for the past twenty-one years, and participated on numerous SAB committees. During that time, I also participated in seven NAAQS reviews and was chair of CASAC for four of them. The lengths of the reviews ranged from three years for CO, $NO_2$, $SO_2$, and PM (1994-1996 review) to six years for the recent PM review.

While I will address Mr. Wehrum and Dr. Gray's specific questions, I would first like to discuss some historical aspects of the reviews that I believe have relevance to the review process. The previous PM review was completed within three years (1994-1996) under a court-ordered deadline. So it is possible to complete a review and come to closure within a three year period. However, a consensus was not reached in that review on the concentration level of the standards. I refer you to the table (which I have appended) in the June 13, 1996 closure letter (EPA-SAB-CASAC-LTR-96-008). Individual Panelists' recommendations for the annual $PM_{2.5}$ standard ranged from 15 to 30 $\mu g/m^3$ and for the 24-hour standard from 20 to 75 $\mu g/m^3$. The closure letter explains this "diversity of opinion":

> "The diversity of opinion also reflects the many unanswered questions and uncertainties associated with establishing causality of the association between $PM_{2.5}$ and mortality. The Panel members who recommended the most stringent $PM_{2.5}$ NAAQS, similar to the lower part of the ranges recommended by the Staff, did so because they concluded that the consistency and coherence of the epidemiology studies made a compelling case for causality of this association. However, the remaining Panel members were influenced, to varying degrees by the many unanswered questions and uncertainties regarding the issue of causality. The concerns include: exposure misclassification, measurement error, the influence of confounders, the shape of the dose-response function, the use of a national $PM_{2.5}/PM_{10}$ ratio to estimate local $PM_{2.5}$ concentrations, the fraction of the daily mortality that is advanced by a few days because of pollution, the lack of an understanding of toxicological mechanisms, and the existence of possible alternative explanations."

In contrast to the 1994-1996 review, the 1999-2005 review took 6 years, was not allowed to seek closure on the documents, but achieved a majority opinion in support of lowering both the annual and 24-hour standards. There were some important differences in the process that lead to the different outcomes.

There were two important reasons why the review took so much longer. The first was the GAM software issue which was beyond the control of the Agency or the Panel, and this added at least a year onto the process. A second more important reason is that the documents (the Criteria Document (CD) and Staff Paper (SP)) given to the Panel to review were far inferior to the ones

given to the previous panel.  In the 1994-96 review, the Agency acknowledged in the documents the numerous and large uncertainties that caused CASAC's "diversity of opinion," and as a result produced more objective documents.  Even though some members disagreed with the Agency's interpretation of the data and EPA's ultimate recommendations, they approved of the documents, because they contained relatively balanced discussions of the uncertainties.

The recent review began with the Agency attempting to minimize the uncertainties by selectively citing new studies (in whole or in part) that supported their 1997 decision and ignoring other studies (or other results in the cited studies) or rationalizing results they did not like away.  This is the main reason why the review took so long.  Drafts were sent back for revisions not for significant technical errors but to remove biases and achieve more balance.  Each subsequent draft was more balanced, but numerous biases still remained in the final documents.  A closure requirement could have further reduced the biases.  I say more on the closure issue later.

A second significant difference between the reviews is the composition of the Panel members.  In the 1994-96 review, there were a number of  Panel members who were skeptical that the epidemiology studies demonstrated cause and effect including one biostatistician and one epidemiologist who were not authors of the studies that found statistical links between PM and health endpoints.  As a result, the Panel expressed "a diversity of opinion."

When the new Panel was formed, most of the Panel members who supported a causal role in 1996 were invited back to be on the new panel.  Most of the skeptics were not.  Instead they were replaced by individuals that, on the balance, were more supportive of the Agency's position.  In fact, by the time the Panel concluded the review, seven out of 22 members had been authors of papers that purport causality.  No epidemiologist or statistician who questioned causality was a member of the Panel.   This lack of balance on the Panel predetermined the outcome of the review.

Timeliness of the Review Process

As indicated above, many of the previous reviews were completed in a three year time-frame, which I consider to be timely.  However, the process can still be improved.  The limiting factor here is the quality of the documents.  Efforts must be made to produce objective, unbiased documents.  Brevity needs to be a goal.  There has been much discussion over the years over how the CD, in particular, needs to be shorter.  A template needs to be developed and followed that stresses brevity and objectivity and maximizes the use of tabular summaries of the studies.

The recent decision by the Agency to eliminate the need for CASAC closure will shorten the process, but, in my opinion, was a bad decision, and I fear that quality will suffer.  The iterative review process leading to closure gave the Agency incentive to produce a document that CASAC would approve.  Removing that incentive could lead to inferior products.

A word about public comments – Over the years there have been numerous excellent scientific comments produced by various organizations.  Unfortunately, they typically arrive a day or two before the CASAC meeting, which gives the members insufficient time to digest them.  I suggest that there be a cutoff date of ten days to two weeks before the meeting.  As of now, relevant public comments on the CD and SP go into a black hole and are only addressed if EPA wants to

or a CASAC member or two push for it.  Some Agency response to the public comment documents should be prepared and provided to CASAC.

Consideration of the Most Recent Available Science

The present PM review represents the extreme because of the length of the review.  The cutoff date was adhered to with the understanding that exceptions would be made if we all agreed that a new study was exceptionally important, and, of course, we had to wait for the GAM re-analysis studies.  Aside from the GAM re-analyses studies, there were several additional papers considered, but EPA only included those supportive of their position and excluded others that members of the Panel suggested.  Thus, there is a need for explicit criteria as to which studies qualify as "exceptionally important."

Distinctions between Science and Policy Judgments

The selection of a particular level for a standard is a policy judgment.  CASAC's job is to insure that the range, form and averaging time recommended in the Staff Paper have a scientific basis.  In questioning the recommendations in the January 17, 2006 NPRM, CASAC has clearly overstepped their boundaries and ventured into the policy arena.

Identifying, Characterizing, Quantifying, and Communicating Uncertainties in Scientific Information

The Agency has not done an adequate job here.  In the PM review, only the statistical uncertainties were considered.  The Agency completely ignored the larger uncertainties associated with various assumptions made by individual investigators including, but not limited to, the selection of the appropriate model, choice of temporal smoothing functions, control of confounders including meteorological parameters, adequacy of exposure metrics, selection of lag structures etc.  It is not that the Agency is unaware of these uncertainties; they just choose to ignore them in the risk assessment.  When the GAM re-analyses were being conducted, some of the investigators conducted sensitivity analysis by varying some of these assumptions within plausible limits. They found that they got a spectrum of results, both positive and negative.  This led the HEI Special Panel of their Review Committee to write in their commentary:

> "Neither the appropriate degree of control for time in these time-series analyses, nor the appropriate specification of the effects of weather, has been determined.  This awareness introduces an element of uncertainty into the time-series studies that has not been widely appreciated previously."

To insure that such uncertainties are incorporated into the Agency's SOP will require high level intervention from senior EPA management and the selection of individuals to CASAC who have an appreciation of the importance and significance of these uncertainties.

**From June 13, 1996 Closure Letter (EPA-SAB-CASAC-LTR-96-008)**

# Summary of CASAC Panel Members Recommendations
### (all units $\mu g/m^3$)

| | | $PM_{2.5}$ 24-hr | $PM_{2.5}$ Annual | $PM_{10}$ 24-hr | $PM_{10}$ Annual |
|---|---|---|---|---|---|
| Current NAAQS | | N/A | N/A | 150 | 50 |
| EPA Staff Recommendation | | 18 - 65 | 12.5 - 20 | 150[13] | 40 - 50 |
| | | | | | |
| **Name** | **Discipline** | | | | |
| Ayres | M.D. | yes[2] | yes[2] | 150 | 50 |
| Hopke | Atmos. Sci. | 20 - 50[3] | 20 - 30 | no | 40 -50[4] |
| Jacobson | Plant Biologist | yes[2] | yes[2] | 150 | 50 |
| Koutrakis | Atmos. Sci. | yes[2,5,6] | yes[2,5,6] | no | yes[4] |
| Larntz | Statistician | no | 25-30[7] | no | yes[2] |
| Legge | Plant Biologist | $\geq 75$ | no | 150 | 40 - 50 |
| Lippmann | Health Expert | 20 - 50[3] | 15 - 20 | no | 40 - 50 |
| Mauderly | Toxicologist | 50 | 20 | 150 | 50 |
| McClellan | Toxicologist | no[8] | no[8] | 150 | 50 |
| Menzel | Toxicologist | no | no | 150 | 50 |
| Middleton | Atmos. Sci. | yes[2,3,12] | yes[2,5] | 150[3,13] | 50 |
| Pierson | Atmos. Sci. | yes[2,9] | yes[2,9] | yes[4] | yes[4] |
| Price | Atmos. Sci./ State Official | yes[3,10] | yes[10] | no[3,4] | yes[4] |
| Shy | Epidemiologist | 20 - 30 | 15 - 20 | no | 50 |
| Samet[1] | Epidemiologist | yes[2,11] | no | 150 | yes[2] |
| Seigneur | Atmos. Sci. | yes[3,5] | no | 150[13] | 50 |
| Speizer[1] | Epidemiologist | 20 - 50 | no | no | 40 - 50 |
| Stolwijk | Epidemiologist | 75[7] | 25-30[7] | 150 | 50 |
| Utell | M.D. | $\geq 65$ | no | 150 | 50 |
| White | Atmos. Sci. | no | 20 | 150 | 50 |
| Wolff | Atmos. Sci. | $\geq 75$[3,7] | no | 150[3] | 50 |

[1] not present at meeting; recommendations based on written comments
[2] declined to select a value or range
[3] recommends a more robust 24-hr. form
[4] prefers a $PM_{10-2.5}$ standard rather than a $PM_{10}$ standard
[5] concerned upper range is too low based on national $PM_{2.5}/PM_{10}$ ratio
[6] leans towards high end of Staff recommended range
[7] desires equivalent stringency as present $PM_{10}$ standards
[8] if EPA decides a $PM_{2.5}$ NAAQS is required, the 24-hr. and annual standards should be 75 and 25 $\mu g/m^3$, respectively with a robust form
[9] yes, but decision not based on epidemiological studies

[10]low end of EPA's proposed range is inappropriate; desires levels selected to include areas for which there is broad public and technical agreement that they have $PM_{2.5}$ pollution problems

[11]only if EPA has confidence that reducing $PM_{2.5}$ will indeed reduce the components of particles responsible for their adverse effects

[12]concerned lower end of range is too close to background

[13]the annual standard may be sufficient; 24-hr level recommended if 24-hour standard retained